**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| TENARIS BAY CITY, INC.; MAVERICK TUBE CORPORATION; IPSCO TUBULARS INC.; TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION; AND SIDERCA S.A.I.C.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>UNITED STATES,<br><br>　　　　Defendant,<br><br>　　　　and<br><br>UNITED STATES STEEL CORPORATION; BORUSAN MANNESMANN PIPE U.S. INC.; PTC LIBERTY TUBULARS LLC; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC; AND WELDED TUBE,<br><br>　　　　Defendant-Intervenors. | Court No. 22-00343 |

**RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, Plaintiffs Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation, and Siderca S.A.I.C. (collectively, "Tenaris") hereby move for judgment on the agency record, requesting that the Court hold that the final determination issued by the U.S. Department of Commerce ("Commerce") in the antidumping duty ("AD") investigation involving oil country tubular goods ("OCTG") from Argentina is neither supported by substantial evidence nor in accordance with law. The contested determination was published in the *Federal Register* as *Oil Country Tubular Goods From Argentina: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative*

*Determination of Critical Circumstances*, 87 Fed. Reg. 59,054 (Sept. 29, 2022). The corresponding AD order was published in the *Federal Register* on November 21, 2022. *See Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation: Antidumping Duty Orders and Amended Final Affirmative Antidumping Duty Determination for the Russian Federation*, 87 Fed. Reg. 70,785 (Nov. 21, 2022).

As set forth in the accompanying brief in support of this motion, and on the basis of the record made before Commerce in the underlying proceeding: (1) Commerce's initiation of the AD investigation based on flawed assumptions, methodological errors, and data from an anomalous period for the OCTG market to support its finding that the AD petition was filed "by or on behalf of the industry" is unsupported by substantial evidence on the record and otherwise not in accordance with law; and (2) Commerce's failure to poll the domestic industry and seek actual production data for the most recent twelve months prior to the filing of the petition to determine the level of industry support for the petition was unsupported by substantial evidence, otherwise not in accordance with law, and an abuse of discretion.

For these reasons, which are more fully set forth in the accompanying Memorandum of Points and Authorities, Plaintiffs respectfully request that this Court grant judgment in their favor, remand this action to Commerce for disposition consistent with the Court's final opinion, and enter an order in the form attached hereto.

Respectfully submitted,

/s/ Gregory J. Spak
Gregory J. Spak
Frank J. Schweitzer
Kristina Zissis
Matthew W. Solomon
Colin Alejandro Dilley

WHITE & CASE LLP

2

701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

*Counsel to Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation, and Siderca S.A.I.C.*

June 23, 2023

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| TENARIS BAY CITY, INC.; MAVERICK TUBE CORPORATION; IPSCO TUBULARS INC.; TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION; AND SIDERCA S.A.I.C., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br>    Defendant, <br><br> and <br><br> UNITED STATES STEEL CORPORATION; BORUSAN MANNESMANN PIPE U.S. INC.; PTC LIBERTY TUBULARS LLC; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC; AND WELDED TUBE, <br><br>    Defendant-Intervenors. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Court No. 22-00343

# NON-CONFIDENTIAL

**Business Proprietary Information Has Been Deleted on Pages 2, 5, 7, 11, 15, 17-21, 25-26, 33, and 37-38.**

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF PLAINTIFFS' RULE 56.2 MOTION**
**FOR JUDGMENT UPON THE AGENCY RECORD**

Gregory J. Spak
Frank J. Schweitzer
Kristina Zissis
Matthew W. Solomon
Colin Alejandro Dilley

WHITE AND CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

June 23, 2023

## TABLE OF CONTENTS

I.     STATEMENT PURSUANT TO USCIT R. 56.2(c) ..............................................1

    A.     Administrative Determination Sought to Be Reviewed .........................................1

    B.     Questions Presented and Summary of Argument ....................................................1

         1.     Was Commerce's Initiation of the AD Investigation Based on Data
from an Anomalous 2020 OCTG Market Period, and Pursuant to
Other Flawed Assumptions, to Support Its Finding That the Petition
Was Filed "By or on Behalf of the Industry" Supported by Substantial
Evidence on the Record and Otherwise in Accordance with Law?.............1

         2.     Was Commerce's Failure to Poll the Domestic Industry and Seek
Actual Production Data for the Most Recent Twelve Months Prior to
the Filing of the Petition Supported by Substantial Evidence on the
Record and Otherwise in Accordance with Law?.......................................2

II.    JURISDICTION ..............................................................................................................4

III.   STATEMENT OF FACTS ..............................................................................................4

IV.   STANDARD OF REVIEW ...........................................................................................11

V.    ARGUMENT..................................................................................................................14

    A.     Commerce's Initiation of the AD Investigation Based on Data from an
Anomalous 2020 OCTG Market Period, and Pursuant to other Flawed
Assumptions, to Support Its Finding That the AD Petition Was Filed "By
or on Behalf of the Industry" Is Unsupported by Substantial Evidence on
the Record and Otherwise Not in Accordance with Law .....................................14

         1.     The Statutory Requirements for Initiation Based on Petition....................15

         2.     The Petitioners Submitted and Commerce Relied on Data from an
Anomalous 2020 OCTG Market Period and Outdated 2018-2019 Data
That Could Not Serve as a Reasonable Proxy for Actual Production
Levels for Commerce to Determine Whether the Petition Was Filed
"By or on Behalf of the Industry"..............................................................17

             a.     Petitioners Submitted Multiple Deficient Industry Support
Calculations..................................................................................17

             b.     Commerce Relied on Petitioners' and Other Flawed Data to
Erroneously Initiate the AD Investigation ...................................20

c.      Commerce Relied on 2020 Data that Reflected an Anomalous OCTG Market ............................................................................ 22

d.      Commerce's Reliance on a Production-to-Shipment Ratio Based on 2018-2019 Data Further Skewed the Industry Support Calculation ................................................................................. 25

3.      Commerce Failed to Ensure That Including the Production Data of Finishers/Processors in Its Calculation of OCTG Production Was Appropriate ...............................................................................27

4.      Petitioners Failed to Meet their Burden to Demonstrate the Petition Satisfied the Statutory Requirements for Initiation of the Investigation ...29

5.      Commerce Ignored the Exceptional Circumstances and Tenaris USA's Repeated Requests to Extend the Time for Making a Determination and Poll the Industry .................................................................33

B.      Commerce's Failure to Poll the Domestic Industry and Seek Actual Production Data for the Most Recent Twelve Months Prior to the Filing of the Petition Was Unsupported by Substantial Evidence, Contrary to Law, and an Abuse of Discretion ...................................................................................35

1.      The Statute Mandates That Commerce "*Shall* Poll the Industry" Where the Petition Does Not Establish the Statutory 50 Percent Level of Support and "Other Information" Cannot Serve as Reasonable Proxy Data for Actual Production Levels .................................................35

2.      Commerce's Failure to Poll and Request Data "Indicative of Production Levels" Is Not Supported by Substantial Evidence on the Record and Is Otherwise Not in Accordance with Law ............................38

3.      Commerce Abused Its Discretion by Failing to Poll the U.S. OCTG Producers to Establish That the Petition Was Filed by or on Behalf of the Industry .............................................................................41

VI.     CONCLUSION AND RELIEF SOUGHT .....................................................45

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allegheny Ludlum Corp. v. United States*,
112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000) ............................................................ 12, 34, 37

*Atlantic Sugar, Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984) ........................................................................................ 12, 37

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*,
419 U.S. 281 (1974) ............................................................................................................ 13

*Celik Halat ve Tel Sanayi A.S. v. United States*,
557 F. Supp. 3d 1348 (Ct. Int'l Trade 2022) ...................................................................... 13

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984) ............................................................................................................ 12

*Chr. Bjelland Seafoods A/S v. United States*,
19 C.I.T. 35 (1995) .......................................................................................................... 12, 35

*Citizens to Preserve Overton Park v. Volpe*,
401 U.S. 402 (1971) ............................................................................................................ 13

*Citrosuco Paulista, S.A. v. United States*,
704 F. Supp. 1075 (Ct. Int'l Trade 1988) ........................................................................... 42

*Clearon Corp. v. United States*,
38 Int'l Trade Rep. (BNA) 1960 (Ct. Int'l Trade 2016) ...................................................... 42

*Consol. Bearings Co. v. United States*,
412 F.3d 1266 (Fed. Cir. 2005) .................................................................................... 13, 44-45

*Guizhou Tyre Co. v. United States*,
399 F. Supp. 3d 1346 (Ct. Int'l Trade 2019) ...................................................................... 31

*Hontex Enters. v. United States*,
248 F. Supp. 2d 1323 (2003) ............................................................................................... 12

*Huaiyin Foreign Trade Corp. v. United States*,
322 F.3d 1369 (Fed. Cir. 2003) ..................................................................................... 12, 36-37

*Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States*,
429 F. Supp. 3d 1353 (Ct. Int'l Trade 2020) ...................................................................... 12

*Jiangsu Jiasheng Photovoltaic Tech. v. United States*,
28 F. Supp. 3d 1317 (2014) ........................................................ 14, 42, 44

*Jindal Poly Films Ltd. of India v. United States*,
365 F. Supp. 3d 1379 (Ct. Int'l Trade 2019) ........................................ 32

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................................................ 13, 45

*Peer Bearing Co.-Changshan v. United States*,
853 F. Supp. 2d 1365 (Ct. Int'l Trade 2012) ........................................ 31

*Pokarna Engineered Stone, Ltd. v. United States*,
547 F. Supp. 3d 1300 (Ct. Int'l Trade 2021),
aff'd, 56 F.4th 1345 (Fed. Cir. 2023) ............................................ 16, 37–38

*PPG Indus., Inc. v. United States*,
708 F. Supp. 1327 (Ct. Int'l Trade 1989) ............................................ 12

*Qingdao Taifa Group Co. v. United States*,
710 F. Supp. 2d 1352 (Ct. Int'l Trade 2010) ........................................ 32

*Risen Energy Co., Ltd. v. United States*,
611 F. Supp. 3d 1384 (Ct. Int'l Trade 2022) ........................................ 31

*Saha Thai Steel Pipe Pub. Co., LTD v. United States*,
605 F. Supp. 3d 1348 (Ct. Int'l Trade 2022) ........................................ 31

*Shandong Dongfang Bayley Wood Co. v. United States*,
375 F. Supp. 3d 1339 (Ct. Int'l Trade 2019) ........................................ 13, 45

*Sigma Corp. v. United States*,
841 F. Supp. 1255 (Ct. Int'l Trade 1993) ............................................ 32

*SKF USA Inc. v. United States*,
263 F.3d 1369 (Fed. Cir. 2001) ................................................... 14, 42, 44

*Star Fruits S.N.C. v. United States*,
393 F.3d 1277 (Fed. Cir. 2005) ...................................................... 13, 44

*USX Corp. v. United States*,
655 F. Supp. 487 (Ct. Int'l Trade 1987) ............................................ 12, 35

*Zhaoqing New Zhongya Aluminum Co. v. United States*,
929 F. Supp. 2d 1324 (2013) ............................................................. 12

## STATUTES AND REGULATIONS

5 U.S.C. § 706(2)(A) ...................................................................... 13

19 U.S.C. § 1516a(a)(2)(B)(i) ................................................................................... 4

19 U.S.C. § 1671a(c)(4)(A) ....................................................................................... 6

19 U.S.C. § 1673a(c)(1)(B) ................................................... 4, 6–7, 15–16, 33–35, 41–42

19 U.S.C. § 1673a(c)(4)(A) .......................................................................... 6, 14, 36

19 U.S.C. § 1673a(c)(4)(A)(i) ......................................................................... 10, 15

19 U.S.C. § 1673a(c)(4)(A)(ii) ................................................................... 6, 10, 15

19 U.S.C. § 1673a(c)(4)(D) ..................................................... 2, 16, 20, 35, 38, 41

19 U.S.C. § 1673a(c)(4)(D)(i) ........................................................... 19, 35, 37-38

19 U.S.C. § 1673a(c)(4)(D)(ii) ....................................................................... 35

28 U.S.C. 1581(c) ..................................................................................................... 4

