UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| TENARIS BAY CITY, INC.; MAVERICK TUBE CORPORATION; IPSCO TUBULARS INC.; TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION; AND SIDERCA S.A.I.C, | |
| *Plaintiffs,* | |
| v. | |
| UNITED STATES, | Court No. 22-00343 |
| *Defendant,* | |
| and | |
| UNITED STATES STEEL CORPORATION; BORUSAN MANNESMANN PIPE U.S. INC.; PTC LIBERTY TUBULARS LLC; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC AND WELDED TUBE, | |
| *Defendant-Intervenors.* | |

## ORDER

Upon consideration of the motion for judgment on the administrative record filed by the plaintiffs, the responses thereto filed by the defendant and defendant-intervenors, and all other papers and proceedings herein, it is hereby:

**ORDERED** that the plaintiffs' motion is **DENIED.**

**SO ORDERED**

Date: _____          _____
     New York, New York                                    Claire R. Kelly, Judge

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| TENARIS BAY CITY, INC.; MAVERICK TUBE CORPORATION; IPSCO TUBULARS INC.; TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION; AND SIDERCA S.A.I.C, <br><br> *Plaintiffs,* <br><br> v. <br><br> UNITED STATES, <br><br> *Defendant,* <br><br> and <br><br> UNITED STATES STEEL CORPORATION; BORUSAN MANNESMANN PIPE U.S. INC.; PTC LIBERTY TUBULARS LLC; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC AND WELDED TUBE, <br><br> *Defendant-Intervenors.* | Court No. 22-00343 <br> **NON-CONFIDENTIAL VERSION** <br><br> Business Proprietary Information Deleted from Pages 4-6, 8-9, and 19-20. |

**DEFENDANT-INTERVENORS'**
**RESPONSE IN OPPOSITION TO RULE 56.2 MOTION**

Thomas M. Beline
Myles S. Getlan
James E. Ransdell
CASSIDY LEVY KENT (USA) LLP
900 19th Street NW
Suite 400
Washington, D.C. 20006
*Counsel to United States Steel Corporation*

Roger B Schagrin
Luke A. Meisner
Christopher T. Cloutier
SCHAGRIN ASSOCIATES
900 7th Street NW
Suite 500
Washington, D.C. 20001
*Counsel to Borusan Mannesmann Pipe U.S. Inc.,*
*PTC Liberty Tubulars LLC, United Steel, Paper and*
*Forestry, Rubber, Manufacturing, Energy, Allied*
*Industrial and Service Workers International*
*Union, AFL-CIO, CLC, and Welded Tube USA Inc.*

Dated: September 22, 2023

NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

STATEMENT PURSUANT TO RULE 56.2 .......................................................... 1

STATEMENT OF FACTS ...................................................................................... 3

STANDARD OF REVIEW ..................................................................................... 11

ARGUMENT .......................................................................................................... 13

I.     COMMERCE'S DETERMINATION OF INDUSTRY SUPPORT IS SUPPORTED
       BY SUBSTANTIAL EVIDENCE AND IS REASONABLE ........................... 13

       A. Commerce Faithfully Followed The Statute ...................................... 15

       B. Commerce's Industry Support Determination Is Based On Substantial Evidence
          And Reasonable .................................................................................. 18

       C. Tenaris' Arguments Amount To Garden Variety Requests To Re-Weigh
          Evidence .............................................................................................. 20

II.    THE STATUTE DOES NOT COMPEL POLLING THE INDUSTRY ............. 25

III.   EVEN IF THE PETITIONS DID NOT DEMONSTRATE SUFFICIENT INDUSTRY
       SUPPORT, THE SUCCESSFUL INVESTIGATIONS SHOULD NOT BE
       NULLIFIED ........................................................................................................ 29

CONCLUSION ...................................................................................................... 32

NON-CONFIDENTIAL VERSION

## TABLE OF AUTHORITIES

**CASES**

*Allegheny Ludlum Corp. v. U.S.,*
    112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000) …………………………..………….. 26

*Atl. Sugar, Ltd., v. United States,*
    744 F.2d 1556 (Fed. Cir. 1984) ………………………………...……………… 13

*Citrosuco Paulista, S.A. v. United States,*
    704 F. Supp. 1075 (Ct. Int'l Trade 1988) ………………………………….………. 26, 30

*Cleo Inc. v. United States,*
    501 F.3d 1291 (Fed. Cir. 2007) …………………………………………...……….12

*Consol. Bearings Co. v. United States,*
    412 F.3d 1266 (Fed. Cir. 2005) …………………………………………………… 29

*Consolidated Edison Co. v. NLRB,*
    305 U.S. 197 (1938) ………………………………………………………………. 20

*Daewoo Elecs. Co. v. United States,*
    6 F.3d 1511 (Fed. Cir. 1993) ……………………………...………………….. 12

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996) …………………………………………………….. 13

*Goldlink Indus. Co. v. United States,*
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ………………………...…………… 13

*INS v. Elias-Zacarias,*
    502 U.S. 478 (1992) ……………………………………………………………… 12

*JBF RAK LLC v. United States,*
    790 F.3d 1358 (Fed. Cir. 2015) ……………………………...…………………….. 13

*Koyo Seiko Co. v. United States,*
    36 F.3d 1565 (Fed. Cir. 1994) …………………………………………………….. 12

*Matsushita Elec. Indus. Co. v. United States,*
    750 F.2d 927 (Fed. Cir. 1984) …………………………………..…………… 11-12, 20

*Mitsubishi Heavy Indus., Ltd. v. United States,*
    275 F.3d 1056 (Fed. Cir. 2001) …………………………………………..……….. 11

**NON-CONFIDENTIAL VERSION**

*Mosaic Co. v. United States*,
    Slip Op. 23-134 (Ct. Int'l Trade Sept. 14, 2023) ………………….....…………… 24, 28

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) …………………………...…………………………… 13

*NSK Ltd. v. United States*,
    28 CIT 1535, 346 F. Supp. 2d 1312 (2004),
    *aff'd*, 481 F.3d 1355 (Fed. Cir. 2007) …………………………………………….. 21

*Pokarna Engineered Stone Ltd. v. United States*,
    547 F. Supp. 3d 1300 (Ct. Int'l Trade 2021),
    *aff'd*, 56 F.4th 1345 (Fed. Cir. 2023) …………………………………………… 21, 26-28

*Shandong Rongxin Imp. & Exp. Co. v. United States*,
    203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017) ……………………………….....………… 12

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
    966 F.2d 660 (Fed. Cir. 1992) …………………………………………………….. 30

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
    44 F.3d 978 (Fed. Cir. 1994) …………………………………………….……… 11, 20

*Ta Chen Stainless Steel Pipe, Inc. v. United States*,
    298 F.3d 1330 (Fed. Cir. 2002) …………………………………………….…… 12, 21

*Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*,
    975 F.2d 807 (Fed. Cir. 1992) …………………………………………………… 24

*United States v. Eurodif S.A.*,
    555 U.S. 305, 319 (2009) ………………………………………………...….. 12

*United States Steel Grp. v. United States*,
    96 F.3d 1352 (Fed. Cir. 1996) …………………………………………..………………… 11

**STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i) …………………………………………………...……11

19 U.S.C. § 1671a(a)(1) …………………………………………………………… 15, 29

19 U.S.C. § 1671a(b)(1) …………………………………………………………… 15, 17

19 U.S.C. § 1671a(c)(1)(A) …………………………………………………… 15, 20, 23

U.S.C. §§ 1671a(c)(1)(B) ……………………………………………………...…… 4, 15

NON-CONFIDENTIAL VERSION

19 U.S.C. § 1671a(c)(4)(A) …………………………………………...…..… 3, 9, 25

19 U.S.C. § 1671a(c)(4)(A)(ii) …………………………………..………… 15, 22

19 U.S.C. § 1671a(c)(4)(B) ………………………………..…………… 4, 6, 15

19 U.S.C. § 1671a(c)(4)(B)(i) …………………………………………… 14

19 U.S.C. § 1671a(c)(4)(D) …………………………………...…………….. 15

19 U.S.C. § 1671a(c)(4)(E) …………………………………………...… 16

19 U.S.C. § 1673a(a)(1) …………………………………………… 15, 29

19 U.S.C. § 1673a(b)(1) …………………………………...…………….. 15, 17

19 U.S.C. § 1673a(c)(1)(A) ……………………………...…. 15, 20, 23

19 U.S.C. § 1673a(c)(1)(B) ……………………………………………… 4, 15

19 U.S.C. § 1673a(c)(4)(A) …………………………………...…….. 3, 9, 25

19 U.S.C. § 1673a(c)(4)(A)(ii) …………………………..………… 15, 22

19 U.S.C. § 1673a(c)(4)(B) …………………………………...……. 4, 6, 15

19 U.S.C. § 1673a(c)(4)(B)(i) ………………………………………...…….14

19 U.S.C. § 1673a(c)(4)(D) ………………………………………..………. 15

19 U.S.C. §1673a(c)(4)(E) …………………………………………..….. 16

19 U.S.C. § 1677e(b) ………………………………………...…….…. 24

## ADMINISTRATIVE MATERIALS

*Certain Oil Country Tubular Goods from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam,* Inv. Nos. 701-TA-499-500 and 731-TA-1215-1217 and 1219-1223 (Final), USITC Pub. 4489 (Sept. 2014) …………………….……….. 18, 23

*Initiation of Antidumping Duty Investigation: Circular Seamless Stainless Steel Hollow Products from Japan,* 64 Fed. Reg. 63,285 (Dep't Commerce Nov. 19, 1999) …………..……. 7, 10

*Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less Than-Fair-Value Investigations*, 85 Fed. Reg. 23,002 (Dep't Commerce Apr. 24, 2020) …………………………….……. 28

NON-CONFIDENTIAL VERSION

*Mattresses from Indonesia: Initiation of Countervailing Duty Investigatio*n, 88 Fed. Reg. 57,412 (Dep't Commerce Aug. 18, 2023) …………………………………………...…….. 17

*Oil Country Tubular Goods from Argentina: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 87 Fed. Reg. 59,054 (Dep't Commerce Sept. 29, 2022) …………………………………...……. 1, 10

*Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation: Antidumping Duty Orders and Amended Final Affirmative Antidumping Duty Determination for the Russian Federation*, 87 Fed. Reg. 70,785 (Dep't Commerce Nov. 21, 2022) ……..... 1, 10

*Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation: Initiation of Less-Than-Fair-Value Investigations*, 86 Fed. Reg. 60,205 (Dep't Commerce Nov. 1, 2021) …………………………………………...…………. 8

*Oil Country Tubular Goods from India, Korea, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1216, 1221-1223 (Review), USITC Pub. 5090 (July 2020) ……………………………………………………………...…….. 23

**OTHER AUTHORITIES**

H.R. Rep. No. 103-316, vol. 1, *reprinted in* 1994 U.S.C.C.A.N. 4040 (1994) ……………….. 16

**REGULATIONS**

19 C.F.R. § 207.3(a) ………………………………………………………………… 23

19 C.F.R. § 351.203(e)(1)............................................................................................16-17

19 C.F.R. § 351.203(e)(3) ………………………………………………………….. 4

19 C.F.R. § 351.303(g) ……………………………………………………………… 23

NON-CONFIDENTIAL VERSION

## INTRODUCTION

Defendant-Intervenors United States Steel Corporation ("U. S. Steel"); Borusan

Mannesmann Pipe U.S. Inc. ("Borusan"); PTC Liberty Tubulars LLC ("PTC"); United Steel,

Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers

International Union, AFL-CIO, CLC (the "USW"); and Welded Tube USA Inc. ("Welded

Tube") hereby submit their response brief in opposition to the Rule 56.2 motion of Tenaris Bay

City, Inc.; Maverick Tube Corporation; IPSCO Tubulars Inc.; Tenaris Global Services (U.S.A.)

Corporation; and Siderca S.A.I.C. (collectively, "Tenaris") (ECF No. 40).

## STATEMENT PURSUANT TO RULE 56.2

### A.  Administrative Determination Under Review

The determination under review consists of the final determination issued by the U.S.

Department of Commerce ("Commerce") in its antidumping duty ("AD") investigation of oil

country tubular goods ("OCTG") from Argentina, Inv. No. A-357-824. The final determination

was published in the *Federal Register* as *Oil Country Tubular Goods from Argentina: Final

Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination

of Critical Circumstances*, 87 Fed. Reg. 59,054 (Dep't Commerce Sept. 29, 2022) ("Final

Determination") (P.R. 226).[1] The corresponding AD order was published in the *Federal Register*

on November 21, 2022. *See Oil Country Tubular Goods from Argentina, Mexico, and the

Russian Federation: Antidumping Duty Orders and Amended Final Affirmative Antidumping

Duty Determination for the Russian Federation*, 87 Fed. Reg. 70,785 (Dep't Commerce Nov. 21,

2022) ("AD Order") (P.R. 233).

---

[1] Citations to the administrative record indicate the public and confidential record document numbers ("P.R." and "C.R.").

NON-CONFIDENTIAL VERSION

### B.  Issues of Law Presented

**Issue 1: Was Commerce's determination that the Petitions, as amended, established sufficient support from the domestic industry producing OCTG based on substantial evidence and otherwise in accordance with law?**

Yes. Consistent with the statute, regulations, and standard agency practice of basing Commerce's analysis of domestic industry support on production in the most recently completed calendar year, Commerce's determination of domestic industry support is grounded in substantial evidence and is otherwise in accordance with law. Commerce based its analysis on actual production data provided by the Petitioners and certain other domestic producers for the calendar year preceding the filing of the petition. Due to the unavailability of production data from other companies, Commerce relied on available domestic shipment data as a proxy for production. These shipment data were adjusted to include an estimate of export shipments based on the experience of Petitioners and then adjusted to estimate production values based on a ratio of shipments to production from the most recent publication from the U.S. International Trade Commission ("ITC") containing such information. Commerce also calculated a second, "conservative" calculation using an estimate of export shipments for those domestic producers whose production data were not available from the most recent ITC information.

**Issue 2: Did Commerce rely on anomalous data and flawed assumptions in calculating the industry support for these Petitions?**

No. Under either calculation methodology, Commerce reasonably found that the Petitions were supported by the majority of domestic production. Commerce relied on actual production data from the petitioners and a well-known industry publication to establish total domestic production for the previously completed calendar year, which comports with established Commerce practice. Although Tenaris offered theories that the actual production and shipment data used by Commerce were inappropriate due to market factors affecting the base year (*i.e.*,

NON-CONFIDENTIAL VERSION

calendar year 2020), these theories were not supported by empirical data and otherwise departed meaningfully from established Commerce practice.

**Issue 3: Did Commerce err by not polling the domestic industry?**

No. Because the Petitions, as amended, demonstrated that the majority of domestic producers supported the Petitions, Commerce was not required to delay initiation and poll the industry as Tenaris argues it was compelled to do.

## STATEMENT OF FACTS

On October 6, 2021, four domestic producers of OCTG (Borusan Mannesmann Pipe U.S. Inc; PTC Liberty Tubulars LLC; and Welded Tube USA Inc.) and the USW, representing domestic workers at OCTG mills throughout the United States, (collectively, "Petitioners") filed petitions for the imposition of antidumping and countervailing duties ("CVD") on OCTG from Argentina (AD), Mexico (AD), Korea (CVD), and Russia (AD/CVD). *See* "Petitions for the Imposition of Antidumping and Countervailing Duties: Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and Russia" (Oct. 6, 2021) ("Petitions") (C.R. 1-6; P.R. 1-6).

The Petitions contained calculations of industry support pursuant to 19 U.S.C. §§ 1671a(c)(4)(A) and 1673a(c)(4)(A) based on information reasonably available to the Petitioners for the most recently completed calendar year, 2020. *Id*. at 5. Because there were no available sources of information for total domestic production during that period, the calculations were based on available information relating to shipment volumes within the United States. *Id*. at 5-6. To ensure that all domestic production of OCTG was accounted for, these domestic shipment volumes were adjusted to include estimated export shipments for the industry support calculation based on the export experience of the Petitioners during the relevant period. *Id*. at 6.