19 C.F.R. § 351.203(e)(1) ................................................................ 3, 16, 22, 38

## ADMINISTRATIVE DETERMINATIONS

*1,1,1,2-Tetrafluoroethane From the People's Republic of China: Initiation of Antidumping Duty Investigation,*
   78 Fed. Reg. 73,832 (Dec. 9, 2013) ................................................................... 43

*Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Initiation of Antidumping Duty Investigation,*
   79 Fed. Reg. 42,292 (Jul. 21, 2014) .................................................................. 43

*Certain Steel Nails from the People's Republic of China and the United Arab Emirates: Initiation of Antidumping Duty Investigations,*
   72 Fed. Reg. 38,816 (Jul. 16, 2007) .................................................................. 44

*Initiation of Antidumping Duty Investigation: Circular Seamless Stainless Steel Hollow Products From Japan,*
   64 Fed. Reg. 63,285 (Nov. 19, 1999) ................................................................. 24

*Initiation of Antidumping Duty Investigation: Liquid Sulfur Dioxide from Canada,*
   70 Fed. Reg. 69,735 (Nov. 17, 2005) ................................................................. 44

*Large Power Transformers from the Republic of Korea: Initiation of Antidumping Duty Investigation,9*
   76 Fed. Reg. 49,439 (Aug. 10, 2011) ................................................................. 39

*Lemon Juice From Brazil and South Africa: Initiation of Less-Than-Fair-Value Investigations,*
   87 Fed. Reg. 3,768 (Jan. 25, 2022) ................................................................... 39

*Mattresses From Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey,*
   *and the Socialist Republic of Vietnam: Initiation of Less Than-Fair-Value Investigations*,
   85 Fed. Reg. 23,002 (Apr. 24, 2020) .................................................................. 39

*Mattresses from China*,
   Inv. No. 731-TA-1421 (Final),
   USITC Pub. 5000 (Dec. 2019) ............................................................................. 39

*Notice of Extension of the Deadline for Determining the Adequacy of the Antidumping Duty*
   *and Countervailing Duty Petitions: 1,1,1,2-Tetrafluoroethane From the People's Republic*
   *of China*,
   78 Fed. Reg. 66,894 (Nov. 7, 2013) ..................................................................... 43

*Notice of Extension of the Deadline for Determining the Adequacy of the Antidumping and*
   *Countervailing Duty Petitions: Certain Passenger Vehicle and Light Truck Tires From the*
   *People's Republic of China*,
   79 Fed. Reg. 35,725 (Jun. 24, 2014) .................................................................... 43

*Notice of Extension of the Deadline for Determining the Adequacy of the Antidumping and*
   *Countervailing Duty Petitions: Passenger Vehicle and Light Truck Tires From Korea,*
   *Taiwan, Thailand, and Vietnam*,
   85 Fed. Reg. 32,013 (May 28, 2020) ............................................................ 36, 43

*Notice of Extension of the Deadline for Determining the Adequacy of the Antidumping and*
   *Countervailing Duty Petitions: Utility Scale Wind Towers From India, Malaysia, and*
   *Spain*,
   85 Fed. Reg. 65,028 (Oct. 14, 2020) ............................................................ 36, 42

*Notice of Extension of the Deadline for Determining the Adequacy of the Antidumping Duty*
   *Petitions: Certain Steel Nails from the People's Republic of China and the United Arab*
   *Emirates*,
   72 Fed. Reg. 38,816 (Jul. 16, 2007) ..................................................................... 44

*Notice of Extension of the Deadline for Determining the Adequacy of the Antidumping Duty*
   *Petitions: Lightweight Thermal Paper from Germany, the Republic of Korea, and the*
   *People's Republic of China; and the Countervailing Duty Petition: Lightweight Thermal*
   *Paper from the People's Republic of China*,
   72 Fed. Reg. 58,639 (Oct. 16, 2007) .................................................................... 43

*Notice of Extension of the Deadline for Determining the Adequacy of the Antidumping Duty*
   *Petition: Liquid Sulfur Dioxide from Canada*,
   70 Fed. Reg. 61,937 (Oct. 27, 2005) .................................................................... 44

*Notice of Extension of the Deadline for Determining the Adequacy of the Antidumping Duty*
   *Petitions: Polyethylene Terephthalate Sheet From the Republic of Korea, Mexico, and the*
   *Sultanate of Oman*,
   84 Fed. Reg. 39,801 (Aug. 12, 2019) ................................................................... 43

*Notice of Extension of the Deadline for Determining the Adequacy of the Antidumping Duty Petition: Steel Wire Garment Hangers from the People's Republic of China,*
72 Fed. Reg. 46,606 (Aug. 21, 2007) ................................................................. 44

*Notice of Initiation of Antidumping Duty Investigations: Lightweight Thermal Paper from Germany, the Republic of Korea, and the People's Republic of China,*
72 Fed. Reg. 62,430 (Nov. 5, 2007) ................................................................. 44

*Notice of Request for Information and Extension of Time: Wooden Bedroom Furniture From the People's Republic of China,*
68 Fed. Reg. 65,875 (Nov. 24, 2003) ................................................................. 36

*Oil Country Tubular Goods from Argentina: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances,*
87 Fed. Reg. 59,054 (Sept. 29, 2022) ................................................................. 1

*Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation: Antidumping Duty Orders and Amended Final Affirmative Antidumping Duty Determination for the Russian Federation,*
87 Fed. Reg. 70,785 (Nov. 21, 2022) ................................................................. 1

*Oil Country Tubular Goods From Argentina: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures,*
87 Fed. Reg. 28,801 (May 11, 2022) ................................................................. 11

*Passenger Vehicle and Light Truck Tires From the Republic of Korea, Taiwan, Thailand, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations,*
85 Fed. Reg. 38,854 (Jun. 29, 2020) ................................................................. 43

*Polyethylene Terephthalate Sheet From the Republic of Korea, Mexico, and the Sultanate of Oman: Initiation of Less-Than-Fair-Value Investigations,*
84 Fed. Reg. 44,854 (Aug. 27, 2019) ................................................................. 43

*Steel Wire Garment Hangers from the People's Republic of China: Initiation of Antidumping Duty Investigation,*
72 Fed. Reg. 52,855 (Sep. 17, 2007) ................................................................. 44

*Sugar From Mexico: Initiation of Antidumping Duty Investigation,*
79 Fed. Reg. 22,795 (Apr. 24, 2014) ................................................................. 39

*Utility Scale Wind Towers From India, Malaysia, and Spain: Initiation of Less-Than-Fair-Value Investigations,*
85 Fed. Reg. 73,023 (Nov. 16, 2020) ................................................................. 42

## OTHER MATERIALS

*Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*,
86 Fed. Reg. 52,300 (Sept. 20, 2021) .................................................................................. 29

NON-CONFIDENTIAL VERSION

**I.     STATEMENT PURSUANT TO USCIT R. 56.2(C)**

**A.     Administrative Determination Sought to Be Reviewed**

Plaintiffs contest certain aspects of, and the legal basis for, the final determination issued by the U.S. Department of Commerce, International Trade Administration ("Commerce") in its antidumping duty ("AD") investigation of oil country tubular goods ("OCTG") from Argentina, Inv. No. A-357-824.  The final determination was published in the *Federal Register* as *Oil Country Tubular Goods from Argentina: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 87 Fed. Reg. 59,054 (Sept. 29, 2022) ("Final Determination") (P.R. 226).[1]  The corresponding AD order was published in the *Federal Register* on November 21, 2022.  *See Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation: Antidumping Duty Orders and Amended Final Affirmative Antidumping Duty Determination for the Russian Federation*, 87 Fed. Reg. 70,785 (Nov. 21, 2022) ("AD Order") (P.R. 233).

**B.     Questions Presented and Summary of Argument**

> **1.     Was Commerce's Initiation of the AD Investigation Based on Data from an Anomalous 2020 OCTG Market Period, and Pursuant to Other Flawed Assumptions, to Support Its Finding That the Petition Was Filed "By or on Behalf of the Industry" Supported by Substantial Evidence on the Record and Otherwise in Accordance with Law?**

No.  Commerce relied on data from an anomalous OCTG market period to support its finding that the AD petition was filed "by or on behalf of the industry."  In addition, the calculation methodology submitted by Petitioners, and relied on by Commerce, also was based on outdated total industry production and domestic shipment volumes for 2018 and 2019 that were

---

[1] Citations to the administrative record indicate the public and confidential record document numbers ("P.R." and "C.R.").

unrepresentative for non-petitioners and skewed the industry support ratio [                    ]. Moreover, Commerce also failed to ensure that including production data of processors and finishers in its calculation of OCTG production was appropriate and did not, for example, result in double counting production.

In the absence of the required level of industry support for the petition, Commerce lacked the statutory authority to initiate the investigation. Commerce relied on a methodology that included the use of certain 2020 production data, certain 2020 domestic shipment data, and an adjustment to the 2020 data using a production-to-shipments ratio derived from 2018 and 2019 data. However, 2020 data were not an appropriate proxy for actual production levels because unprecedented market factors, including the oversupply of oil by the Organization of the Petroleum Exporting Countries ("OPEC") and the global COVID-19 pandemic, rendered the OCTG market in 2020 volatile and highly unusual. Industry support calculations based on flawed assumptions and methodological errors, and on anomalous 2020 production and shipment data, were not indicative of the actual production data as required by the statute and regulations, and did not provide an accurate basis for Commerce to determine whether the petition was filed "by or on behalf of the industry." Accordingly, Commerce's initiation of the investigation on imports of OCTG from Argentina was inconsistent with the statutory requirements for determining the requisite level of industry support to permit the initiation of the investigation, the issuance of the Final Determination, and the imposition of the AD Order.

      **2.**      **Was Commerce's Failure to Poll the Domestic Industry and Seek Actual Production Data for the Most Recent Twelve Months Prior to the Filing of the Petition Supported by Substantial Evidence on the Record and Otherwise in Accordance with Law?**

No. Pursuant to 19 U.S.C. § 1673a(c)(4)(D), if the industry support established by the petition accounts for less than 50 percent of the total production of the domestic like product,

NON-CONFIDENTIAL VERSION

Commerce must "poll the industry or rely on other information to determine whether there is support for the petition." The record before Commerce demonstrated "exceptional circumstances" warranting an extension of the period for Commerce to initiate the investigation so it could poll the domestic industry to determine whether there was sufficient industry support in accordance with the statute. The industry support calculations were revised multiple times by Petitioners and were based on flawed assumptions and methodological errors, and data from an anomalous market period characterized by historic conditions affecting the OCTG market, that was not indicative of actual production levels, and that could not provide a reliable basis for Commerce's industry support analysis.

Commerce's regulations provide that "{t}he Secretary normally will measure production over a twelve-month period specified by the Secretary, and may measure production based on either value or volume," and contemplate that "production levels may be established by reference to alternative data" but only if such data are "indicative of production levels." *See* 19 C.F.R. § 351.203(e)(1). Commerce inappropriately relied on anomalous 2020 production and shipment data and an adjustment using an outdated 2018/2019 production-to-shipments ratio that could not be considered indicative of production levels. Given the market conditions in 2020 and the lack of data on the record that could serve as reasonable proxy data for actual production levels, the statute required Commerce to poll the industry and request actual production data for the most recent twelve months prior to the filing of the petition to determine whether the petition was filed "by or on behalf of the industry."

The record before Commerce also demonstrated opposition to the petition from Tenaris USA, the largest U.S. OCTG producer, questions regarding the appropriateness of including the

production data of processors and finishers, and Tenaris USA's repeated requests that Commerce poll the industry.

In these circumstances, the statute mandates that Commerce poll the domestic industry to determine whether there was sufficient industry support for the initiation of the investigation. 19 U.S.C. § 1673a(c)(1)(B). Accordingly, Commerce's initiation of the investigation on OCTG from Argentina without polling the industry was inconsistent with the statutory requirements for determining the requisite industry support required for the initiation of the investigation, the issuance of the Final Determination, and the imposition of the AD Order.