**NON-CONFIDENTIAL VERSION**

The Petitions also deducted the production of [

]. *Id*. at 6-7. The Petitions also deducted tonnages for mills owned by non-

petitioning companies believed to be represented by the USW, consistent with 19 C.F.R. §

351.203(e)(3). *Id*. at 6-7. The Petitions identified Tenaris as a domestic producer but established

that the company's position on the Petitions should be disregarded pursuant to 19 U.S.C. §§

1671a(c)(4)(B) and 1673a(c)(4)(B) because Tenaris and its affiliates produce subject

merchandise in Argentina and Mexico and distribute this and Russian OCTG in the United

States. *Id*. at 8-9, 27-29.

The day after the Petitions were filed, Commerce issued a questionnaire to Petitioners

requesting, *inter alia*, additional information regarding 2020 production and shipment quantities.

*See* Letter from Commerce to Petitioners re: Supplemental Questions (Oct. 7, 2021) (C.R. 7; P.R.

12). The questionnaire also identified a "methodological error with respect to the calculation of

total shipments for the U.S. industry" and requested that Petitioners provide production figures

for USW-represented mills. *Id*.

On October 8, 2021, Tenaris filed comments arguing that the Petitions contained certain

errors such that they did not demonstrate sufficient domestic industry support and that

Commerce should, as a result, either dismiss the Petitions or poll the domestic industry under 19

U.S.C. §§ 1671a(c)(1)(B) and 1673a(c)(1)(B). *See* Tenaris Letter (Oct. 8, 2021) (C.R. 9; P.R.

15). In addition, Tenaris informed Commerce that it would file a letter demonstrating that it

should be included in the calculation of domestic industry support. *Id*. at 2. Finally, Tenaris

contended that production volumes in 2020 were not the appropriate basis for determining

industry support because of purportedly low OCTG production due to (1) a global oversupply of

oil, (2) the impacts of COVID-19, and (3) high prices for flat-rolled steel input materials in the U.S. market during that period. *Id*. at 6.

On October 12, 2021, Petitioners responded to Commerce's supplemental questionnaire and addressed the calculation of domestic industry support. *See* Petitioners' General Issues Questionnaire Response (Oct. 12, 2021) (C.R. 10, P.R. 19). Petitioners revised their industry support calculations based on their own 2020 production data and, in light of their lack of access to production data for other companies, domestic shipment data for 2020 as [

]. *Id*. at 6. These values were then adjusted with the most recent export data on the U.S. OCTG industry available from the ITC to estimate total domestic production by combining both domestic and export shipments. *Id*. at 6-7. Petitioners again removed the production of [

]. *Id*. at 7. Petitioners also revised their calculations by removing the support from any domestic mill represented by the USW if the company that owned the mill was not part of the petitioning coalition. *Id*. at 8.

On October 15, 2021, Tenaris submitted additional comments asserting that it was the "largest" producer of OCTG in the United States (P.R. 22-28; C.R. 12-18) ("Tenaris Oct. 15 Comments") at 11. These claims did not reference or provide any production data to support Tenaris' claim that it was the largest domestic producer. *Id*. at 11-13. Moreover, while Tenaris proclaimed that it sought to serve U.S. customers from its U.S. mills "to the greatest extent possible," it also admitted that at some unspecified point in time it had shuttered all its U.S. welded OCTG production facilities in favor of imports to take advantage of the lower price for input materials in other markets. *Id*. at 1-2, 14-15. Tenaris argued that Petitioners' revised industry support calculations were inaccurate, and again asked Commerce to either reject the

**NON-CONFIDENTIAL VERSION**

Petitions or poll the industry. *Id*. at 5-9. Tenaris argued that data for certain Petitioners could possibly include "mere" finishing operations for imported green tube, which Tenaris asserted should not be considered domestic production. *Id*. at 9. Tenaris also argued that Commerce should not disregard its position on the Petitions under 19 U.S.C. §§ 1671a(c)(4)(B) and 1673a(c)(4)(B) as the imposition of remedial duties on imports from its foreign affiliates would adversely affect its U.S. operations because (1) some of its domestic facilities finished input material sourced from affiliates in subject countries, and (2) the company's marketing strategies include offering customers a full range of OCTG products that it sometimes sources from subject countries. *Id*. at 19-21.

On October 18, 2021, Petitioners submitted a second revised industry support calculation to Commerce. *See* Petitioners' Response to Tenaris Submission Concerning Petitioners' Standing (Oct. 18, 2021) (C.R. 19; P.R. 29) at Attachment 6. This submission highlighted, *inter alia*, that subject imports, including imports by Tenaris while its U.S. welded OCTG operations were apparently shuttered, captured [      ] percent of the U.S. market between the first half of 2020 to the second half of 2021 at the expense of the companies actually producing OCTG in the United States. *Id*. at 2. Petitioners also reiterated the reasonableness of their revised industry support calculations, explaining that (1) the calculations were based on Petitioners' own data and information published by the ITC, (2) they did not rely on any production volumes at non-Petitioner mills even if represented by the USW, and (3) whatever market conditions may have existed in 2020 did not undermine calculations based on the best available data for the most recent calendar year. *Id*. at 3.

Petitioners also observed that they had obtained a declaration from [

], as well as

NON-CONFIDENTIAL VERSION

a declaration from domestic producer Wheatland Tube Company that it supported the Petitions. *Id*. at 4. Petitioners pointed out that, despite Tenaris' contentions about "mere" finishing operations at certain of the Petitioners' mills, the ITC had long considered the processing of green tubes into OCTG as domestic production. *Id*. at 8. Petitioners furthermore provided an example of an instance in which Commerce rejected claims like those of Tenaris that some period of time other than the most recent calendar year should be used to analyze industry support. *Id*. at 9 n.21 (citing *Initiation of Antidumping Duty Investigation: Circular Seamless Stainless Steel Hollow Products from Japan*, 64 Fed. Reg. 63,285, 63,287 (Dep't Commerce Nov. 19, 1999)). Finally, Petitioners demonstrated that Tenaris favors foreign production and its position on industry support should consequently be disregarded, and that the company's claims that the imposition of remedial duties would harm its U.S. operations were nonsensical. *Id*. at 11.

The following day, Commerce issued a second questionnaire to Petitioners requesting revisions to certain of the declarations relating to industry support and a specific explanation of how the USW qualified as an interested party — including an identification of the production facilities with USW representation. Commerce Letter re: Supplemental Questions (Oct. 19, 2021) (C.R. 24; P.R. 33).

On October 20, 2021, Tenaris replied to Petitioners' October 18 submission, repeating its arguments that Petitioners' calculations were flawed and that Commerce must poll the industry, adding that Tenaris was under no obligation to contribute any data for Commerce to use in creating a more accurate industry support calculation. *See* Tenaris' Reply Comments on Petitioners' Standing (Oct. 20, 2021) (C.R. 22; P.R. 31) at 4. Tenaris also speculated that petitioner Borusan may be importing subsidized input material and, without citing any legal support, argued that it would be "counterintuitive to include in the industry support calculation

imported OCTG that members of the petitioning group have claimed to be unfairly traded and injurious." *Id*. at 9. Tenaris also reiterated its position that Tenaris had no choice but to suspend production at its U.S. welded OCTG operations in 2020 in light of high U.S. prices for input materials compared to other markets where Tenaris could make OCTG more profitably. *Id*. at 14.

On October 21, 2021, representatives of Tenaris discussed industry support with Commerce officials at an *ex parte* meeting. Commerce Memorandum re: *Ex Parte Meeting* (Oct. 21, 2021) (P.R. 34). Petitioners also, on the same day, responded to Commerce's second questionnaire, providing updated declarations and information on domestic mills represented by the USW, as well as a [

            ]. Petitioners' Response to Second General Issues Questionnaire (Oct. 21, 2021) (C.R. 23; P.R. 32).

The following day, Tenaris objected to Petitioners' revised industry support calculations for the same reasons outlined in its prior submissions and again asked Commerce to poll the industry. *See* Tenaris' Comments on Petitioners' Second General Issues Questionnaire Response (Oct. 22, 2021) (C.R. 25; P.R. 35).