## II.    JURISDICTION

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(i).

## III.    STATEMENT OF FACTS

On October 6, 2021, Petitioners Borusan Mannesmann Pipe U.S., Inc., PTC Liberty Tubulars LLC, U.S. Steel Tubular Products, Inc., the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW"), and Welded Tube USA, Inc. (collectively, "Petitioners") filed petitions for the imposition of antidumping and countervailing duties ("CVD") on OCTG from Argentina (AD), Mexico (AD), Korea (CVD), and Russia (AD/CVD). *See Petitions for the Imposition of Antidumping and Countervailing Duties: Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia*, Inv. No. A-357-824 (Oct. 6, 2021) ("Petition") (C.R. 1-6; P.R. 1-6).

Several U.S. OCTG producers did not join in the filing of the petition. The largest U.S. producer of OCTG, Tenaris USA, was not a petitioner. Through investments totaling more than $10 billion under a plan launched in the early 2000s and continuing through the present, Tenaris

USA built the world's largest industrial base for the production of OCTG in the United States. *See, e.g.*, Letter from White & Case LLP to Sec'y Commerce, re: *Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Comments on Petitioners' Standing* at 11-13, Inv. No. A-357-824 (Oct. 15, 2021) ("Tenaris' October 15, 2021 Comments") (C.R. 12-18; P.R. 22-28).  Tenaris' U.S. OCTG production companies include Maverick Tube Corporation, Tenaris Bay City, Inc., and IPSCO Tubulars Inc.  *Id.*  In addition, [

                                                                  ].  *See* Petition at 6; *see also* Letter from Cassidy Levy Kent (USA) LLP and Schagrin Associates to Sec'y Commerce and Sec'y Int'l Trade Comm'n, re: *Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Response to General Issues Questionnaire* at Exhibit 5, Inv. No. A-357-824 (Oct. 12, 2021) ("Petitioners' General Issues Questionnaire Response") (C.R. 10; P.R. 19).

On October 7, 2021, Commerce issued a questionnaire to Petitioners requesting additional information or revisions regarding each petitioning company's 2020 production and shipment quantities.  *See* Letter from Rebecca Janz to Roger B. Schagrin and Thomas M. Beline, re: *Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation: Supplemental Questions*, Inv. No. A-357-824 (Oct. 7, 2021) ("First General Issues Questionnaire") (C.R. 7; P.R. 12).  Commerce also identified a "methodological error with respect to the calculation of total shipments for the U.S. industry," and requested that Petitioners provide production figures for USW-represented mills.  *Id.*

On October 8, 2021, Tenaris USA submitted comments to Commerce identifying factual errors and other flaws in the petition that rendered Petitioners' industry support calculation inaccurate and unreliable.  *See* Letter from White & Case LLP to Sec'y Commerce, re: *Oil Country*

NON-CONFIDENTIAL VERSION

*Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Factual Errors in Petitions*, Inv. No. A-357-824 (Oct. 8, 2021) ("Tenaris' October 8, 2021 Comments") (C.R. 9; P.R. 15). Tenaris USA submitted the same comments in each of the OCTG investigations (Inv. Nos. A-357-824, C-580-913, A-201-856, A-821-833, and C-821-834). *See id.* at 1 (caption). The statute requires that AD and CVD petitions must have the support of companies/workers constituting more than 50 percent of the industry expressing either support or opposition, as measured by production of the domestic like product.   19 U.S.C. §§ 1673a(c)(4)(A), 1671a(c)(4)(A).   Tenaris USA's comments demonstrated that Petitioners' calculations were flawed for several reasons.   First, Petitioners incorrectly stated that two of Tenaris USA's production plants were represented by USW and therefore the production figures from these two mills were incorrectly deducted from the denominator for the standing calculation.   Tenaris' October 8, 2021 Comments at 3-5, Exhibits 1-2.  Second, the standing calculation was based on 2020 production data that was anomalous and therefore unreliable for purposes of establishing the requisite level of industry support for the petition.   *Id.* at 6-7.  Tenaris USA explained that unique demand market factors in 2020, including the oversupply of oil by OPEC, combined with the global COVID-19 pandemic, rendered the OCTG market in 2020 volatile and highly unusual, and, therefore, data pertaining to this aberrational period did not accurately reflect the state of the domestic industry at the time of the filing of the petition.   *Id.*   Finally, Petitioners relied on shipment data to support their industry support calculations rather than on production data as specified by the statute in 19 U.S.C. § 1673a(c)(4)(A)(ii).   *Id.* at 5-6.  Tenaris USA requested that Commerce reject the petition as inadequate or, alternatively, delay determination of adequacy by 20 days in order to poll the industry to determine support, in accordance with 19 U.S.C. § 1673a(c)(1)(B). *Id.* at 2, 8.

On October 12, 2021, Petitioners submitted their first of several modified calculations of industry support, to attempt to correct deficiencies in the petition. *See* Petitioners' General Issues Questionnaire Response. They relied on a combination of domestic shipment data [

], data from the U.S. International Trade Commission's ("ITC") 2020 final sunset review determination, further adjustments based on ratios of domestic and export shipments using 2020 data, and estimates of non-petitioning companies' production (as opposed to shipments). *Id.*

On October 15, 2021, Tenaris USA submitted additional comments explaining that Petitioners' modified industry support calculation also was flawed because it: (1) erroneously deducted production data from a third non-union Tenaris USA mill from the standing calculation; (2) relied on anomalous 2020 production and shipment data, leading to results not accurately reflecting the domestic industry; and (3) presented a modified calculation methodology relying on total industry production and domestic shipment volume for 2018 and 2019 – a time frame that was even more distant, and therefore also unreliable. *See generally* Tenaris' October 15, 2021 Comments. Due to these fundamental questions about Petitioners' standing, Tenaris USA again reiterated that Commerce should poll the industry and take the additional 20 days permitted under 19 U.S.C. § 1673a(c)(1)(B) to evaluate the level of industry support for the petition; and further noted that Tenaris USA is the largest U.S. OCTG producer, and its position on the petition should be counted in determining industry support because its interests as a domestic producer would be adversely affected by the imposition of AD orders. *Id.*

On October 18, 2021, in response to Tenaris USA's comments regarding deficiencies that failed to demonstrate the requisite level of domestic industry support for the petition, Petitioners submitted a second further revised industry support calculation. Letter from Cassidy Levy Kent

**NON-CONFIDENTIAL VERSION**

(USA) LLP and Schagrin Associates to Sec'y Commerce, re: *Oil Country Tubular Goods from Argentina, Mexico, Russia, and the Republic of Korea: Response to Tenaris Submission Concerning Petitioners' Standing* at Attachment 6, Inv. No. A-357-824 (Oct. 18, 2021) ("Petitioners' Response Comments on Standing") (C.R. 19; P.R. 29).

On October 19, 2021, Commerce issued a second questionnaire identifying further deficiencies and requesting additional information regarding (1) USW mill representation and (2) errors in the declarations of industry support submitted in Petitioners' October 18, 2021 comments. Letter from Rebecca Janz to Roger B. Schagrin and Thomas M. Beline, re: *Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation: Supplemental Questions*, Inv. No. A-357-824 (Oct. 19, 2021) (C.R. 24; P.R. 33).

On October 20, 2021, Tenaris USA submitted reply comments to Petitioners' October 18 submission, stating that:  (1) Petitioners bear the burden of demonstrating industry support for the petition; (2) Petitioners' two subsequent revised support calculations continued to be based on flawed data and assumptions, and were therefore unreliable; and (3) Petitioners' strategy to cobble together the requisite support based on data for a group that also included processors and finishers of OCTG had implications for the accuracy of the industry support calculations.  *See* Letter from White & Case LLP to Sec'y Commerce, re: *Oil Country Tubular Goods from Mexico: Reply Comments on Petitioners' Standing*, Inv. No. A-357-824 (Oct. 20, 2021) ("Tenaris' October 20, 2021 Comments") (C.R. 22; P.R. 31).

On October 21, 2021, Russian OCTG producer TMK Group also filed comments challenging Petitioners' industry support calculation in the parallel investigation of OCTG from Russia.  *See* Commerce Initiation Checklist at 8 n.58, Inv. No. A-357-824 (Oct. 26, 2021)

## NON-CONFIDENTIAL VERSION

("Initiation Checklist") (C.R. 26; P.R. 40) (citing Letter from TMK Group, re: *Oil Country Tubular Goods from Russia: Comments on Petitioners' Standing* (Oct. 21, 2021) ("TMK Letter")). Just as Tenaris USA had stated, TMK Group also explained that "calendar year 2020 data are inappropriate for evaluating industry support and that there is a compelling reason to use a more recent period because of unique conditions in the OCTG market." *Id.* at 12 (citing TMK Letter at 3-4). TMK Group further stated that "it is likely that the petitioners' production was far lower during a more recent 12- month period than calendar year 2020 and that the trends suggest that the petitioners would lack the requisite support over a more recent 12-month period." *Id.* (citing TMK Letter at 6-7).

On October 21, 2021, Petitioners filed a third revised industry support calculation, accompanying its submission in response to Commerce's second questionnaire identifying further deficiencies. Letter from Cassidy Levy Kent (USA) LLP and Schagrin Associates to Sec'y Commerce and Sec'y Int'l Trade Comm'n, re: *Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Response to Second General Issues Questionnaire* at Exhibit 5, Inv. No. A-357-824 (Oct. 21, 2021) ("Petitioners' Second General Issues Questionnaire Response") (C.R. 23; P.R. 32).

On October 21, 2021, counsel to Tenaris USA met with Commerce officials to reiterate Tenaris USA's concerns stated in its three sets of comments, including that Commerce poll the domestic industry to determine whether the petition has the statutorily-required level of domestic industry support. As Commerce's memorandum to the file confirms, "{d}uring the meeting, counsel to Tenaris USA raised concerns noted in their submissions on the record of this proceeding regarding industry support." Memorandum from Jill E. Pollack to the File, re: *Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Oil Country Tubular Goods*

*from Argentina, Mexico, the Republic of Korea, and the Russian Federation* (Oct. 21, 2021) (P.R. 34).

On October 22, 2021, Tenaris USA filed a fourth set of comments, in response to Petitioners' October 21, 2021 submission, stating that Petitioners' revised industry support calculation, like the three previous attempts to provide the requisite support for the petition, also was based on flawed data and assumptions. *See* Letter from White & Case LLP to Sec'y Commerce, re: *Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia: Comments on Petitioners' Second General Issues Questionnaire Response*, Inv. No. A-357-824 (Oct. 22, 2021) ("Tenaris' October 22, 2021 Comments") (C.R. 25; P.R. 35).  The comments addressed (1) the use of 2020 production data, given the historic market factors that impacted demand for OCTG in 2020, and (2) the implications of high hot-rolled coil ("HRC") prices for the production of welded OCTG. *Id.*

Four days later, on October 26, 2021, Commerce initiated the investigation. *Oil Country Tubular Goods From Argentina, Mexico, and the Russian Federation: Initiation of Less-Than-Fair-Value Investigations*, 86 Fed. Reg. 60,205 (Nov. 1, 2021) (P.R. 36, 44).

Commerce determined that the share of U.S. production represented by the supporters of the petition was above 25 percent of total U.S. production, so that the threshold under 19 U.S.C. § 1673a(c)(4)(A)(i) was met. *See* Initiation Checklist at Attachment II at 6.  Commerce also found that the petition did not establish the support of domestic producers accounting for more than 50 percent of the total production of the domestic like product, as required under 19 U.S.C. § 1673a(c)(4)(A)(ii). *Id.*  However, Commerce did not poll the industry as provided for by statute. Instead, Commerce decided to "rely on other information" submitted by Petitioners and it determined, on the basis of that information, that there was adequate industry support. *See id.* at

19, 21-22.   Specifically, Commerce adopted Petitioners' methodology as presented in their October 12, 2021 submission, as modified by Petitioners' subsequent submissions, which relied on shipment data from 2020, adjusted using 2018 and 2019 data reported in the ITC's *India et al OCTG 2020 Sunset Review*. *Id*. at 4-5.   The numerator and the denominator of the ratio were further adjusted by [

]. *Id*. at 4.