On October 26, 2021, Commerce initiated the investigations. *Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation: Initiation of Less-Than-Fair-Value Investigations*, 86 Fed. Reg. 60,205 (Dep't Commerce Nov. 1, 2021). When analyzing whether the Petitions were supported by the domestic industry, Commerce accepted the most recent calculation from Petitioners and performed a second, conservative calculation utilizing domestic shipment data from [                    ] and calculating a production-to-shipments ratio based on the ITC's most recent report on the U.S. OCTG industry.

Commerce identified the information on which it was relying and explained its reasoning

in its standard Initiation Checklist. *See* Commerce Initiation Checklist, Inv. No. A-357-824 (Oct.

26, 2021) ("Initiation Checklist") (C.R. 26; P.R. 40) at 5. Among other things, Commerce

explained that under either Petitioners' final or Commerce's conservative methodology, the

petitioning companies (not including the USW) accounted for more than 25 percent but less than

50 percent of the domestic industry. *Id*. Attachment II at 6. Commerce noted that in such

circumstances where less than half of the domestic industry (by production) supports a petition,

19 U.S.C. §§ 1671a(c)(4)(A) and 1673a(c)(4)(A) specify that the agency may either "poll the

industry or rely on other information." *Id*. at 6. Commerce then noted that information on the

record before it included declarations of support from certain non-Petitioner domestic producers

and [                                                                ]. *Id*. at 4-6. Using this information to

adjust the numerator and denominator of the calculation of industry support, Commerce

calculated that the domestic producers supporting the Petitions accounted for more than half of

production by those expressing an opinion, and polling the industry would therefore be

unnecessary. *Id*. at 7. Commerce further noted that although Tenaris had indicated its opposition

to the Petitions, the company had not provided any production data such that the agency might

adjust the calculation to reflect this opposition and, regardless, even if Tenaris and all domestic

producers that had not yet made their position clear to Commerce opposed the Petitions, there

would still be sufficient support under the statute. *Id*.

Commerce also addressed Tenaris' other complaints, observing that any misidentification

of certain mills as represented by the USW was moot because the subsequent industry support

calculations did not count these mills as supporting the Petitions. *Id*. at 13-14. Commerce also

observed that the ITC has considered finishing operations to constitute domestic production of

OCTG in numerous prior proceedings, contradicting Tenaris' protestations about support from domestic entities that might "merely" finish OCTG. *Id*. at 14. Commerce also observed that the statute requires industry support to be based on domestic production and makes no provision for excluding domestic producers with potentially subsidized inputs. *Id*. The agency then rejected Tenaris' arguments that the 2020 time period was so anomalous that Commerce should jettison its "longstanding practice of measuring production over the most recently completed calendar year," noting that Tenaris failed to provide any of its own data to support its claims that a different time period would be more appropriate, and that Commerce had rejected similar arguments in other proceedings. *Id*. at 16 (citing *Initiation of Antidumping Duty Investigation: Circular Seamless Stainless Steel Hollow Products from Japan*, 64 Fed. Reg. 63,285, 63,287 (Dep't Commerce Nov. 19, 1999)). Finally, Commerce noted that its alternative, conservative methodology replaced the export ratio derived from Petitioners' actual operations with an industry-wide ratio derived from the most recent ITC publication on the U.S. OCTG industry, and that using either ratio showed sufficient industry support for initiation. *Id*. at 17.

After initiating the investigation, conducting fact-finding, conducting verification, and receiving case and rebuttal briefs, Commerce published its Final Determination on September 29, 2022, finding that OCTG from Argentina was being, or was likely to be, sold in the United States at less than fair value during the period of investigation. *See* Final Determination, 87 Fed. Reg. at 59,054. Commerce calculated a dumping margin of 78.30 percent for OCTG imported from Argentina. *Id*. After the ITC found subject imports caused injury to domestic producers, Commerce published the AD Order on OCTG from Argentina. AD Order, 87 Fed. Reg. at 70,785.

NON-CONFIDENTIAL VERSION

## STANDARD OF REVIEW

The applicable standard of review requires that the Court uphold an agency determination as lawful unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In evaluating Commerce's determination, the Court must decide whether "the administrative record contain{s} substantial evidence to support" Commerce's decision and whether that decision was "rational." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

A plaintiff must do more than simply point to contradictory evidence in the record to overturn the agency's decision. "{T}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Id.* (internal quotations and citations omitted). To the extent, therefore, that a plaintiff claims the evidence before Commerce "could be open to multiple interpretations, its argument does not require, or even allow, reversal." *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1062 (Fed. Cir. 2001) (citing *Matsushita*, 750 F.2d at 933).

In addition, a plaintiff may not ask the Court to re-weigh the evidence and decide the case for Commerce. *See Matsushita*, 750 F.2d at 933. The role of the Court is not to question the agency's decisions about the weight or quality of the evidence. *See United States Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996) (it is the agency's task to evaluate and assign weight to the evidence); *see also Matsushita*, 750 F.2d at 933 (it is not the weight of the evidence, but whether it reasonably supports a rational decision, that is evaluated by a reviewing

court). The Court may not substitute its judgment or its interpretation of the evidence for that of

the agency. *See Matsushita*, 750 F.2d at 936.

Given Commerce's special expertise in applying the antidumping law, this Court has

repeatedly held that Commerce is the "master" of the antidumping law, entitling its decisions to

great deference. *See NSK Ltd. v. United States*, 28 CIT 1535, 1561, 346 F. Supp. 2d 1312, 1335

(2004), *aff'd*, 481 F.3d 1355 (Fed. Cir. 2007) (citations omitted). The U.S. Court of Appeals for

the Federal Circuit ("Federal Circuit") has also noted that Commerce's "special expertise in

administering the anti-dumping law entitles its decisions to deference from the courts." *Ta Chen

Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1335 (Fed. Cir. 2002) (citations

omitted); *see also Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994)

("Deference to an agency's statutory interpretation is at its peak in the case of a court's review of

Commerce's interpretation of the antidumping laws.") (citing *Daewoo Elecs. Co. v. United

States*, 6 F.3d 1511, 1516 (Fed. Cir. 1993)). In addition, the Supreme Court has held that where

the agency is applying the antidumping statute, "we ask only whether the department's

application was reasonable." *United States v. Eurodif S.A.*, 555 U.S. 305, 319 (2009).

Indeed, when Congress entrusts an agency to administer a statute that demands inherently

fact-intensive inquiries, agency conclusions may be set aside only if the record is "so compelling

that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S.

478, 483-84 (1992); *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327,

1338 (Ct. Int'l Trade 2017) (recognizing tremendous deference to Commerce's factual findings).

It is thus improper to overturn a determination "simply because the reviewing court would have

reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d

1291, 1296 (Fed. Cir. 2007) (citations omitted). The Court will not substitute its judgment for

NON-CONFIDENTIAL VERSION

Commerce in choosing between two fairly conflicting views, even if it could justifiably have made a different choice had the matter been before it *de novo*. *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006). Hence, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court sustains Commerce's factual determinations if they are reasonable and supported by the record as a whole, even if evidence detracts from them. *See Atl. Sugar, Ltd., v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

Finally, the Court affords Commerce especially great deference "{w}hen a statute fails to make clear any Congressionally mandated procedure or methodology for assessment of the statutory tests." *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (citation and quotation marks omitted). In that circumstance, "Commerce may perform its duties in the way it believes most suitable." *Id.* (citation omitted). Consequently, Commerce receives "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when it exercises its technical expertise to select and to apply methodologies to implement the trade statute. *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996).

## ARGUMENT

## I.   COMMERCE'S DETERMINATION OF INDUSTRY SUPPORT IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS REASONABLE

In its brief, Tenaris argues that Commerce's decision to initiate the investigation was not supported by substantial evidence or otherwise in accordance with law. Tenaris Br. at 14. Tenaris' misconceived argument focuses on certain "flawed assumptions" by Commerce in its calculation of industry support: (1) Commerce's analysis using data from 2018 through 2020 was

13

NON-CONFIDENTIAL VERSION

insufficient to support the initiation of the investigation because the U.S. market for OCTG in

2020 was anomalous and earlier data were outdated, and (2) Commerce did not adequately

ensure that including potential OCTG finishers and processors in its industry support calculation

was appropriate. *See, e.g., id.* at 15, 22, 24-25. As explained in more detail below, Commerce's

initiation of the investigation was reasonable and based on substantial evidence, and none of the

grievances raised by Tenaris regarding Commerce's methodology have merit.