Commerce published its preliminary determination on May 11, 2022, preliminarily determining that OCTG from Argentina is being, or is likely to be, sold in the United States at less than fair value ("LTFV").   *See Oil Country Tubular Goods From Argentina: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 28,801 (May 11, 2022) (P.R. 161, 172).

Commerce published its Final Determination on September 29, 2022, finding that OCTG from Argentina is being, or is likely to be, sold in the United States at LTFV during the period of investigation.   *See* Final Determination, 87 Fed. Reg. at 59,054.

The AD Order on OCTG from Argentina was published in the *Federal Register* as *Oil Country Tubular Goods From Argentina, Mexico, and the Russian Federation: Antidumping Duty Orders and Amended Final Affirmative Antidumping Duty Determination for the Russian Federation*, 87 Fed. Reg. at 70,785.

## IV.    STANDARD OF REVIEW

In reviewing a challenge to Commerce's determination in an AD proceeding, the Court "shall hold unlawful any determination, finding, or conclusion found … to be unsupported by

NON-CONFIDENTIAL VERSION

substantial evidence on the record, or otherwise not in accordance with law ….” 19 U.S.C. § 1516a(b)(1)(B)(i).

The Court determines whether an agency action is “in accordance with law” based on the two-prong test established in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See, e.g., Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States*, 429 F. Supp. 3d 1353, 1357 (Ct. Int’l Trade 2020). The agency’s decision “must be authorized by the statute, and consistent with the agency’s regulations” for it to be in accordance with law. *See, e.g., Zhaoqing New Zhongya Aluminum Co. v. United States*, 929 F. Supp. 2d 1324, 1326 (2013) (citing *Hontex Enters. v. United States*, 248 F. Supp. 2d 1323, 1340 (2003)). The Court has found that “{a}n agency’s failure to follow its own rules and procedures is fatal to action.” *PPG Indus., Inc. v. United States*, 708 F. Supp. 1327, 1332 n.4 (Ct. Int’l Trade 1989) (citation omitted)).

The existence of substantial evidence is determined “by considering the record as a whole, including evidence that supports as well as evidence that ‘fairly detracts from the substantiality of the evidence.’” *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (“taking into account *the entire record* …”) (emphasis added)). “{I}t is … well-established that Commerce’s total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders the Department’s determination unsupported by substantial evidence.” *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1165 (Ct. Int’l Trade 2000). Moreover, a determination based on inadequate reasoning or conjecture cannot survive the “substantial evidence” standard of review. *See Chr. Bjelland Seafoods A/S v. United States*, 19 C.I.T. 35, 37 (1995) (citing *USX Corp. v. United States*, 655 F. Supp. 487, 489 (Ct. Int’l Trade 1987)).

NON-CONFIDENTIAL VERSION

The courts have considered the reasonableness of discretionary agency action in the trade remedy context in analyzing whether such action constitutes an abuse of discretion.  The Court of Appeals for the Federal Circuit has found, in the context of an AD investigation, that there is an abuse of discretion where Commerce's decision "is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or *represents an unreasonable judgment in weighing relevant factors*." *See Consol. Bearings Co. v. United States*, 412 F.3d 1266, 1269 (Fed. Cir. 2005) (citing *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005)) (emphasis added).

The Administrative Procedure Act prohibits an agency from acting in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  This Court has found an agency acted in "an arbitrary and capricious manner if 'it entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Shandong Dongfang Bayley Wood Co. v. United States*, 375 F. Supp. 3d 1339, 1344 (Ct. Int'l Trade 2019) (quoting *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  The agency must "articulate a satisfactory explanation for its action," and the court shall "consider whether the decision was based on a consideration of the relevant factors." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285 (1974); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)).  The court will find an abuse of discretion where "the decision … represents an unreasonable judgment in weighing relevant factors.'" *See, e.g., Celik Halat ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1348, 1357 (Ct. Int'l Trade 2022) (citations omitted).  This Court has also found that

"where the agency is vested with discretion to set the procedure by which it administers its governing statute, the court reviews such decisions for abuse of discretion … In abuse of discretion review, 'an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.'" *Jiangsu Jiasheng Photovoltaic Tech. v. United States*, 28 F. Supp. 3d 1317, 1323 (2014) (quoting *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001)).

## V.   ARGUMENT

### A.   Commerce's Initiation of the AD Investigation Based on Data from an Anomalous 2020 OCTG Market Period, and Pursuant to other Flawed Assumptions, to Support Its Finding That the AD Petition Was Filed "By or on Behalf of the Industry" Is Unsupported by Substantial Evidence on the Record and Otherwise Not in Accordance with Law

Commerce improperly initiated the AD investigation.  Petitioners repeatedly failed to meet their burden to satisfy the statutory requirement that an AD petition must be "filed by or on behalf of the industry."  19 U.S.C. § 1673a(c)(4)(A).  Each of Petitioners' successive industry support calculations were based on flawed assumptions and a combination of production data and shipment data from an anomalous 2020 period that was not a reliable basis for Commerce to determine whether the petition was filed "by or on behalf of the industry."

Commerce's reliance on these industry support calculations based on a combination of atypical 2020 production data and shipment data, combined with a production-to-shipments ratio derived from outdated 2018 and 2019 data, could not serve as a reasonable proxy for production data.  Unprecedented market factors that impacted demand for OCTG in 2020, including the oversupply of oil by OPEC and the global COVID-19 pandemic, rendered the OCTG market in 2020 volatile and highly unusual.  In addition, the calculation methodology submitted by Petitioners, and relied on by Commerce, also was based on outdated total industry production and domestic shipment volumes for 2018 and 2019 that were unrepresentative for non-petitioners and

skewed the industry support ratio [                    ].  Finally, Commerce also failed to ensure

that including production data of processors and finishers in its calculation of OCTG production

was appropriate.

Given the "exceptional circumstances" demonstrated by the record evidence, including the

fact that 2020 was an unrepresentative OCTG market period and the opposition from Tenaris USA,

the largest U.S. OCTG producer, ([

]), Commerce should not have mechanistically initiated the investigation.  Instead,

Commerce should have extended the period to make its determination, polled the industry, and

requested actual production data for the most recent twelve months prior to the filing of the petition

to determine whether there was sufficient industry support for the initiation of the investigation,

the issuance of the Final Determination, and the imposition of the AD Order.  19 U.S.C. §

1673a(c)(1)(B).

### 1.   The Statutory Requirements for Initiation Based on Petition

For Commerce to determine that a petition "has been filed by or on behalf of the industry"

it must confirm that two statutory requirements have been satisfied:

> (i) the domestic producers or workers who support the petition account for at least
> 25 percent of the total production of the domestic like product, and
>
> (ii) the domestic producers or workers who support the petition account for more
> than 50 percent of the production of the domestic like product produced by that
> portion of the industry expressing support for or opposition to the petition.

19 U.S.C. § 1673a(c)(4)(A)(i)-(ii).

In evaluating the statutory threshold under 19 U.S.C. § 1673a(c)(4)(A)(ii) for determining

whether industry support is "more than 50 percent of the *production* of the domestic like product

produced by that portion of the industry expressing support for or opposition to the petition"

Commerce's regulations state that:

15

NON-CONFIDENTIAL VERSION

> The Secretary *normally* will measure production over a twelve-month period specified by the Secretary, and may measure production based on either value or volume. Where a party to the proceeding establishes that production data for the relevant period, as specified by the Secretary, is unavailable, production levels may be established by reference to alternative data that the Secretary determines to be *indicative of production levels*.

19 C.F.R. § 351.203(e)(1) (emphasis added).  Commerce may only depart from reliance on actual production data when the information relied upon in its place serves as a reasonable proxy for, and is indicative of, actual production levels.

Where the petition does not establish support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product, the statute mandates that Commerce shall:

> (i) poll the industry or rely on other information in order to determine if there is support for the petition as required by subparagraph (A), or
>
> (ii) if there is a large number of producers in the industry, the administering authority may determine industry support for the petition by using any statistically valid sampling method to poll the industry.

19 U.S.C. § 1673a(c)(4)(D).

The statute further provides that, "{i}n any case in which the administering authority is required to poll or otherwise determine support for the petition by the industry under paragraph (4)(D), the administering authority may, in exceptional circumstances" extend the 20-day deadline by an additional 20 days.  19 U.S.C. § 1673a(c)(1)(B); *see also Pokarna Engineered Stone, Ltd. v. United States*, 547 F. Supp. 3d 1300, 1310 (Ct. Int'l Trade 2021) ("Commerce's discretion to extend its deadline is reserved for 'exceptional circumstances' …").

NON-CONFIDENTIAL VERSION

2.      **The Petitioners Submitted and Commerce Relied on Data from an Anomalous 2020 OCTG Market Period and Outdated 2018-2019 Data That Could Not Serve as a Reasonable Proxy for Actual Production Levels for Commerce to Determine Whether the Petition Was Filed "By or on Behalf of the Industry"**

a.      **Petitioners Submitted Multiple Deficient Industry Support Calculations**

Petitioners stated in the petition that they "accounted for the majority of domestic shipments and exports in 2020 after total domestic production is adjusted to account for [


]." Petition, Vol. 1 at 5. Petitioners' calculation started with domestic OCTG shipments for U.S. producers, as reported in [                                                    ], and applied a calculated ratio of exports to total shipments in order to derive total shipments (domestic and exports) by U.S. producers. *Id.* at 6. From this denominator, Petitioners then [



]. *Id.* at 6-7; *see* Tenaris' October 8, 2021 Comments. Using Petitioners' 2020 production volume as the numerator, the calculated industry support ratio was [      ] percent; using Petitioners' 2020 shipment volume as the numerator, the result was [      ]. *Id.* [      ] there were numerous issues with the calculations, including primarily the use of 2020 data.

As described below, Petitioners revised their calculations in three separate post-petition filings to attempt to correct errors in their industry support calculations.

***Petitioners' Industry Support Calculation Correction 1***

Just one day after the petition was filed, Commerce issued questions to Petitioners to remedy errors in their industry support calculations. *See* First General Issues Questionnaire. On October 12, 2021, Petitioners responded to the questionnaire and revised their industry support

calculation from the petition, adding several steps to arrive at the ultimate ratio:  (1) first, Petitioners again started with [                    ] domestic OCTG shipments for 2020 by U.S. producers; (2) applied their ratio of exports to total shipments; (3) deducted their 2020 shipments, to get a 2020 total of non-petitioning companies' shipments; (4) to approximate non-petitioning companies' production, the Petitioners first calculated a historical ratio (using 2018 and 2019 data) of non-petitioning companies production to shipments based on data from the 2020 ITC sunset review of OCTG from India, Korea, Turkey, Ukraine and Vietnam data to derive an estimated 2020 non-petitioning company production volume, which was then added to Petitioners' own production volume; and (5) [                                                    ].

Petitioners' General Issues Questionnaire Response at 6-8.  Petitioners claimed that the resulting levels of industry support were "conservative because they do not rely on any production at OCTG mills whose management are not part of the Petitioners' group but are represented by" USW. Petitioners' General Issues Questionnaire Response at 8.  The result of this calculation was [      ] percent.  *Id.* at 7, Exhibit 8.

### *Petitioners' Industry Support Calculation Correction 2*

On October 18, 2021, Petitioners made a second attempt to further revise their calculation, [                                                                                    ]. Petitioners' Response Comments on Standing at 4, Attachment 6.  The result of this calculation, after accounting for this new "other information," was [      ] percent.  *Id.*

### *Petitioners' Industry Support Calculation Correction 3*

Petitioners again modified their calculation on October 21, 2021, for the third time, [

].  *See* Petitioners' Second General Issues

NON-CONFIDENTIAL VERSION

Questionnaire Response at Exhibit 5.  The result of this calculation was [     ] percent.  *Id.* at 2, Exhibit 5.

    As discussed below, Petitioners' repeatedly deficient industry support filings necessitated multiple revisions, and they continued to rely on an OCTG market that did not reflect the market at the time of the filing of the petition.