      In addition, Tenaris' claim that Commerce should not consider OCTG finishing

operations to constitute domestic production contradicts years of ITC determinations about what

qualifies as domestic production of OCTG. *See* Initiation Checklist Att. II at 14. The argument is

also incompatible with Tenaris' claim that its interests as a domestic producer would be

adversely affected by the imposition of remedial duties because duties would impair the

company's ability to import green tube for finishing and sale in the United States. *See* Tenaris

Br. at 9, 27; *see also* Tenaris Oct. 15 Comments at 9-10, 21 (P.R. 22-28; C.R. 12-18); and 19

U.S.C. §§ 1671a(c)(4)(B)(i) and 1673a(c)(4)(B)(i).

      Further, under Tenaris' theory of the case, the only permissible method for Commerce to

determine domestic industry support when markets are not static is to poll the industry for

production data for the twelve months immediately preceding the filing of a petition. As

discussed below, however, markets constantly evolve, and the statute leaves to Commerce's

discretion how and when to measure industry support. The statute only requires polling the

industry — which can unnecessarily delay the proceeding — in exceptional circumstances when

neither the petition nor other information available to Commerce establishes the requisite

support. As those circumstances did not arise here, Commerce was not statutorily required to poll

the domestic industry to determine industry support.

**NON-CONFIDENTIAL VERSION**

**A.      Commerce Faithfully Followed The Statute**

The statute provides in 19 U.S.C. §§ 1671a(b)(1) and 1673a(b)(1) that Commerce shall

initiate an investigation following the submission of a petition filed on behalf of the domestic

industry that alleges the required elements and is supported by information reasonably available

to the petitioner supporting those allegations. "The petition may be amended … as the

administering authority and the Commission may permit." It further provides in 19 U.S.C. §§

1671a(c)(1)(A) and 1673a(c)(1)(A) that Commerce will, with limited exception, take 20 days to

examine a petition to determine whether it alleges "the elements necessary" and contains

"information reasonably available to the petitioner supporting the allegations," including whether

the petition was filed "by or on behalf of the domestic industry."

With respect to determining whether a petition has adequate support from the domestic

industry, 19 U.S.C. §§ 1671a(c)(4)(A)(ii) and 1673a(c)(4)(A)(ii) provide, in relevant part, that

Commerce should determine whether the domestic producers or workers who support the

petition account for more than 50 percent of the production of the domestic like product

produced by that portion of the industry expressing support for, or opposition to, the petition. 19

U.S.C. §§ 1671a(c)(4)(B) and 1673a(c)(4)(B) also provide that Commerce may disregard the

positions of domestic producers who are related to foreign producers or who import the subject

merchandise.

In addition, 19 U.S.C. §§ 1671a(c)(4)(D) and 1673a(c)(4)(D) provide that if "the petition

does not establish support of domestic producers or workers accounting for more than 50 percent

of the total production," Commerce shall either "poll the industry *or rely on other information*

to determine industry support" (emphasis added). The statute makes clear that polling should be

limited to "exceptional circumstances." 19 U.S.C. §§ 1671a(c)(1)(B) and 1673a(c)(1)(B).

**NON-CONFIDENTIAL VERSION**

Finally, 19 U.S.C. §§ 1671a(c)(4)(E) and 1673a(c)(4)(E) allow any interested party to "submit

comments or information on the issue of industry support."

The Statement of Administrative Action Accompanying the Uruguay Round Agreements

Act ("SAA") confirms that polling the industry is to be employed in only exceptional

circumstances:

> The Administration expects to initiate most cases within twenty days of the filing
> of a petition, as required under existing law. New sections 702(c)(1)(B) and
> 732(c)(1)(B) provide for an extension of up to twenty additional days after the
> filing of a petition in ***exceptional circumstances*** where Commerce cannot
> establish whether there is the requisite industry support within twenty days. Such
> exceptional circumstances may arise where the petition provides insufficient
> information on support, the domestic industry is fragmented, or there is a large
> number of producers in the industry. The Administration expects that, ***in the vast***
> ***majority of cases***, the determination of industry support will be made within the
> initial twenty-day period. The ability to extend the initiation determination will
> avoid negative initiation determinations simply because Commerce was unable to
> gather the required support information in twenty days. The Administration
> intends that Commerce will use this extension authority ***only in exceptional***
> ***circumstances*** where the industry support issue cannot be decided in twenty days,
> and the initiation determination will be extended only for the additional time
> necessary to make a determination regarding industry support.

H.R. Rep. No. 103-316, vol. 1, at 863, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4193-94 (1994)

(emphasis added).

It is also noteworthy that Commerce's regulations provide that the agency will

"normally" determine industry support based on "a twelve-month period specified by the

Secretary." 19 C.F.R. § 351.203(e)(1). Indeed, Commerce in the Initiation Checklist here

referenced its "longstanding practice of measuring production over the most recently completed

calendar year." Initiation Checklist Att. II at 16 (C.R. 26; P.R. 40). Commerce's regulations also

provide that "Where a party to the proceeding establishes that production data for the relevant

period, as specified by the Secretary, is unavailable, production levels may be established by

reference to alternative data that the Secretary determines to be indicative of production levels." 19 C.F.R. § 351.203(e)(1).

Here, Petitioners submitted reasonably available information showing sufficient domestic industry support based on the most recently completed calendar year. In the absence of published production data for the entire domestic OCTG industry, Petitioners provided production data for their own facilities and shipment data from a reputable source for facilities not under their control. *See* Petitions at 5-6, (C.R. 1-6; P.R. 1-6). Petitioners did so because actual production data for other domestic producers was not available and because Commerce has in numerous proceedings accepted such shipment data as a proxy for otherwise unavailable production data. *See, e.g., Mattresses from Indonesia: Initiation of Countervailing Duty Investigatio*n, 88 Fed. Reg. 57,412 (Dep't Commerce Aug. 18, 2023).

Commerce subsequently requested and allowed certain revisions to the Petitions, and accepted information from other interested parties including Tenaris, consistent with 19 U.S.C. §§ 1671a(b)(1) and 1673a(b)(1). In this regard, although Tenaris spends pages of its brief describing iterations of the industry support calculations, those early calculations were not the basis of Commerce's determination. *See* Tenaris Br. at 17-20. The only calculations relevant to this proceeding are those underpinning Commerce's determination to initiate the investigation. *See* Initiation Checklist Att. II at 16-17 (C.R. 26; P.R. 40).

In sum, Commerce followed the statute. As further described below, at the end of this 20-day process, the administrative record contained what Commerce in its discretion deemed reliable data demonstrating that the Petitions were supported by more than half of domestic production expressing an opinion on the Petitions, as measured pursuant to its long-standing practice of using data from the most recently completed calendar year. Based on these data,

NON-CONFIDENTIAL VERSION

Commerce duly initiated the investigation. Because Petitioners had provided credible information demonstrating sufficient domestic industry support, Commerce was not compelled to accept Tenaris' requests to poll the industry.

**B.     Commerce's Industry Support Determination Is Based On Substantial Evidence And Reasonable**

Commerce set forth the evidence on which it relied to determine that the Petitions were supported by the domestic OCTG industry in Attachment II to its Initiation Checklist (C.R. 26; P.R. 40).

As an initial matter, Commerce included data for those domestic producers Tenaris speculated could be finishing imported green pipe, noting that the proposed scope definition covered both finished and unfinished OCTG, and that the ITC has consistently counted OCTG finishing operations as domestic production. *See* Initiation Checklist Att. II at 14. For example, in a 2014 investigation concerning unfairly traded OCTG from a variety of countries, the ITC concluded that

> processors have made significant capital investments, use substantial technical expertise to engage in heat treatment and other finishing activities, add significant value, employ a substantial number of personnel, and source some green tube in the United States. In light of these considerations, we find that processors that provide heat treatment engage in sufficient production-related activities in the United States to be treated as domestic producers.