    As Commerce's Initiation Checklist makes clear, it is undisputed that for each of the calculations the supporters of the petition, based on production data alone, accounted for less than 50 percent of total U.S. production of the domestic like product:

> Under the petitioners' methodology, the supporters of the Petitions account for [     ] percent of total production of the domestic like product in 2020, which is well above the 25 percent threshold established in sections 701(c)(4)(A)(i) and 732(c)(4)(A)(i) of the Act. Under the alternative methodology described above, the supporters of the Petitions account for [     ] percent of total production of the domestic like product in 2020, which is also well above the 25 percent threshold established in sections 701(c)(4)(A)(i) and 732(c)(4)(A)(i) of the Act.... The Petitions did not establish the support of domestic producers accounting for more than 50 percent of total production of the domestic like product.  Therefore, we have relied on other information to determine industry support for the Petitions{.}

Initiation Checklist at 6; *see also id.* at 19 n.155 ("depending on the methodology applied, the supporters of the Petitions account for [     ] percent, [     ] percent, or [     ] percent of total U.S. production").  Pursuant to 19 U.S.C. § 1673a(c)(4)(D)(i), in cases where the petition does not establish support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product, Commerce must either poll the industry or rely on "other information" to determine industry support.  In this case, only by considering "other information" (*i.e.*, [

]) did Commerce find sufficient industry support for the petition.  *Id.* at 6.  Commerce considered that "the petitioners provided reasonably available information," "have the industry

support required" under the statute, and therefore that "it is unnecessary for Commerce to poll the industry to determine industry support." *Id.* at 19.

> **b.   Commerce Relied on Petitioners' and Other Flawed Data to Erroneously Initiate the AD Investigation**

To initiate the investigation, Commerce referred to the two industry support calculations in its Initiation Checklist that are described below.  As both calculations relied on data from the anomalous 2020 market period, they could not serve as a reasonable proxy for the production data levels as specified in the statute.

### ***Commerce Industry Support Calculation***

First, Commerce adopted Petitioners' flawed methodology as presented in their October 21, 2021 submission (*i.e.*, "Petitioners' Industry Support Calculation Correction 3" described in **Section V.A.2.a**) [                              ].  Commerce stated that the industry shipment data from 2020 underlying Petitioners' calculation was a reasonable proxy for production of OCTG.  *Id.* at 5.  With respect to the [                                                            ], Commerce found [                                                            ] to constitute "other information" under 19 U.S.C. § 1673a(c)(4)(D) which Commerce may use to determine industry support.  *Id.*   [

           ] resulted in total production of OCTG produced by that portion of the industry expressing support for or opposition to the petition of [        ] short tons.  Petitioners' General Issues Questionnaire Response at 7, Exhibit 8.  As noted above, for the numerator, Petitioners used their actual 2020 production data, [                                                            ], and Commerce accepted this approach.  Initiation Checklist at Attachment II at 4.

**NON-CONFIDENTIAL VERSION**

As discussed below, Commerce never requested production data from Tenaris USA. Commerce noted that, despite Tenaris USA registering its opposition to the petition, Tenaris USA did not place its production data on the record. *Id.* at 6-7. Commerce stated:

> {B}ecause [
>                                ] Petitions,
> we find that the supporters of the Petitions account for [     ] percent of the total
> U.S. production of those parties expressing an opinion on the Petitions for which
> we have production data.

*Id.* at 7. Commerce further stated that, even if all other U.S. producers opposed the petition, "the supporters of the Petitions would account for [     ] percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the Petitions." *Id.* at 7. Therefore, Commerce found, using the 2020 data, that the petition had sufficient industry support. *Id.*

### *Commerce Alternative Industry Support Calculation*

In addition, Commerce also included what it termed a "conservative, alternative methodology" for calculating the denominator, in which Commerce also started with domestic producers' 2020 domestic shipments of OCTG, as reported in [          ]. *Id.* at 5. Next, using the data from [          ] and the ITC's *India et al OCTG 2020 Sunset Review*, Commerce calculated a new ratio to derive estimated total production from domestic shipments, and applied this ratio to the [          ] 2020 domestic shipment data, resulting in an estimated total 2020 production for the U.S. OCTG industry of [     ] ST. *Id.* Using the [     ], this alternative approach yielded an industry support ratio of [     ] percent. *Id.* at 7. This methodology is similarly flawed, in that it also relies on the anomalous 2020 shipment data and the 2018-2019 data from the ITC sunset review.

As shown in both of Commerce's approaches, the investigation was initiated based on the use of data from 2020 – an anomalous period for the OCTG market and industry – and the results

NON-CONFIDENTIAL VERSION

were therefore fundamentally unrepresentative of the domestic industry as constituted at the time

of the filing of the petition in 2021.  Record evidence shows that the unprecedented market factors,

including (1) the oversupply of oil by OPEC, including a period of negative oil prices, (2) the

supply and demand shocks of the global COVID-19 pandemic, and (3) historic prices of HRC,

rendered the OCTG market in 2020 unrepresentative and an unreliable basis for determining

whether a petition filed in October 2021 is, as required by the statute, filed "by or on behalf of the

industry."  *See, e.g.*, Tenaris' October 8, 2021 Comments at 6-7, Exhibit 3; Tenaris' October 15,

2021 Comments at 9, Exhibits 2-4, 26-28, 35; Tenaris' October 20, 2021 Comments at 6-7;

Tenaris' October 22, 2021 Comments at 5.  Commerce failed to acknowledge any of the underlying

factors that rendered 2020 anomalous and, therefore, Commerce's initiation of the investigation

was unsupported by substantial evidence on the record and otherwise not in accordance with law.

> **c.    Commerce Relied on 2020 Data that Reflected an Anomalous OCTG Market**

Commerce's regulations provide that "production levels may be established by reference

to alternative data," so long as such data are "indicative of production levels."  19 C.F.R. §

351.203(e)(1).  Thus, although the regulations permit the use of "alternative data" in the place of

actual production data, such data must be "indicative of production levels" so as to serve as a

reasonable proxy for actual production levels.  *Id.*  Commerce's reliance on industry support

calculations that were based on a combination of anomalous 2020 production and shipment data,

and on a production-to-shipments ratio derived from 2018 and 2019 data, were not "indicative of

production levels" and therefore could not serve as a reasonable proxy for production data.

Calendar year 2020 was central to Petitioners' industry support calculations.  The OCTG

market in 2020 was subject to significant disruptions, leading to historic supply and demand

NON-CONFIDENTIAL VERSION

conditions affecting U.S. OCTG producers.  OPEC's oversupply of oil, combined with the global COVID-19 pandemic, led to negative oil prices in 2020 – below $0 for the first time ever.



**US crude oil price has turned negative for the first time on record**

Tenaris' October 15, 2021 Comments at Exhibit 2.

The OCTG market is inextricably linked to energy production activity, which was severely reduced by these market forces.  As the press recounted in April 2020:  "US oil prices turned negative for the first time on record on Monday after oil producers ran out of space to store the oversupply of crude left by the coronavirus crisis, triggering an historic market collapse which left oil traders reeling" – a collapse in demand which the article referred to as "the biggest slump in oil demand for 25 years{.}"  *Id*.  Tenaris USA placed extensive evidence on the record demonstrating that market conditions during 2020 were highly unusual and therefore an inappropriate basis for Commerce to establish the level of industry support.  *See* Tenaris' October 8, 2021 Comments at 6-7 and Exhibits 3-4; Tenaris' October 15, 2021 Comments at 3-4 and Exhibits 2-4.  In addition to these exogenous demand shocks, prices of HRC – the principal input for producing welded OCTG – were soaring at the end of 2020.  Record evidence demonstrated that "{s}ince March

2020, steel prices are up a staggering 215%. The benchmark price for hot-rolled steel hit another all-time high last week, climbing to $1,825. Prior to the pandemic, it traded in the $500 to $800 range." Tenaris' October 8, 2021 Comments at Exhibit 3.

Petitioners cited a case acknowledging that "the Department has discretion in defining the 12-month period for which production will be measured," but nonetheless claimed that "using calendar year 2020 makes logical sense given the statutory standard of best available information." Petitioners' October 18, 2021 Comments at 9 & n.21 (citing *Initiation of Antidumping Duty Investigation: Circular Seamless Stainless Steel Hollow Products From Japan*, 64 Fed. Reg. 63,285, 63,287 (Nov. 19, 1999). Petitioners did not refute the substance of Tenaris' arguments regarding the unprecedented demand shocks for OCTG and the 2020 market dynamic. Nor did Commerce address the historic circumstances affecting the 2020 OCTG market, or the essential differences between 2020 and 2021 with respect to the OCTG industry:

> {W}e see no reason to depart from our longstanding practice of measuring production over the most recently completed calendar year for purposes of determining industry support. We note that Tenaris USA contends that another time period would be more appropriate, but it does not offer a specific time period that would be more appropriate, only broadly suggesting that Commerce should poll the industry and request production data, "including for the most recent 12 months." Moreover, despite its arguments regarding anomalous production data for 2020, Tenaris USA did not provide any production or shipment data or any other relevant data for comparison purposes to support its contention that an alternate time period is more appropriate than calendar year 2020 for purposes of determining industry support.

Initiation Checklist at Attachment II at 16 (citation omitted).

The OCTG market in 2020 had fundamentally shifted by October 2021, when the petition was filed. The industry support calculations relied upon by Commerce, based on 2020 production and shipment data, were entirely disconnected from the market in which the domestic industry

filed the petition in late 2021, and thus could not provide Commerce with a reasonable basis for determining whether the petition was filed "by or on behalf of the industry."

> **d.      Commerce's Reliance on a Production-to-Shipment Ratio Based on 2018-2019 Data Further Skewed the Industry Support Calculation**

The calculation methodology submitted by Petitioners and relied on by Commerce also was based on outdated total industry production and domestic shipment volumes for 2018 and 2019 from the ITC's 2020 final sunset review determination. *See, e.g.*, Petitioners' General Issues Questionnaire Response at 7.   Petitioners' use of data that are 2-3 years out-of-date and unrepresentative for non-petitioners skewed the industry support ratio in [                    ].

Petitioners [

]. *See* Tenaris' October 15, 2021 Comments at 6-7, Exhibit 1.  By applying the [

]. *Id.* at Exhibit 1.  However, when comparing [                                                  ], the data are skewed.   Petitioners reported [

]. *Id.* This approach, and the resulting [

].  By stating that [

].   Simply stated, Petitioners unjustifiably [                                                  ], skewing the results [                    ].

NON-CONFIDENTIAL VERSION

In the Initiation Checklist, Commerce does not address this effect:

> Although Tenaris USA and TMK argue that the ITC historical ratios are insufficient, it is unclear on what basis they make such a claim. Tenaris USA and TMK object to the petitioners' use of the most recently available industry-wide production and shipment data from the *India et al OCTG 2020 Review* to derive a ratio to approximate production from the available domestic shipment data for the entire U.S. OCTG industry, as reported in [                              ], but they do not offer any alternative sources or production estimates that would, in their view, be more reliable.

Initiation Checklist at Attachment II at 15-16. Commerce's claim that Tenaris USA did not offer any alternative is inaccurate. Tenaris USA repeatedly asserted that an "alternative source" would be more reliable. Tenaris USA specifically requested that Commerce poll the industry and collect actual production data – a process that would remove the need for Commerce to rely on a convoluted methodology cobbled together from 2-3 year-old data, and including 2020 data resulting from unprecedented market conditions. *See* Tenaris' October 15, 2021 Comments at 5; Tenaris' October 20, 2021 Comments at 7.

In its Initiation Checklist, Commerce also describes an "alternative methodology," (*i.e.*, "Commerce Alternative Industry Support Calculation" described in **Section V.A.2.b**) in which Commerce "used the publicly available record information on industry-wide production and shipments for 2018-2019 to derive the ratio of industry-wide shipments to production and directly applied this ratio to the 2020 domestic shipment data available for the entire U.S. OCTG industry to approximate total U.S. production of OCTG in 2020," instead of "petitioners' own ratios or the ratios derived for the 'non-petitioners,' which Tenaris USA contends are skewed." Initiation Checklist at Attachment II at 17. However, Commerce's alternative methodology suffers from the same defect, discussed above, because it is based on domestic shipment data from the anomalous 2020 market period.