*Certain Oil Country Tubular Goods from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam,* Inv. Nos. 701-TA-499-500 and 731-TA-1215-1217 and 1219-1223 (Final), USITC Pub. 4489 (Sept. 2014) at 13 (internal citations removed) (Petitions Volume I at Exhibit I-11). Commerce also observed that one of the companies Tenaris alleged could be engaged in finishing imported material, PTC, operated the assets of a company that had been considered a petitioner in prior trade cases involving OCTG, further demonstrating that Tenaris' claims regarding processing operations were baseless. *See* Initiation Checklist Att. II at 14.

**NON-CONFIDENTIAL VERSION**

Commerce then looked to the evidence provided by Petitioners, including their own

production data for the most recent calendar year, letters of support including production data for

other domestic producers, and [

]. *Id*. at 4. In light of the unavailability of

production data for the remaining domestic producers, Petitioners provided as a proxy the

volume of total domestic shipments in the most recent calendar year [

], and made adjustments to estimate total

shipments (both domestic and export) based on the experience of the Petitioners during the same

period. *Id.* at 4-5. From this estimate of total shipments, Petitioners subtracted their own

shipments to arrive at an estimate of shipments for those domestic producers whose data were

unavailable. *Id.* at 5. To convert this value for the other producers to an estimate of production,

Petitioners used a ratio of domestic shipments to production based on the most recent ITC

publication containing such information. *Id*. Finally, Petitioners added their production to the

estimate for the companies whose data were unavailable to provide an estimate total production.

*Id*.

Commerce also performed a second industry support calculation using record information

based on total shipments as reported in [                           ], and the publicly available

information on U.S. producers' production and domestic shipments reported in the ITC's most

recent report on the domestic OCTG industry. *Id*. This alternative, more conservative

methodology resulted in [                      ] estimate of domestic production volumes and [

]. *Id.* at 5-6.

19

**NON-CONFIDENTIAL VERSION**

Even using the less favorable methodology, domestic producers supporting the Petitions well exceeded 25 percent of the domestic industry. While by themselves they were less than the statutory threshold of 50 percent, *id.* at 7-8, after [

] and "even assuming *arguendo* that all other U.S. producers of OCTG oppose the Petitions … the supporters of the Petitions would still have the requisite level of support." *Id*. at 7.

The information supporting the analysis described above is substantial evidence that the Petitions were supported by the domestic industry — especially considering the express language of the statute that petitions need only be supported by "reasonably available information." *See* 19 U.S.C. §§ 1671a(c)(1)(A) and 1673a(c)(1)(A). Commerce relied on actual production data for those companies that provided it, and then estimated production for other companies based on published shipment data and other information. As the Court is aware, substantial evidence means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Suramerica*, 44 F.3d at 985 (quoting *Consolidated Edison*, 305 U.S. at 229). A reasonable mind could certainly accept that the actual production data for some producers, combined with estimates based on shipment volumes adjusted with the shipment-to-production ratios from the most recent government publication for the remaining producers, reasonably reflected domestic production of OCTG. *See Matsushita*, 750 F.2d at 933. This court should sustain Commerce's analysis as it is based on substantial evidence and reasonable.

C.     **Tenaris' Arguments Amount To Garden Variety Requests To Re-Weigh Evidence**

As discussed above, Commerce's industry support calculations were based on substantial evidence consisting of actual production and shipment data for the most recently completed calendar year, consistent with the statute, regulations, and long-standing agency practices.

**NON-CONFIDENTIAL VERSION**

Tenaris, however, points this Court to various documents and theories it submitted below and asks this Court to revisit the administrative record and find differently. For example, the company argues that 2020 production and shipment data used as a proxy for unavailable production data (with the shipment data adjusted based on ratios or shipments to production from the most recent government publication available) were not "indicative of production levels" because the production levels changed between the end of 2020 and when the Petitions were filed in 2021. Tenaris Br. at 22. To support its contentions, Tenaris cites news reports of factors it claims affected OCTG production levels — including COVID, high prices for flat-rolled steel, and an oversupply of oil — but no empirical evidence of changes in OCTG production between 2020 and 2021 or legal precedent that would make Commerce's reliance on that data unreasonable. *Id*. at 23-24.

As explained in one case cited by Tenaris, a "party's ability to point to an alternative, reasonable finding on the agency record does not provide a basis for the court to set aside an agency's determination." *Pokarna Engineered Stone Ltd. v. United States*, 547 F. Supp. 3d 1300, 1308 (Ct. Int'l Trade 2021), *aff'd*, 56 F.4th 1345 (Fed. Cir. 2023). Commerce's determinations regarding the domestic industry were grounded in facts regarding the production of OCTG in the year before the Petitions were filed. Tenaris' insistence that no reasonable fact finder could possibly have based their analysis of domestic industry support on the most recently completed calendar year ignores that Commerce is the "master" of the antidumping duty law and entitled to substantial deference. *See NSK*, 28 CIT at 1561, 346 F. Supp. 2d at 1335 (citations omitted); *Ta Chen*, 298 F.3d 1335. That Tenaris might raise alternative methodologies for calculation of industry support does not make Commerce's choice of method unreasonable.

NON-CONFIDENTIAL VERSION

The statute instructs Commerce to determine domestic industry support based on total "production of the domestic like product" at some unspecified point in time. 19 U.S.C. §§ 1671a(c)(4)(A)(ii) and 1673a(c)(4)(A)(ii). Given the facts of this case, as well as Commerce's regulations and long-standing practice, Commerce determined that the most recently completed calendar year before the Petitions were filed could serve as the base period for determining whether sufficient "production of the domestic like product" supported the Petitions. This is not an unreasonable decision. To warrant overturning Commerce's decision, Tenaris would need this Court to decide that, notwithstanding the absence of any specification of time or methodology in the statute, when relying on production in the most recent calendar year, no rational fact finder could have used the most recently completed calendar year as the year to use for the domestic industry support calculation for a petition filed in 2021. On the selection of which factual information to rely on in implementing a statutory requirement without a prescribed statutory methodology, Commerce's determinations in such matters are due especially significant deference. *JBF RAK*, 790 F.3d at 1363 (holding that where the statute specifies no methodology or procedure, "Commerce may perform its duties in the way it believes most suitable"). Under the appropriate legal standard, Tenaris' preference for some other outcome must be rejected.

Tenaris similarly attempts to impugn Commerce's reliance on an ITC report used to convert shipment data to production quantities for domestic producers whose production data were unavailable because that report, which is the most recent available, includes "outdated" and unrepresentative data from 2018 and 2019. Tenaris Br. at 25. Tenaris does not, however, identify any particular reason that the report cannot be used or any events in 2018 or 2019 that would make the market in those years aberrational. Rather, Tenaris' complaint is essentially that 2018 and 2019 are not the twelve months immediately preceding the filing of the Petitions, and that

using market information from these years somehow "skewed" the result. *Id*. at 25. Putting aside the inherent contradiction in Tenaris' arguments concerning which data to use, actual production data for certain domestic producers, including Tenaris, was not reasonably available to Petitioners, which is why the best method available to Petitioners was using adjusted shipment data as a proxy for production. *See* 19 U.S.C. §§ 1671a(c)(1)(A) and 1673a(c)(1)(A); *see also* Initiation Checklist Att. II at 15-16. Commerce's methodology was reasonable under the circumstances based on the best information available to it at the time, and as discussed above, is due substantial deference. *See*, *e.g.*, *JBF RAK*, 790 F.3d at 1363.

Tenaris also faults Commerce for not making more of the company's allegation that certain Petitioners might be finishing imported green tube, and that such activities should not be considered domestic production. Tenaris Br. at 27. As described in Section I.B., above, however, Commerce correctly declined to waste administrative resources on this allegation finding that it is well-settled that finishing OCTG in the United States constitutes domestic production. *See, e.g.,* Initiation Checklist Att. II at 10-11, 15-16 (citing, *e.g.*, *Oil Country Tubular Goods from India, Korea, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1216, 1221-1223 (Review), USITC Pub. 5090 (July 2020)).