3. **Commerce Failed to Ensure That Including the Production Data of Finishers/Processors in Its Calculation of OCTG Production Was Appropriate**

Tenaris USA also expressed concern with Petitioners' treatment of OCTG processors/finishers in the calculation of domestic production and industry support. Tenaris' October 22, 2021 Comments at 5; *see also* Tenaris' October 20, 2021 Comments at 8. Tenaris USA explained that "Petitioners' calculations of their own production and/or shipments might include data that pertain to mere finishing operations of Petitioners rather than the production of OCTG," and that "Petitioners do not address how the issue of finishing pertains to Commerce's determination of industry support, and do not cite to any Commerce precedent to explain their unclear position." Tenaris' October 20, 2021 Comments at 8.

Commerce did not sufficiently address Tenaris USA's legitimate concerns. Blindly accepting data that treats processed pipe as "production" runs the clear risk of double-counting: one ton of green tube produced by an OCTG producer could very well have been counted as two tons when the "production" was reported by a processor. Commerce refused to even take the time available under the statute to check that Petitioners were not counting the same "production" volume twice.

Nor did Commerce address Tenaris USA's concern about the relationship of pipe formation to pipe finishing, and the implications for any assessment of "domestic" OCTG production. Tenaris' October 20, 2021 Comments at 8; Initiation Checklist at Attachment II at 14. Nor did Commerce address Tenaris USA's concern that it would be inappropriate under the statute to consider minor finishing of imported pipe to be "domestic production." Tenaris' October 15, 2021 Comments at 10; Initiation Checklist at Attachment II at 14. Pipe finishers have two options for their input (unfinished OCTG): domestic or imported. To the extent that a finisher sourced from domestic production, Commerce had to control for double counting. To the extent that a

27

finisher sourced from imports, Commerce had to ensure that the finishing operations were sufficient to be considered "domestic production" of OCTG. Commerce engaged in neither inquiry and accepted everything as "domestic production."

In dismissing Tenaris USA's concerns, Commerce relies on the ITC's finding in its injury analyses in past OCTG cases that finished and unfinished OCTG is a single like product and green tube processing is domestic production:

> With respect to the inclusion of OCTG finishing operations, including the finishing of green tube, our examination of the record gives us no reason to believe that these finishing operations should not be included as production of the domestic like product. The scope and domestic like product of these investigations includes OCTG "whether finished…or unfinished (including green tubes and limited service OCTG products)." In past proceedings involving similar scopes, the ITC has found that OCTG, as defined in the scope, constitutes a single like product and that green tube processing constitutes domestic production. Tenaris USA does not contest these arguments or the petitioners' definition of the domestic like product as co-extensive with the scope. In addition, the data from the ITC that the petitioners used in their industry support calculation clearly include finishing activities.

Initiation Checklist at 14 (citations omitted). The fact that the scope of the investigation includes both unfinished and finished OCTG does not mean that Commerce can double count the production, or that all processing of imported pipe is "domestic production." Commerce cannot discharge its statutory obligation to assess whether a petition has been filed by or on behalf of the domestic industry by simply relying on the ITC's findings. It reflects an analysis conducted by a different agency, with a different mandate, operating under different statutory requirements. Commerce's failure to address Tenaris USA's arguments and concerns regarding the inclusion of activities of OCTG processors and finishers was unsupported by substantial evidence and not in accordance with law.

NON-CONFIDENTIAL VERSION

    **4.**    **Petitioners Failed to Meet their Burden to Demonstrate the Petition Satisfied the Statutory Requirements for Initiation of the Investigation**

By providing flawed and insufficient data from an anomalous OCTG market period, Petitioners failed to meet their burden of establishing sufficient industry support for the petition. The principle that Petitioners bear this burden is uncontested. Commerce recently confirmed this in the Final Rule implementing the "Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws":

> **Two commenters suggest that Commerce include a regulatory provision that requires parties objecting to industry support to:** (1) If they are domestic producers, provide their affiliation status and whether they are related to a foreign producer; **and (2) identify the sources of industry data and indicate why the data is more accurate than the data in the petition.** Other commenters disagree with the suggested additions to the proposed regulation and argue that, pursuant to the Act, the petitioner bears the burden of establishing industry support, and not for opposing parties to establish a lack of industry support.
>
> *Response*:
>
> **We have not adopted the proposed additions. The suggestion to impose new requirements on parties that object to a petition would establish a substantive change beyond the scope of the procedural rule Commerce has proposed.** In addition, in our view, the suggested requirement is unnecessary. **The petitioners are responsible for establishing industry support of the petition**. To the extent industry support is not established in accordance with the Act, or is unclear from the evidence on the record, Commerce has authority to address these situations as they arise, such as through polling the industry or otherwise determining whether there is sufficient industry support to initiate an AD or CVD investigation.

*Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300, 52,305 (Sept. 20, 2021) (emphasis added) ("*Final Rule*"). Indeed, Commerce expressly rejected the notion that a party challenging the existence of sufficient industry support be required to show that other data "is more accurate than the data in the petition." *Id.* Commerce confirmed that the burden rests on Petitioners: "The petitioners are responsible for establishing industry support of the petition." *Id.* Petitioners did *not* satisfy the statutory

requirements despite multiple revisions to their industry support calculation so as to demonstrate that the petition was filed "by or on behalf of the industry."

In explaining its decision to initiate the investigation, Commerce pointed to Tenaris USA, a non-petitioning domestic producer, and its alleged failure to not place its own production data onto the record:

> We note that, despite providing four submissions on the topic of industry support and arguing that Commerce should not disregard its opposition, Tenaris USA did not provide any data on its production of the domestic like product for Commerce to account for Tenaris USA in the industry support calculations or to call into question the data provided by the petitioners. While the petitioners are responsible for establishing industry support of the petition, parties that oppose the petition or seek to impugn the data provided by the petitioners are responsible for giving effect to their opposition and/or arguments by providing evidence that supports them. As Tenaris USA points out, such information was readily available to Tenaris USA as it had recently been compiled and submitted to the ITC.

Initiation Checklist at Attachment II at 21 (citations omitted). Commerce did not request Tenaris USA's production data. Nor did Commerce cite to any authority to support the position that Tenaris USA should have placed its production data on the record. Indeed, Tenaris USA raised issues in written comments with supporting documentation regarding flaws in the data provided by Petitioners, and its counsel participated in a meeting with Commerce to discuss these concerns. That Commerce would under these circumstances initiate the investigation rather than poll the industry and request actual production data from the U.S. OCTG producers, including Tenaris USA, was unexpected. As noted, in adopting its regulations, Commerce expressly rejected the view that a party challenging the existence of sufficient industry support would need to adduce evidence to demonstrate that other data "is more accurate than the data in the petition." *Final Rule*, 86 Fed. Reg. at 52,305. Commerce confirmed that the burden of demonstrating industry support rests entirely on Petitioners.

NON-CONFIDENTIAL VERSION

Commerce effectively treated the alleged failure of Tenaris USA to provide production information that was never requested by Commerce as tantamount to a failure to cooperate and then drew an adverse inference against Tenaris USA that the petition had the statutorily required level of support to initiate the investigation without conducting any polling of the industry.  In other contexts, this Court routinely has established that Commerce cannot penalize a party for failure to submit information that Commerce never requested.  *See, e.g.*, *Risen Energy Co., Ltd. v. United States*, 611 F. Supp. 3d 1384 (Ct. Int'l Trade 2022) ("Commerce may not determine that a respondent failed to cooperate to the best of its ability because it did not provide information that Commerce did not request"); *Guizhou Tyre Co. v. United States*, 399 F. Supp. 3d 1346, 1352 (Ct. Int'l Trade 2019) ("'Fairness requires that Commerce, before invoking an adverse inference, must have communicated its information requests clearly and adequately,' and a 'party's failing to take actions never requested cannot be the basis for a finding of a lack of cooperation under § 1677e(b).' Here, what Commerce labels a 'failure to cooperate' is actually a failure by the Department to request the proper information" (citing *Peer Bearing Co.-Changshan v. United States*, 853 F. Supp. 2d 1365, 1377-78 (Ct. Int'l Trade 2012))); *Saha Thai Steel Pipe Pub. Co., LTD v. United States*, 605 F. Supp. 3d 1348 (Ct. Int'l Trade 2022) ("Commerce did not request in the Second Supplemental Questionnaire or any point thereafter a revised U.S. sales database … Yet that information is what Commerce now claims Saha Thai failed to provide … Commerce failed to provide notice and an opportunity to remedy as § 1677m(d) requires").  While the context and underlying facts in these decisions are of course different, the principle that *Commerce must request the information it requires* is applicable.  Commerce did not request Tenaris USA's production data, so it cannot point to Tenaris USA's production data not being on the record as a basis for its determination.

31

NON-CONFIDENTIAL VERSION

In addition, in cases where the burden was on respondent to justify a post-sale price adjustment and Commerce claimed that the respondent had not satisfied the criteria, the Court found that Commerce should have requested more information because "Commerce was the only party that could have been aware of the deficiency in the questionnaire response because it was the only participant in the review that knew what would satisfy its unarticulated criteria." *Jindal Poly Films Ltd. of India v. United States*, 365 F. Supp. 3d 1379, 1388 (Ct. Int'l Trade 2019). As in *Jindal*, Commerce in the present case did not request information from Tenaris USA.

Similarly, the Court has recognized that where a party bears the evidentiary burden (such as Petitioners in this case to establish the requisite level of industry support), the burden will also *extend to Commerce* to request additional information if Commerce considers further examination is warranted or the matter at issue is not satisfactorily supported. *See Qingdao Taifa Group Co. v. United States*, 710 F. Supp. 2d 1352 (Ct. Int'l Trade 2010) ("Although the burden of rebutting the presumption of government control remains on the respondent, in some circumstances Commerce may have to perform an independent investigation of the facts related to the question of government control if the parties' filings do not answer it to Commerce's satisfaction"); *Sigma Corp. v. United States*, 841 F. Supp. 1255, 1267 (Ct. Int'l Trade 1993) ("The burden of proof to show that a company is independent is on the respondent, but if it has not supplied enough information, the burden shifts to Commerce to ask for more information … Commerce cannot expect a respondent to be a mind-reader").

Tenaris USA's four submissions pointing out deficiencies, and Petitioners' three sets of corrections to the calculation in the petition, demonstrated that the level of industry support was deficient or unclear at best. Commerce could have obtained Tenaris USA's actual production data

and that of the other U.S. producers by polling the industry and requesting production data, which is precisely what Tenaris USA requested and reasonably expected Commerce to do.

**5.**     **Commerce Ignored the Exceptional Circumstances and Tenaris USA's Repeated Requests to Extend the Time for Making a Determination and Poll the Industry**

In four separate submissions prior to Commerce's initiation of the investigation, Tenaris USA, the largest U.S. producer of OCTG, repeatedly requested that Commerce delay the initiation to better evaluate the level of domestic industry support for the petition and poll the industry. Commerce ignored each of these requests and the record evidence that exceptional circumstances existed that justified extending the deadline to initiate the investigation in order to poll the industry. 19 U.S.C. § 1673a(c)(1)(B).

Tenaris USA clearly requested that Commerce poll the industry:

Petitioners claim that "Tenaris provides no suggested alternate period to use to calculate industry support." ***The solution is simple:  Commerce should poll domestic industry and request actual production data, including for the most recent 12 months.***  It would not be burdensome for the parties (who currently are providing production information to the ITC in questionnaires due today, October 20) to provide monthly production data for the most recent 12 months.  Such data would give Commerce a basis for concluding whether these petitions are filed on behalf of the domestic industry.