Nor did Commerce need to further consider Tenaris' transparent delaying tactic in arguing that Commerce should investigate whether Petitioners double-counted producers with finishing operations, as the allegation had no factual basis. *See* Tenaris. Br. at 27. Petitioners' production data were certified as accurate by both company officials and their counsel, and Commerce could rely on them, as it always does with the volumes of information submitted pursuant to such certifications. *See* 19 C.F.R. § 351.303(g); 19 C.F.R. § 207.3(a).

NON-CONFIDENTIAL VERSION

Tenaris correctly observes that petitioners are responsible for demonstrating sufficient industry support for a petition. Tenaris Br. at 29. Tenaris then concocts an alternate reality in which Commerce's reliance on the only production information before the agency was an unacknowledged use of adverse facts available under 19 U.S.C. § 1677e(b) against Tenaris. *Id*. at 31. To the contrary, Commerce's discussion highlighted the lack of empirical evidence supporting Tenaris' claims, and the impossibility of making a determination regarding domestic production volumes based on substantial evidence using the tangential information Tenaris had provided about phenomena other than production volumes. *See* Initiation Checklist Att. II at 21. As this Court recently held:

> The burden of record creation lies in general with the parties, not the agency. Here, the parties involved … were better positioned than was Commerce to provide data pertaining to total production of the domestic like product. That only the petitioner did so, and that the evidence submitted by the petitioner was sufficient to support the Department's decision to initiate the investigation, do not constitute a "refusal" by Commerce to consider wholesaler opposition to the Petition.

*Mosaic Co. v. United States*, Slip Op. 23-134 (Ct. Int'l Trade Sept. 14, 2023) at *17 (internal citations omitted). In the instant case, Tenaris failed to create a record that could lead to its desired result, espousing theories and asking Commerce to draw inferences and ignore the empirical evidence before the agency.

It is well settled that a plaintiff may not ask the Court to re-weigh the evidence and decide the case for Commerce. *See, e.g., Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 815 (Fed. Cir. 1992). Yet, Tenaris asks the Court to do just that. As discussed in Section I.B., above, Commerce found the actual production and shipment data provided by the Petitioners to be credible, and based its determination on this information. The information underlying Commerce's analysis consists of actual production and shipment data,

the latter with certain adjustments. Reliance on such information for determining domestic

production volumes is inherently reasonable. In its role as finder of fact, Commerce determined

that the hodgepodge of theories and assertions presented by Tenaris did not provide a more

credible assessment of domestic OCTG production, or sufficiently detract from the information

contained in the Petitions. Tenaris' complaint is that it would have preferred the finder of fact to

find the information it provided more credible and assign it greater weight. This Court should

decline the invitation to do so. *See, e.g.*, *United States Steel*, 96 F.3d at 1357 (affirming that it is

the agency's task to evaluate and assign weight to the evidence).

## II.     The Statute Does Not Compel Polling The Industry

Tenaris claims that Commerce impermissibly ignored its requests to poll the industry and

seek additional production data. Tenaris Br. at 34. As an initial matter, the company's assertion

that it is the largest domestic producer is unsupported. Tenaris provided no production data to

Commerce, even after arguing that Commerce must collect such data, and thus the administrative

record does not indicate that Tenaris was the largest domestic producer. *See* Initiation Checklist

Att. II at 21 (C.R. 26; P.R. 40). While the information before Commerce did indicate that Tenaris

had spent significant sums to acquire a number of U.S. facilities, the company also shuttered

many of those facilities when it could import OCTG more profitably. Tenaris Oct. 15 Comments

at 1, 14-15. Simply put, because Tenaris failed to provide the information to Commerce, the

agency had no idea what proportion of domestic industry production in 2020 was accounted for

by Tenaris-owned facilities. Regardless of Tenaris' total investments, the statute's focus is on

actual domestic production, which is what Commerce considered. *See* 19 U.S.C. §§

1671a(c)(4)(A) and 1673a(c)(4)(A).

According to Tenaris, Commerce's disagreement that information provided by the

company reflected "exceptional circumstances" that would compel polling of the industry

resulted from the agency's failure to consider the information Tenaris provided. Tenaris Br. at 34. Tenaris invokes *Allegheny Ludlum Corp. v. U.S.*, 112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000), and similar cases for the proposition that, when an agency either ignores or fails to discuss detracting information, the resulting determination is necessarily unsupported by substantial evidence. Tenaris Br. at 34-37. This line of argument is meritless. Commerce undeniably considered the information provided by Tenaris, as reflected in pages 9-21 of Attachment II to Commerce's Initiation Checklist (C.R. 26; P.R. 40). Commerce simply found Tenaris' information and argument unconvincing.

In support of its argument that Commerce was required to poll the industry, Tenaris focuses on a handful of Commerce determinations where the agency decided to poll the industry, *id.* at 36, 42-44, and cites the Court's decision in *Citrosuco Paulista, S.A. v. United States*, 704 F. Supp. 1075, 1088 (Ct. Int'l Trade 1988) for the proposition that "an agency must either conform itself to its prior decisions or explain the reasons for its departure …." Tenaris Br. at 41-42. Yet, in each of the investigations cited by Tenaris Commerce determined that, unlike here, the information in the underlying petitions was insufficient to determine domestic industry support. Tenaris does not otherwise analogize the proceedings it cites to the instant case beyond the unsupported assertion that the Petitions here contained insufficient evidence of industry support. Tenaris Br. at 36. As explained below, most of precedent Tenaris cites supports Commerce's decision not to poll the industry here.

For example, Tenaris invokes this Court's decision in *Pokarna Engineered Stone Ltd. v. United States*, which, instead of supporting Tenaris' arguments, highlights why the company's claims should be rejected. *See* Tenaris Br. at 7. *Pokarna* makes clear that if Commerce

**NON-CONFIDENTIAL VERSION**

determines a petition sufficiently demonstrates domestic industry support, no polling is required,

<u>even if an interested party repeatedly requests it</u>:

> {Plaintiff} MSI also argues that Commerce was required to poll the industry prior
> to initiating the investigation as mandated by the "applicable statutory and
> regulatory requirements." MSI's argument appears to be that Commerce violated
> 19 U.S.C. § 1673a(c)(4)(D) when it initiated the underlying investigation without
> polling the industry. Section 1673a(c)(4)(D) directs Commerce to poll or sample
> the industry "if the petition does not establish support of domestic producers or
> workers accounting for more than 50 percent of the total production of the
> domestic like product." 19 U.S.C. § 1673a(c)(4)(D). Where Commerce
> determines that a petition has met the industry support threshold, no such polling
> is required. *See id.* Because Commerce found the requisite industry support within
> the petition, ***it was not required to poll the industry to confirm support***. ... MSI
> fails to identify any legal authority that would require Commerce to poll the
> industry upon request, despite a finding of sufficient industry support.
> Accordingly, Plaintiff's *Chevron* step one arguments fail.

*Pokarna Engineered Stone Ltd. v. United States*, 547 F. Supp. 3d at 1305–06, *aff'd*, 56 F.4th

1345 (Fed. Cir. 2023) (internal citations omitted) (emphasis added). *Pokarna* also rejected the

plaintiff's claim that Commerce should have extended the deadline to initiate the investigation to

continue to explore issues related to industry support:

> Finally, MSI challenges Commerce's failure to extend the deadline to initiate,
> arguing that "serious factual disagreements among interested parties" made it
> unreasonable for Commerce to initiate its investigation after only 20 days. …
>
> In the underlying investigation, Commerce determined that an extension of the
> industry support deadline was not necessary, as the agency found sufficient
> evidence of industry support within the petition. MSI's argument that Commerce
> should have extended the industry support determination deadline fails for two
> reasons. First, Commerce found the necessary industry support to proceed without
> polling, thus making the option for a deadline extension irrelevant. … Second,
> even assuming Commerce could have extended its deadline, ***doing or not doing***
> ***so was within the agency's discretion***. *See* 19 U.S.C. § 1673a(c)(1)(B) ("the
> administering authority *may*, in exceptional circumstances," extend investigation
> initiation deadline to forty days (emphasis added)) …

**NON-CONFIDENTIAL VERSION**

*Id*. at 1309-1310 (emphasis added). This Court also recently issued another decision with similar reasoning:

> The relevant statutory provision requires Commerce to "poll the industry or rely on other information in order to determine if there is support for the petition" only "{i}f the petition does not establish support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product." 19 U.S.C. § 1671a(c)(4)(D). The legislative history indicates that "if the petition on its face does not establish that it is supported by domestic producers or workers accounting for more than 50 percent of total domestic production, Commerce will poll the industry or otherwise determine whether the support requirements have been met." S. Rep. No. 103-412, at 36 (1994) (emphasis added).