Tenaris' October 20, 2021 Comments at 7 (emphasis added).  Tenaris USA made numerous similar requests in its other submissions to Commerce.  *See* Tenaris' October 8, 2021 Comments at 2 ("In the absence of rejecting the petitions, Commerce would need to extend this deadline by an additional 20 days in order to poll the industry"); *id.* at 8 ("At a minimum, the flaws with [

] warrant

Commerce to poll the industry"); Tenaris' October 15, 2021 Comments at 3 ("The inadequacies in the Petitioners' initial and modified calculations of industry support require Commerce to poll the industry, and take the additional 20 days permitted under the statute to obtain reliable data in

order to ensure that the petitions have been filed 'by or on behalf of the industry'"); *id.* at 5 ("Commerce should further investigate these inadequacies by polling the industry to get a more precise picture of actual domestic industry production data in 2021"); Tenaris' October 20, 2021 Comments at 3 ("Equally important, in light of the flaws identified with each of Petitioners' successive attempts to provide a sufficient standing calculation, where the level of industry support 'is unclear from the evidence on the record,' Commerce should poll the industry"); *id.* at 6 ("At the very least, the level of industry support remains 'unclear,' such that Commerce should poll the industry"); Tenaris' October 22, 2021 Comments at 6 ("If Commerce does not reject the petitions outright, it should take additional time to determine industry support based on actual data by polling the industry … Because the level of industry support has been demonstrated to be, at the very least, 'unclear from the evidence on the record,' Commerce should extend the deadline and conduct polling in this case to ensure that there is a statutorily consistent basis for initiating any investigations").

Commerce simply disregarded the repeated requests of Tenaris USA and initiated the investigation instead of extending its industry support determination by 20 days as permitted by 19 U.S.C. § 1673a(c)(1)(B).  Initiation Checklist at Attachment II at 8.  The record confirms that Tenaris USA implored Commerce to seek more recent data and to poll the domestic industry, and was ready to respond to polling and any requests for actual production data.

Commerce's decision not to extend the investigation initiation and poll the industry in the face of the opposition of the largest domestic OCTG producer is a failure by Commerce to consider record evidence which, on its face, provided significant support for an alternative conclusion, rendering its affirmative industry support finding unsupported by substantial evidence.  *See Allegheny Ludlum Corp.*, 112 F. Supp. 2d at 1165.  ("{I}t is … well-established that Commerce's

total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders the Department's determination unsupported by substantial evidence"); *see also Chr. Bjelland Seafoods A/S v. United States*, 19 C.I.T. 35, 37 (1995) (citing *USX Corp. v. United States*, 655 F. Supp. 487, 489 (Ct. Int'l Trade 1987)) (holding that "a determination based on inadequate reasoning or conjecture cannot survive the 'substantial evidence' standard of review").

**B.      Commerce's Failure to Poll the Domestic Industry and Seek Actual Production Data for the Most Recent Twelve Months Prior to the Filing of the Petition Was Unsupported by Substantial Evidence, Contrary to Law, and an Abuse of Discretion**

**1.      The Statute Mandates That Commerce "*Shall* Poll the Industry" Where the Petition Does Not Establish the Statutory 50 Percent Level of Support and "Other Information" Cannot Serve as Reasonable Proxy Data for Actual Production Levels**

Pursuant to 19 U.S.C. § 1673a(c)(4)(D), if the petition does not establish support for domestic producers accounting for more than 50 percent of the total production of the domestic like product, Commerce "*shall* poll the industry or rely on other information in order to determine if there is support for the petition." 19 U.S.C. § 1673a(c)(4)(D)(i) (emphasis added). Alternatively, "if there is a large number of producers in the industry, {Commerce} may determine industry support for the petition by using any statistically valid sampling method to poll the industry." 19 U.S.C. § 1673a(c)(4)(D)(ii). While Commerce typically determines whether a petition has the requisite level of support within 20 days, the statute allows an extension of an additional 20 days when Commerce determines that it must poll the industry or otherwise determine industry support. 19 U.S.C. § 1673a(c)(1)(B).

Commerce previously has extended the deadline for initiation to poll the industry if the petition has not clearly established support surpassing the 50 percent threshold. *See, e.g., Notice of Extension of the Deadline for Determining the Adequacy of the Antidumping and Countervailing*

*Duty Petitions: Passenger Vehicle and Light Truck Tires From Korea, Taiwan, Thailand, and Vietnam*, 85 Fed. Reg. 32,013 (May 28, 2020) ("Because it is not clear from the Petitions whether the industry support criteria have been met, Commerce has determined it should extend the time period for determining whether to initiate investigations in order to further examine the issue of industry support.   Commerce will need additional time to gather and analyze additional information regarding industry support"); *see also Notice of Extension of the Deadline for Determining the Adequacy of the Antidumping and Countervailing Duty Petitions: Utility Scale Wind Towers From India, Malaysia, and Spain*, 85 Fed. Reg. 65,028 (Oct. 14, 2020) (same); *Notice of Request for Information and Extension of Time: Wooden Bedroom Furniture From the People's Republic of China*, 68 Fed. Reg. 65,875 (Nov. 24, 2003) (same).

Commerce's reliance on 2020 production and shipment data provided by Petitioners raises questions as to the accuracy of Petitioners' industry support calculations.  As discussed in **Section V.A.2.c**, the unprecedented demand conditions present in 2020 (OPEC's oversupply of oil combined with the global COVID-19 pandemic), along with the soaring HRC prices at the end of 2020, rendered the 2020 OCTG market unrepresentative, calling into serious question whether a petition filed in October 2021 is, as required by the statute, filed "by or on behalf of the industry." 19 U.S.C. § 1673a(c)(4)(A). *See* Tenaris' October 8, 2021 Comments at 6-7, Exhibits 3-4; Tenaris' October 15, 2021 Comments at 3-4, Exhibits 2-4.  In its Initiation Checklist, Commerce failed to acknowledge any of the underlying factors that rendered 2020 anomalous. *See* Initiation Checklist at 25.

Commerce's failure to address record evidence provided by Tenaris USA regarding the unsuitability of 2020 production data for calculating domestic industry support renders its affirmative industry support determination unsupported by substantial evidence. *See Huaiyin*

NON-CONFIDENTIAL VERSION

*Foreign Trade Corp.*, 322 F.3d at 1374 (quoting *Atlantic Sugar, Ltd.*, 744 F.2d at 1562 ("taking into account the *entire record* …") (emphasis added)); *Allegheny Ludlum Corp.*, 112 F. Supp. 2d at 1165 ("it is … well-established that Commerce's total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders the Department's determination unsupported by substantial evidence").

Commerce's refusal to poll the industry also was contrary to law.  This Court's precedent confirms that, in cases where the petition fails to demonstrate sufficient industry support "on its face, Commerce must then poll the relevant industry or rely on other information." *See Pokarna*, 547 F. Supp. 3d at 1303 ("When the petition is unable to demonstrate support on its face, Commerce must then poll the relevant industry or rely on other information to determine whether support exists").  In *Pokarna*, the Court sustained Commerce's decision to not poll the industry, but only because "Commerce found the requisite industry support within the petition, {so} it was not required to poll the industry to confirm support." *Pokarna*, 547 F. Supp. 3d at 1306.  Here, sufficient industry support was not apparent within the petition "on its face." *See id*.

Petitioners submitted four different calculations (in the petition, and then three subsequent revisions) in their attempt to demonstrate domestic industry support for the petition.  It is undisputed that for [                              ] supporters of the petition accounted for less than 50 percent of total U.S. production of the domestic like product, and therefore Commerce was required to either poll the industry to rely on other information under 19 U.S.C. § 1673a(c)(4)(D)(i). *See* Initiation Checklist at 6 ("{t}he Petitions did not establish the support of domestic producers accounting for more than 50 percent of total production of the domestic like product"); *see also id*. at 19 n.155 ("depending on the methodology applied, the supporters of the Petitions account for [        ] percent, [        ] percent, or [        ] percent of total U.S. production").

Nevertheless, Commerce declined to poll the industry in accordance with 19 U.S.C. § 1673a(c)(4)(D)(i).   Commerce considered that "petitioners provided reasonably available information" and "have the industry support required" under the statute, and that "it is unnecessary for Commerce to poll the industry to determine industry support." *Id*. at 19.

Even after Commerce issued questionnaires and assisted Petitioners with multiple revisions to their industry support calculation, significant uncertainty remained regarding the calculation methodology and the level of domestic industry support for the petition.  Commerce's reliance on allegedly "reasonably available information," and its refusal to poll the domestic industry, where support for the petition was not apparent on its face, renders Commerce's affirmative industry support determination contrary to the requirements of 19 U.S.C. § 1673a(c)(4)(D). *See Pokarna*, 547 F. Supp. 3d at 1303 (citing 19 U.S.C. § 1673a(c)(4)(D)).

## 2. Commerce's Failure to Poll and Request Data "Indicative of Production Levels" Is Not Supported by Substantial Evidence on the Record and Is Otherwise Not in Accordance with Law

As demonstrated above, Commerce should not have relied on 2020 shipment and production data because they were not "*indicative of production levels*" that could serve as a reasonable proxy for actual production levels. *See* 19 C.F.R. § 351.203(e)(1) (emphasis added). Production data for the most recent twelve-month period would have been more appropriate as a proxy for actual production levels.  Commerce's failure to poll the industry and request data indicative of production levels is not supported by substantial evidence and is otherwise not in accordance with law.

Commerce normally will measure production "over the most recently completed calendar year for purposes of determining industry support."  Initiation Checklist at Attachment II at 16. Commerce, however, "will depart from its standard practice of using production data from the previous calendar year where there is a 'compelling argument that a different time period is more

appropriate.'" *Id.* at 12 (citing *Large Power Transformers from the Republic of Korea: Initiation of Antidumping Duty Investigation*, 76 Fed. Reg. 49,439 (Aug. 10, 2011) and accompanying Initiation Checklist at Attachment II at 19).

For example, in a recent case Commerce relied on data from the then-most recent marketing season (August 1, 2020 - July 31, 2021) instead of the most recent calendar year (calendar year 2020, as the petitions were filed in December 2021). *See Lemon Juice From Brazil and South Africa: Initiation of Less-Than-Fair-Value Investigations*, 87 Fed. Reg. 3,768, 3,770 (Jan. 25, 2022). Similarly, Commerce looked to production data from crop year 2012-2013, as opposed to the most recent calendar year, because petitioners argued that this time period "more accurately reflects the production of sugar than would data presented on a calendar year basis." *Sugar From Mexico: Initiation of Antidumping Duty Investigation*, 79 Fed. Reg. 22,795 (Apr. 24, 2014). In another case, Commerce calculated industry support using production data from only a portion of the prior calendar year (January-June 2019), which was derived from the parallel ITC investigation. *Mattresses From Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less Than-Fair-Value Investigations*, 85 Fed. Reg. 23,002 (Apr. 24, 2020) (citing *Mattresses from China*, Inv. No. 731-TA-1421 (Final), USITC Pub. 5000 (Dec. 2019) (only including 2019 production data through June 2019)).

Thus, where market conditions for an industry may warrant departure from the standard practice of relying on data from the previous calendar year, Commerce has used production data from a more recent period that is more representative. Given the unprecedented and unrepresentative market conditions in 2020 for the OCTG industry, as noted above in **Section**

**V.A.2.c**, Commerce should have done the same in this case. It decision to rely on the 2020 data was unsupported by record evidence and not in accordance with law.

Tenaris USA requested that Commerce poll the industry and request actual production data for the most recent twelve months. *See, e.g.*, Tenaris' October 8, 2021 Comments at 2, 8; Tenaris' October 15, 2021 Comments at 5, 7, 10-11, 23; Tenaris' October 20, 2021 Comments at 2-9; Tenaris' October 22, 2021 Comments at 2-3, 5-6. Inexplicably, Commerce incorrectly claimed in its Initiation Checklist that "Tenaris USA contends that another time period {for production data} would be more appropriate, but it does not offer a specific time period that would be more appropriate." Initiation Checklist at Attachment II at 16. However, Commerce then correctly confirms *in the same sentence* that Tenaris USA requested that Commerce poll the industry and request production data "including for the most recent 12 months." *Id.* As detailed above in **Section V.A.5** the record confirms that Tenaris USA repeatedly requested that Commerce poll the industry to determine actual production levels for the most recent twelve-month period. *See* Tenaris' October 15, 2021 Comments at 5 ("Commerce should further investigate these inadequacies by polling the industry to get a more precise picture of *actual domestic industry production data in 2021*" (emphasis added)); Tenaris' October 20, 2021 Comments at 7 ("Commerce should poll domestic industry and request actual production data, including for *the most recent 12 months*" (emphasis added)).