*Mosaic Co. v. United States*, Slip Op. 23-134 (Ct. Int'l Trade Sept. 14, 2023) at *19. Thus, notwithstanding Tenaris' claims of "significant uncertainty" regarding domestic industry support, Tenaris Br. at 38, Commerce was not required to poll the industry because the record already demonstrated sufficient support existed.

Tenaris also argues that polling the industry was necessary because Commerce may depart from its standard practice of analyzing domestic industry support relative to the most recent calendar year. *Id.* at 39. To support its claim, Tenaris cites certain agricultural cases in which Commerce departed from its standard practice. *Id*. These are misplaced comparisons. An analysis based on growing season and crop years might be reasonable for agricultural products, but would be inapplicable to steel pipes that are produced year-round.

Although Tenaris cites one administrative proceeding in which Commerce departed from its standard practice for a non-agricultural product, that case further highlights why Commerce was not required to poll the industry in the instant case. *Id.* (citing *Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Initiation of Less Than-Fair-Value Investigations*, 85 Fed. Reg. 23,002 (Dep't Commerce Apr. 24, 2020)). Commerce in that case determined that total domestic production

data for the entire preceding calendar year were not reasonably available to the petitioners, who represented only a subset of total domestic production. Consequently, the agency relied on the petitioners' own production data plus estimates based on the portion of the prior calendar year for which data were available in a recent ITC publication. In the instant case, Commerce similarly recognized that production data for the entire domestic industry were not reasonably available to Petitioners, and on this basis used information available from a recent ITC publication with certain adjustments.

Finally, Tenaris claims that Commerce's rejection of the company's arguments for polling the industry represented an abuse of discretion. Tenaris Br. at 44. Tenaris cites cases including the Federal Circuit's decision in *Consol. Bearings Co. v. United States*, 412 F.3d 1266, 1269 (Fed. Cir. 2005) as support. But this line of cases is inapposite as, for the reasons discussed in Section I.B, above, Commerce's determination of domestic industry support for the Petitions was based on substantial evidence and reasonable. In fact, given existing Commerce practice and factual support for a conclusion that over 50 percent of the domestic industry supported the petitions here, it would have been an abuse of discretion for Commerce to poll the industry. Simply put, Tenaris' disagreement with Commerce's findings does not mean that Commerce abused its discretion.

III.   **EVEN IF THE PETITIONS DID NOT DEMONSTRATE SUFFICIENT INDUSTRY SUPPORT, THE SUCCESSFUL INVESTIGATIONS SHOULD NOT BE NULLIFIED**

Even if the Court were to find that there was insufficient industry support at the time of the filing of the Petitions, there would still be no need to nullify the investigations because Commerce has the authority to initiate an antidumping investigation *sua sponte* whenever it has reason to believe that unfairly traded imports are causing material injury to a domestic industry. *See* 19 U.S.C. §§ 1671a(a)(1) and 1673a(a)(1).

NON-CONFIDENTIAL VERSION

For example, in *Citrosuco Paulista, S.A. v. United States*, a cased relied upon by Tenaris, the Court held that once Commerce has determined to initiate an antidumping investigation, even where there may have been a defect in industry support at the time of the filing of the petition, it would "elevate{} form over substance" to require Commerce to dismiss the petition and require the petitioners to file a new petition to achieve the same result. 704 F. Supp. at 1083. There, a group of processors challenged Commerce's decision to initiate an antidumping duty investigation on frozen concentrated orange juice ("FCOJ") from Brazil on the basis that the petitioners were not producers of the like product but were instead producers of oranges for processing into FCOJ. After the petitions were filed, Commerce allowed the addition of other domestic producers of FCOJ as co-petitioners and proceeded to initiate an antidumping investigation. After final determinations were reached and an antidumping duty order was issued, the processors and the Brazilian respondent challenged Commerce's initiation of the investigation for lack of domestic industry support. The Court rejected this challenge, finding that it would be unreasonable to impose a judicial requirement that Commerce terminate the investigation based on a flaw with industry support at the time of the filing of the petition, because Commerce "is authorized to commence an antidumping duty investigation *sua sponte* whenever it determines that an investigation is warranted based upon available information." *Id*. Had Commerce determined to self-initiate, it would have possessed the authority to continue the investigation on the same timetable that it had originally followed. Thus, Commerce was not required to start a new investigation based on any flaw with industry support at the time of initiation.

Similarly, in *Suramerica de Aleaciones Laminadas, C.A. v. United States*, the Court of International Trade found that a petition was not filed on behalf of the domestic industry, and the

**NON-CONFIDENTIAL VERSION**

"ensuing investigation was therefore declared a nullity." 966 F.2d 660, 663 (Fed. Cir. 1992). The

Federal Circuit reversed the Court. In so doing, it explained:

> Commerce can initiate a countervailing or antidumping duty investigation
> completely on its own, without any petition having been filed by an "interested
> party." 19 U.S.C. § 1671a(a), 1673a(a). Commerce need only determine, from
> information available to it, "that a formal investigation is warranted." 19 U.S.C. §
> 1671a(a); 1673a(a). … There is no indication whatever that the phrase "from
> information available to it" is to be given a narrower meaning than the plain
> meaning of the words — Commerce could use information made "available to it"
> by a petition filed by one who is not "an interested party," or by a petition filed by
> "an interested party" ***but not* "*on behalf of an industry*.**" There is no requirement
> that Commerce had to acquire on its own the information leading to a self-started
> investigation, or that Commerce must ignore or cannot rely on information made
> available by a petition which may for some reason fall short of the statutory
> requirements for a petition-induced investigation.

*Id*. at 666 (emphasis added). Based on this reasoning, the Federal Circuit ultimately found that

"Commerce has broad discretion in deciding when to pursue an investigation, and when to

terminate one," and reversed the Court for finding fault with Commerce's initiation of the

investigation. *Id*. at 667.

Here, even if there were a defect in industry support at the time of filing of the Petitions,

that does not mean Commerce's initiation of the OCTG investigations should be nullified.

Commerce has the authority to self-initiate investigations, and it could have done so in the

underlying proceeding based on the information before it.

\* \* \*

## CONCLUSION

For the foregoing reasons, Defendant-Intervenors respectfully request that the Court deny

Plaintiffs' motion for judgment on the agency record and uphold Commerce's final

determination in the underlying investigation.

Respectfully Submitted,

 /s/ Thomas B. Beline                        /s/ Roger B. Schagrin
Thomas M. Beline                            Roger B Schagrin
Myles S. Getlan                             Luke A. Meisner
James E. Ransdell                           Christopher T. Cloutier
CASSIDY LEVY KENT (USA) LLP                 SCHAGRIN ASSOCIATES
900 19th Street NW                          900 7th Street NW
Suite 400                                   Suite 500
Washington, D.C. 20006                      Washington, D.C. 20001
*Counsel to United States Steel Corporation*  *Counsel to Borusan Mannesmann Pipe U.S. Inc.,*
                                            *PTC Liberty Tubulars LLC, United Steel, Paper and*
                                            *Forestry, Rubber, Manufacturing, Energy, Allied*
                                            *Industrial and Service Workers International*
Dated: September 22, 2023                   *Union, AFL-CIO, CLC, and Welded Tube USA Inc.*

NON-CONFIDENTIAL VERSION

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 9,590 words, including accompanying motion, text, headings, table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word used to prepare this brief.

/s/ Christopher T. Cloutier
Christopher T. Cloutier

Dated: September 22, 2023