Despite subsequent requests – and the manifest problems of Petitioners' revisions to the calculation – Commerce declined to poll the industry to obtain *actual* production data from the preceding twelve months.

NON-CONFIDENTIAL VERSION

### 3. Commerce Abused Its Discretion by Failing to Poll the U.S. OCTG Producers to Establish That the Petition Was Filed by or on Behalf of the Industry

As noted, where the petition does not establish support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product, the statute mandates that Commerce shall either "poll the industry" or "rely on other information" in order to determine if there is required level of support for the petition. 19 U.S.C. § 1673a(c)(4)(D). The statute further vests Commerce with discretion "in exceptional circumstances" to extend the 20-day deadline by an additional 20 days. 19 U.S.C. § 1673a(c)(1)(B).

While Commerce enjoys discretion as to whether to "poll the industry" or "rely on other information," and whether to extend the deadline for initiation, that discretion is not unbounded and can be abused, especially given Commerce's past practice, the factual circumstances, and the record before Commerce that demonstrate:

- Petitioners' numerous revisions to the petition;

- Commerce's reliance on anomalous 2020 data from an unrepresentative OCTG market;

- Petitioners were below the 50 percent statutory level in the absence of using other information;

- Petitioners' treatment of OCTG processors/finishers in the calculation of domestic production and industry support;

- Repeated requests of Tenaris USA, the largest U.S. OCTG producer, to poll the industry; and

- Commerce's past practice to poll the domestic industry in similar situations in which industry support was unclear.

**NON-CONFIDENTIAL VERSION**

This Court has found, in the context of an AD investigation, that, "{i}n abuse of discretion review, 'an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.'" *Jiangsu Jiasheng Photovoltaic Tech.*, 28 F. Supp. 3d at 1323 (quoting *SKF USA*, 263 F.3d at 1382); *see also Clearon Corp. v. United States*, 38 Int'l Trade Rep. (BNA) 1960 (Ct. Int'l Trade 2016) (repeating the "well-established" standard that "agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently," and further stating that, "{w}hen an agency changes its existing 'policy', *i.e.*, in the sense of a 'course or principle of action previously adopted', then at a minimum the agency must 'display awareness that it is changing position' {and} 'show that there are good reasons for the new policy'" (citations omitted)). When Commerce departs from its normal practice, it must explain its reasoning for doing so. *See, e.g.*, *Citrosuco Paulista, S.A. v. United States*, 704 F. Supp. 1075, 1088 (Ct. Int'l Trade 1988) ("an agency must either conform itself to its prior decisions or explain the reasons for its departure … to insure consistency in an agency's administration of a statute" (citations omitted)).

Commerce has, in prior cases where the petition did not clearly establish industry support, extended the initiation deadline by 20 days and polled the domestic industry pursuant to 19 U.S.C. § 1673a(c)(1)(B), as confirmed in its extension and subsequent initiation notices. *See, e.g., Notice of Extension of the Deadline for Determining the Adequacy of the Antidumping and Countervailing Duty Petitions: Utility Scale Wind Towers From India, Malaysia, and Spain*, 85 Fed. Reg. 65,028 (Oct. 14, 2020) ("Commerce has determined it would be appropriate in this case to poll the industry and extend the time period for determining whether to initiate investigations"); *Utility Scale Wind Towers From India, Malaysia, and Spain: Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 73,023 (Nov. 16, 2020) ("On October 7, 2020, Commerce extended the initiation

deadline by 20 days to poll the domestic industry in accordance with section 732(c)(4)(D) of the Tariff Act of 1930, as amended"); *Notice of Extension of the Deadline for Determining the Adequacy of the Antidumping and Countervailing Duty Petitions: Passenger Vehicle and Light Truck Tires From Korea, Taiwan, Thailand, and Vietnam*, 85 Fed. Reg. 32,013 (May 28, 2020); *Passenger Vehicle and Light Truck Tires From the Republic of Korea, Taiwan, Thailand, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 38,854 (Jun. 29, 2020); *Notice of Extension of the Deadline for Determining the Adequacy of the Antidumping Duty Petitions: Polyethylene Terephthalate Sheet From the Republic of Korea, Mexico, and the Sultanate of Oman,* 84 Fed. Reg. 39,801 (Aug. 12, 2019); *Polyethylene Terephthalate Sheet From the Republic of Korea, Mexico, and the Sultanate of Oman: Initiation of Less-Than-Fair-Value Investigations*, 84 Fed. Reg. 44,854 (Aug. 27, 2019); *Notice of Extension of the Deadline for Determining the Adequacy of the Antidumping and Countervailing Duty Petitions: Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China*, 79 Fed. Reg. 35,725 (Jun. 24, 2014); *Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Initiation of Antidumping Duty Investigation*, 79 Fed. Reg. 42,292 (Jul. 21, 2014); *Notice of Extension of the Deadline for Determining the Adequacy of the Antidumping Duty and Countervailing Duty Petitions: 1,1,1,2-Tetrafluoroethane From the People's Republic of China*, 78 Fed. Reg. 66,894 (Nov. 7, 2013); *1,1,1,2-Tetrafluoroethane From the People's Republic of China: Initiation of Antidumping Duty Investigation*, 78 Fed. Reg. 73,832 (Dec. 9, 2013); *Notice of Extension of the Deadline for Determining the Adequacy of the Antidumping Duty Petitions: Lightweight Thermal Paper from Germany, the Republic of Korea, and the People's Republic of China; and the Countervailing Duty Petition: Lightweight Thermal Paper from the People's Republic of China*, 72 Fed. Reg. 58,639 (Oct. 16, 2007); *Notice of*

*Initiation of Antidumping Duty Investigations: Lightweight Thermal Paper from Germany, the Republic of Korea, and the People's Republic of China*, 72 Fed. Reg. 62,430 (Nov. 5, 2007); *Notice of Extension of the Deadline for Determining the Adequacy of the Antidumping Duty Petition: Steel Wire Garment Hangers from the People's Republic of China*, 72 Fed. Reg. 46,606 (Aug. 21, 2007); *Steel Wire Garment Hangers from the People's Republic of China: Initiation of Antidumping Duty Investigation*, 72 Fed. Reg. 52,855 (Sep. 17, 2007); *Notice of Extension of the Deadline for Determining the Adequacy of the Antidumping Duty Petitions: Certain Steel Nails from the People's Republic of China and the United Arab Emirates*, 72 Fed. Reg. 38,816 (Jul. 16, 2007); *Certain Steel Nails from the People's Republic of China and the United Arab Emirates: Initiation of Antidumping Duty Investigations*, 72 Fed. Reg. 38,816 (Jul. 16, 2007); *Notice of Extension of the Deadline for Determining the Adequacy of the Antidumping Duty Petition: Liquid Sulfur Dioxide from Canada,* 70 Fed. Reg. 61,937 (Oct. 27, 2005); *Initiation of Antidumping Duty Investigation: Liquid Sulfur Dioxide from Canada*, 70 Fed. Reg. 69,735 (Nov. 17, 2005).

These cases demonstrate that Commerce's past practice when industry support is unclear is to poll the domestic industry. Commerce's refusal here to recognize that the record regarding industry support was unclear, and its departure from past practice of polling the domestic industry under such circumstances, constitutes an abuse of discretion. *See Jiangsu Jiasheng Photovoltaic Tech.*, 28 F. Supp. 3d at 1323 (quoting *SKF USA*, 263 F.3d at 1382).

Separately, apart from arbitrarily departing from standard practice in similar situations, the Court of Appeals for the Federal Circuit has found, in the context of an AD investigation, an abuse of discretion occurs when Commerce's decision "*represents an unreasonable judgment in weighing relevant factors*." *See Consol. Bearings Co.*, 412 F.3d at 1269 (citing *Star Fruits S.N.C.*, 393 F.3d at 1281 (emphasis added). This Court has also found that Commerce acted in "an

arbitrary and capricious manner if 'it entirely failed to consider an important aspect of the problem.'" *Shandong Dongfang*, 375 F. Supp. 3d at 1344 (quoting *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43). Here, Commerce failed to account for the aberrational and unrepresentative nature of the production and shipment data underlying Petitioners' successive flawed calculations, and ignored the repeated requests from Tenaris USA, the largest U.S. producer of OCTG, to exercise its statutory authority to delay initiation of the investigation in order to poll the industry and collect actual production data from a representative period. Based on the record before it, Commerce's decision to initiate the investigation based on the flawed industry support calculations and data from the unrepresentative 2020 OCTG market period shows "unreasonable judgment in weighing relevant factors" and was an abuse of discretion. *Consol. Bearings Co. v. United States*, 412 F.3d at 1269.

## VI.   CONCLUSION AND RELIEF SOUGHT

For the reasons discussed above, Plaintiffs respectfully request that the Court:

1)   Enter judgment in favor of Plaintiffs;

2)   Find that Commerce's initiation of the investigation on imports of OCTG from Argentina was inconsistent with the statutory requirements for determining the requisite level of industry support to permit the initiation of the investigation, the issuance of the Final Determination, and the imposition of the AD Order.

3)   Remand this matter to Commerce to reopen the record, request production data for the most recent twelve-month period prior to the date that the petition was filed, and poll the domestic industry;

**NON-CONFIDENTIAL VERSION**

4)      Remand this matter to Commerce reconsider its determination of industry

support for the petition, the initiation of the investigation, and the Final

Determination, and to issue revised final results in conformity with the Court's

decision; and

5)      Grant Plaintiffs such additional relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Gregory J. Spak
Gregory J. Spak
Frank J. Schweitzer
Kristina Zissis
Matthew W. Solomon
Colin Alejandro Dilley

WHITE AND CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

*Counsel to Tenaris Bay City, Inc., IPSCO Tubulars Inc., Maverick Tube Corporation, Tenaris Global Services (U.S.A.) Corporation, and Siderca S.A.I.C.*

June 23, 2023

CERTIFICATE OF COMPLIANCE

I, Gregory J. Spak, certify that the attached brief complies with the word limitation requirement, as stated in the Standard Chambers Procedures.  The word count for the Rule 56.2 Brief of Tenaris Bay City, Inc., IPSCO Tubulars Inc., Maverick Tube Corporation, Tenaris Global Services (U.S.A.) Corporation, and Siderca S.A.I.C., as computed by the White & Case word processing system (Microsoft Word 2016) and manual tally, is 13,893 (13,872 in the text of the brief and 21 words within the screenshot on page 23).

                                                    /s/Gregory J. Spak
                                                    Gregory J. Spak

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| TENARIS BAY CITY, INC.; MAVERICK TUBE CORPORATION; IPSCO TUBULARS INC.; TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION; AND SIDERCA S.A.I.C.,<br><br>          Plaintiffs,<br><br>     v.<br><br>UNITED STATES,<br><br>          Defendant,<br><br>          and<br><br>UNITED STATES STEEL CORPORATION; BORUSAN MANNESMANN PIPE U.S. INC.; PTC LIBERTY TUBULARS LLC; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC; AND WELDED TUBE,<br><br>          Defendant-Intervenors. | Court No. 22-00343 |

## ORDER

Upon consideration of Plaintiffs' motion for judgment upon the agency record pursuant to Rule 56.2 of the Rules of this Court, the Court, having reviewed the papers and pleadings on file herein, and after due deliberation, hereby:

**ORDERS** that Plaintiffs' motion is granted; and further

**ORDERS** that this matter is remanded to the United States Department of Commerce for disposition consistent with the Court's final opinion.

**SO ORDERED.**

Dated: _____, 2023          _____
     New York, New York                              Claire R. Kelly, Judge