A-357-824
Remand
Slip Op. 24-31
POI: 10/01/2020 – 09/30/2021
**Public Version**
E&C/TRCI: WS

*Tenaris Bay City, Inc. et al. v. United States*,
**Court No. 22-00343, Slip Op. 24-31 (CIT March 14, 2024)**
*Oil Country Tubular Goods from Argentina*

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of
redetermination pursuant to the opinion and remand order of the U.S. Court of International
Trade (the Court) in *Tenaris Bay City, Inc. v. United States*, Court No. 22-000343, Slip Op. 24-
31 (CIT March 14, 2024) (*Remand Order*).  These final results of redetermination concern
Commerce's final affirmative determination in the investigation of sales of oil country tubular
goods (OCTG) from Argentina at less-than-fair value (LTFV).[1]  The Court remanded for
Commerce to reconsider or further explain its determination that the data relied upon accurately
reflected industry support, including whether finishing operations were counted twice.[2]

On remand, Commerce has reconsidered the facts on the record and further explained its
decision underlying industry support; specifically, whether the data relied upon accurately
reflected industry support and whether finishing operations were counted twice.  For the reasons
explained below, Commerce continues to find that initiating the underlying LTFV investigation
was lawful and supported by substantial evidence.

---

[1] *See Oil Country Tubular Goods from Argentina: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Critical Circumstances*, 87 FR 59054 (September 29, 2022) (*Final Determination*), and accompanying Issues and Decision Memorandum.
[2] *See Remand Order* at 27.

## II.     BACKGROUND

On October 6, 2021, Commerce received an antidumping duty (AD) petition concerning imports of OCTG from Argentina, filed in proper form on behalf of the petitioners.[3]  On October 12 and 21, 2021, the petitioners provided supplemental information and clarifications, in response to Commerce's requests for additional information regarding the Petition.[4]  Also in October, Commerce received four submissions from Tenaris USA[5] commenting on industry support.[6]  On October 18, 2021, the petitioners responded to Tenaris USA's comments on industry support.[7]

On October 26, 2021, Commerce initiated the LTFV investigation on imports of OCTG from Argentina, finding that the Petition met the requirements of section 732 of the Tariff Act of 1930, as amended (the Act).[8]  On May 11, 2022, Commerce issued its preliminary determination that OCTG from Argentina is being, or is likely to be, sold in the United States at LTFV for the period of investigation (POI), October 1, 2020, through September 30, 2021.[9]  Commerce made

---

[3] *See* Petitioners' Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties," dated October 6, 2021 (the Petition).  The petitioners are Borusan Mannesmann Pipe U.S., Inc. (Borusan U.S.), PTC Liberty Tubulars LLC (PTC Liberty), United States Steel Corporation, the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded Tube USA, Inc. (collectively, the petitioners).

[4] *See* Petitioners' Letters, "Response to General Issues Questionnaire," dated October 12, 2021 (First General Issues Supplement); and "Response to Second General Issues Questionnaire," dated October 21, 2021.

[5] Tenaris Bay City, Inc., IPSCO Tubulars Inc., Maverick Tube Corporation, Tenaris Global Services (U.S.A.) Corporation (collectively, Tenaris USA).

[6] *See* Tenaris USA's Letters, "Factual Errors in Petitions," dated October 8, 2021 (Tenaris USA Letter I); "Comments on Petitioners' Standing," dated October 15, 2021 (Tenaris USA Letter II); "Reply Comments on Petitioners' Standing," dated October 20, 2021 (Tenaris USA Letter III); and Comments on Petitioners' Second General Issues Questionnaire Response," dated October 22, 2021 (Tenaris USA Letter IV).

[7] *See* Petitioners' Letter, "Response to Tenaris Submission Concerning Petitioners' Standing," dated October 18, 2021 (Petitioners' Response).

[8] *See Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation:  Initiation of Less-Than-Fair-Value Investigations*, 86 FR 60205 (November 1, 2021).

[9] *See Oil Country Tubular Goods from Argentina:  Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 87 FR 28801 (May 11, 2022).

no change, in this regard, for purposes of its *Final Determination*.[10]  Tenaris[11] subsequently challenged the *Final Determination* at the Court, contesting Commerce's:  (1) determination that the Petition was filed "by or on behalf of the industry"; and (2) decision not to poll the domestic industry and seek actual production data for the 12 months immediately preceding the filing of the Petition to determine industry support.[12]

On March 14, 2024, the Court remanded the *Final Determination* for Commerce to further explain or reconsider its determination that the data relied upon accurately reflected industry support, including whether finishing operations were counted twice.[13]  On May 28, 2024, Commerce released its draft results of redetermination[14] and provided interested parties the opportunity to comment.  On June 4, 2024, the petitioners and Tenaris each submitted comments regarding the Draft Remand.[15]  On June 7, 2024, however, Commerce rejected Tenaris' comments after determining that the submission contained untimely new factual information not previously contained on the record of the proceeding.[16]  On June 10, 2024, Tenaris resubmitted its comments redacting references containing new factual information in accordance with Commerce's request.[17]

---

[10] *See Final Determination*, 87 FR at 59054.
[11] Tenaris USA and Siderca S.A.I.C. (collectively, Tenaris).  Throughout this final remand, where appropriate, we refer to Tenaris USA and Tenaris separately, with Tenaris reflecting the collective entity that includes Tenaris USA and Siderca S.A.I.C.
[12] *See Remand Order* at 2.
[13] *Id.* at 3, 21, and 27.
[14] *See* Draft Results of Redetermination Pursuant to Court Remand, Tenaris Bay City, Inc. et al. v. United States, Court No. 22-00343, Slip Op. 24-31 (CIT March 14, 2024), dated May 28, 2024 (Draft Remand).
[15] *See* Petitioners' Letter, "Comments on Draft Remand Redetermination," dated June 4, 2024 (Petitioners' Comments); *see also* Tenaris' Letter, "Comments on Draft Results of Redetermination Pursuant to Court Remand," dated June 4, 2024.
[16] *See* Commerce's Letter, "Rejection of Tenaris' Comments on Draft Results of Redetermination," dated June 7, 2024; *see also* Memorandum, "Rejection and Removal of Documents," dated June 7, 2024.
[17] *See* Tenaris' Letter, "Resubmission of Comments on Draft Results of Redetermination Pursuant to Court Remand," dated June 10, 2024 (Tenaris' Comments).

III.    ANALYSIS

In its *Remand Order*, the Court held that "Commerce fail{ed} to address record evidence indicating that certain domestic companies both produce and finish OCTG, leading to the inference that some domestic pipe may have been double counted in the industry support calculations."[18]  The Court elaborated that "Commerce may have reasons to reject this inference; however, it must acknowledge consideration of such evidence and explain why it nonetheless rejects the reference."[19]  Additionally, the Court held that "Commerce fail{ed} to respond to record evidence suggesting the possibility of double counting within the industry support calculations, and therefore the Court cannot conclude that Commerce's determination is supported by substantial evidence."[20]  Consequently, the Court ordered that Commerce further explain or reconsider its determination on the double counting issue.[21]

As an initial matter, we note that during the initiation phase of the underlying investigation, Commerce addressed Tenaris USA's comments opposing the Petition on the merits, and, because the petition had the requisite support even when accounting for the opposition of Tenaris USA,[22] did not consider whether Tenaris USA's opposition should be disregarded by law, as argued by the petitioners.[23]  Indeed, even under the more conservative

---

[18] *Id.* at 24.

[19] *Id.* at 25.

[20] *Id.* at 27 (citing *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").

[21] *Id.*

[22] As Commerce previously noted, Tenaris USA did not provide its production data for Commerce to account for its opposition in the industry support calculation.  *See* Initiation Checklist at Attachment II (page 7 n.48).  Commerce further noted that, even assuming *arguendo* that all other U.S. producers of OCTG (including Tenaris USA) opposed the Petition, the supporters of the Petition would still have the requisite level of support pursuant to section 732(c)(4)(A)(ii) of the Act.  *Id.* at 7.

[23] *See* sections 732(c)(4)(B)(i) and (ii) of the Act ("In determining industry support under subparagraph (A), {Commerce} shall disregard the position of domestic producers who oppose the petition, if such producers are related to foreign producers, as defined in section 771(4)(B)(ii), unless such domestic producers demonstrate that their interests as domestic producers would be adversely affected by the imposition of an antidumping duty order. {Commerce} may disregard the position of domestic producers of a domestic like product who are importers of the

industry support calculations on the record, including the alternative methodology proposed by Tenaris USA in its pre-initiation comments, initiation was, and continues to be, proper.[24]

We also note that, based on our analysis of the record, we find that the explicit issue of "double counting" was never raised before Commerce in any of Tenaris USA's four submissions on industry support prior to Commerce's initiation deadline.[25] Specifically, the record before Commerce prior to initiation contains no reference to "double counting," and Tenaris USA *never* framed the issue as such in *any* of its four pre-initiation submissions. Consequently, Tenaris USA's claim failed to satisfy the requisite exhaustion of administrative remedies.[26] Even so, to address the Court's concerns, on remand, we have reexamined the four submissions from Tenaris USA in the 20-calendar day pre-initiation phase and the arguments pertaining to the inclusion of finishing operations in the industry support calculation and, pursuant to the *Remand Order*, have addressed any concerns with respect to "double counting."

In its first submission, dated October 8, 2021, Tenaris USA failed to advance any argument regarding finishing operations or green tube.[27] In its second submission, dated October

---

subject merchandise."); 19 CFR 351.203(e)(4)(i) and (ii) ("{Commerce} will disregard the position of a domestic producer that opposes the petition if such producer is related to a foreign producer or to a foreign exporter under section 771(4)(B)(ii) of the Act, unless such domestic producer demonstrates to {Commerce's} satisfaction that its interests as a domestic producer would be adversely affected by the imposition of an antidumping order or a countervailing duty order, as the case may be; and {Commerce} may disregard the position of a domestic producer that is an importer of the subject merchandise, or that is related to such an importer, under section 771(4)(B)(ii) of the Act."); *see also* Checklist, "Oil Country Tubular Goods from Argentina," dated October 26, 2021 (Initiation Checklist), at Attachment II, Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Oil Country Tubular Goods from Argentina, Mexico, the Republic of Korea, and the Russian Federation (Attachment II), at 19-21.

[24] *See* Initiation Checklist at Attachment II (page 14).

[25] *See, e.g.*, *U.S. Steel Corp. v. United States*, 348 F.Supp.3d 1248, 1259 (CIT 2018) ("Failure to raise and adequately develop a legal claim results in waiver.") (citing *Ad Hoc Shrimp Trade Action Comm. v. United States*, 616 F.Supp.2d 1354, 1367 (CIT 2009) (*Ad Hoc Shrimp*); *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (*Rhone Poulenc*); and *JTEKT Corp. v. United States*, 768 F.Supp.2d 1333, 1354 (CIT 2011) (*JTEKT Corp.*)).

[26] *See U.S. Steel Corp. v. United States*, 348 F.Supp.3d 1248, 1259 (CIT 2018) ("Failure to raise and adequately develop a legal claim results in waiver.") (citing *Ad Hoc Shrimp*, 616 F.Supp.2d at 1367; *Rhone Poulenc*, 899 F.2d at 1191; and *JTEKT Corp.*, 768 F.Supp.2d at 1354).

[27] *See* Tenaris USA Letter I.

15, 2021, Tenaris USA argued that the petitioners' calculations "suffer from an additional *potential* flaw" as they *might* include data that pertain to "mere finishing operations" of the petitioners rather than the production of OCTG.[28]  Tenaris USA then argued that Commerce should exclude OCTG that is "merely finish{ed}" rather than produced.[29]  Tenaris USA also asserted that, based on publicly available information, two of the petitioning companies – Borusan U.S. and PTC Liberty – "appear to have potentially significant finishing operations relative to their actual OCTG production."[30]  Tenaris USA argued that this "deficiency" justifies a decision by Commerce to poll the industry.[31]  As support for its claim, Tenaris USA provided printouts of each company's website, containing basic "who we are" summary information.[32]  Tenaris USA asserted that, according to Borusan U.S.'s website, "it is unclear what portion of Borusan U.S.'s operations involve actual pipe production, as opposed to finishing operations for green tube."[33]  With respect to PTC Liberty, Tenaris USA asserted that the company's website provided "information that indicates its operations include finishing operations" and that PTC Liberty was not identified as a U.S. producer in the 2020 U.S. International Trade Commission (ITC) sunset review.[34]  Tenaris USA further claimed that Commerce should ensure that, to extent these two companies are processors, their further processed production is not included in the industry support calculation.[35]  In its third submission, dated October 20, 2021, Tenaris USA

---

[28] *See* Tenaris USA Letter II at 9 (emphasis added).
[29] *Id.* at 10.
[30] *Id.*
[31] *Id.*
[32] *Id.* at 10, Exhibit 5, and Exhibit 6.
[33] *See* Tenaris USA Letter I at 10 and Exhibit 5.  As support, Tenaris USA includes the following excerpt from Borusan U.S.'s website:  "Borusan's Baytown location manufactures OCTG casing…primarily with 'made and melted USA' steel.  Green tube from our world-class facility in Gemlik, Turkey…is also heat-treated, inspected, and threaded at our Baytown facility.…"  *see* Tenaris USA Letter I at 10 n.26).
[34] *Id.* at 10 and Exhibit 6.  As support, Tenaris USA includes the following excerpt from PTC Liberty's website: "PTC Liberty Tubular produces highlight engineered {OCTG} for consumption in the US and Canadian natural gas and crude oil drilling markets.  We offer Electric Resistance Welded (ERW) and Seamless tube, full finishing capabilities, and both API and Semi-Premium threading."  *Id.* at 10 (n. 27).
[35] *Id.* at 10.

reiterated its claim that the petitioners' own production and/or shipment data *might* include data that pertain to "mere finishing operations" rather than the production of OCTG.[36]  In addition, Tenaris USA reiterated its claim that PTC Liberty was not recognized as a U.S. producer in the 2020 ITC sunset review.[37]  Tenaris USA further claimed that the petitioners did not address how the issue of finishing pertains to Commerce's determination of industry support and that the "relationship of pipe formation and pipe finishing has implications for any assessment of a domestic OCTG industry given that the percentage of green pipe and plain end imports of OCTG into the United States will vary year to year and may constitute the majority of imports in any given year," but failed to elucidate what such implications would be.[38]  Finally, in its fourth submission, dated October 22, 2021, Tenaris USA stated that it opposed the Petition and briefly referenced the page numbers of its prior submissions pertaining to its claims regarding processors/finishers of OCTG products.[39]  In three of these four pre-initiation submissions, Tenaris USA claimed to be the largest U.S. producer of OCTG, but failed to provide *any* information (*e.g.*, production data) to substantiate its assertion.[40]

In determining whether a petition was filed by or on behalf of the domestic industry under section 732(c)(4)(A) of the Act, Commerce must first define the domestic like product and the domestic industry producing the domestic like product.  Section 771(4)(A) of the Act defines the "industry" as producers, as a whole, of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the like product.  Thus, to determine whether a petition has the requisite industry

---

[36] *See* Tenaris USA Letter III at 8.
[37] *Id.*
[38] *Id.*
[39] *See* Tenaris USA Letter IV at 5.
[40] *See* Tenaris USA Letter II at 1 and 11; *see also* Tenaris USA Letter III at 2-3 and 10; and Tenaris USA Letter IV at 2.

support, the Act directs Commerce to look to producers and workers who produce the domestic

like product.  While both Commerce and the ITC must apply the same statutory definition

regarding the domestic like product (*i.e.*, section 771(10) of the Act), they do so for different

purposes and pursuant to a separate and distinct authority.  Although this may result in different

definitions of the like product, such differences do not render the decision of either agency

contrary to law.[41]  Section 771(10) of the Act defines the domestic like product as "a product

which is like, or in the absence of like, most similar in characteristics and uses with, the article

subject to an investigation under this title."  As such, the reference point from which the

domestic like product analysis begins is "the article subject to an investigation," which normally

will be the scope as defined in the Petition.  While Commerce is not bound by the criteria used

by the ITC to determine the domestic like product in answering this question, we reviewed the

ITC's traditional six factors for the domestic like product presented by the petitioners in the

Petition.[42]

In the Petition, the petitioners did not offer a definition of the domestic like product

distinct from the scope of the investigation.[43]  Based on our analysis of the information presented

by the petitioners, as well as past ITC determinations on OCTG, we concluded that the domestic

---

[41] *See USEC, Inc. v. United States*, 132 F.Supp.2d 1, 8 (CIT 2001) (citing *Algoma Steel Corp., Ltd. v. United States*, 688 F.Supp. 639, 644 (CIT 1988), *aff'd Algoma Steel Corp., Ltd. v. United States*, 865 F.2d 240 (Fed. Cir. 1989)).

[42] *See* Petition at Volume I at 20 (citing *Cleo Inc. v. United States*, 501 F.3d 1291, 1295 (Fed. Cir. 2007) ("The Commission generally considers the following factors:  (1) physical characteristics and uses; (2) interchangeability; (3) channels of distribution; (4) customer and producer perceptions; (5) common manufacturing facilities, production processes, and production employees; and, where appropriate, (6) price.").

[43] *See* Initiation Checklist at Attachment II (pages 2-3); *see also* Petition at Volume I (pages 20-22 and Exhibits I-11 (containing *Oil Country Tubular Goods from India, Korea, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1216, 1221-1223 (Review), USITC Pub. 5090 (July 2020) (*India et al. OCTG 2020 Review*), at 7), I-13 (containing *Oil Country Tubular Goods from China*, Inv. No. 701-TA-463 (Final), USITC Pub. 4124 (January 2010), at 6), I-14 (containing *Oil Country Tubular Goods from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1217 and 1219-1223 (Final), USITC Pub. 4489 (September 2014) (*2014 OCTG Final*), at 12), and I-18 (containing *Oil Country Tubular Goods from China*, Inv. Nos. 701-TA-463 and 731-TA-1159 (Second Review), USITC Pub. 5136 (November 2020), at 6-7)).

like product consists of OCTG (including green tube), as defined in the scope of the Petition.[44]

This finding is consistent with Commerce's broad discretion to define and clarify the scope of an

LTFV investigation in a manner that reflects the intent of the Petition.[45]  Consequently,

Commerce's discretion permits interpreting the Petition in such a way as to best effectuate not

only the intent of the Petition, but the overall purpose of the AD laws as well.[46]

In deciding whether a firm qualifies as a domestic producer of the domestic like product,

the ITC generally uses a six-factor framework to analyze the overall nature of a firm's U.S.

production-related activities.[47]  Commerce also evaluates the sufficiency of companies'

production-related activities when identifying domestic producers for industry support purposes

and generally considers the same factors as the ITC.[48]

Here, we reexamined the administrative record to determine whether companies engaged

in OCTG green tube finishing operations (*i.e.*, heat treatment) should be part of the domestic

industry.  As this evidence shows, in the *2014 OCTG Final*, the ITC applied its traditional six

factor analysis regarding a firm's U.S. production-related activities and concluded that

processors of green tube that provide heat treatment engage in sufficient production-related

activities to be considered domestic producers of OCTG.[49]  The record also reflects that in

---

[44] *See* Initiation Checklist at Attachment II (page 3).
[45] *See, e.g.*, *Fujitsu Ltd. v. United States*, 36 F.Supp.2d 394 (CIT 1999) (citing *Kern-Liebers USA, Inc. v. United States*, 881 F.Supp. 618, 621 (CIT 1995)); and *Initiation of Antidumping Duty Investigations:  Spring Table Grapes from Chile and Mexico*, 66 FR 26831 (May 15, 2001)).
[46] *See Notice of Final Determination of Sales at Less Than Fair Value:  Freshwater Crawfish Tail Meat from the People's Republic of China*, 62 FR 41347, 42357 (August 1, 1997).
[47] The six factors for the ITC's "sufficient production-related activities" test are:  (1) source and extent of the firm's capital investment; (2) technical expertise involved in U.S. production activities; (3) value added to the product in the United States; (4) employment levels; (5) quantity and type of parts sourced in the United States; and (6) any other costs and activities in the United States directly leading to production of the domestic like product.  *See, e.g.*, *Diamond Sawblades and Parts Thereof from China and Korea*, Inv. Nos 731-TA-1092-93 (Final), USITC Pub. 3862 (July 2006), at 8-11.
[48] *See, e.g.*, *Pokarna Engineered Stone Limited. v. United States*, 56 F.4th 1345 (Fed. Cir. 2023).
[49] *See* Petitioners' Response at 7-8; *see also* Petition at Volume I (Exhibit I-14 (containing *2014 OCTG Final* at 8-14)).

subsequent proceedings on OCTG, the ITC consistently included processors of green tube that provide heat treatment as part of the domestic industry.[50]  Therefore, based on our analysis of the record evidence, including past ITC proceedings,[51] Commerce finds *no reason* to depart from the petitioners' domestic like product or domestic industry definitions as co-extensive with the scope of the proceedings and inclusive of green tube finishing operations.  Moreover, no interested party provided *any* evidence or argument in the pre-initiation period for Commerce to question these definitions.  The record is also devoid of evidence to suggest that processors providing heat treatment do *not* engage in sufficient production-related activities in the United States to be treated as domestic producers.  As such, the record supports Commerce's conclusion that OCTG, including unfinished green tube, as defined in the scope, constitutes a single domestic like product and that the domestic industry consists of all U.S. producers of OCTG, including finishers and processors of green tube that provide heat treatment.

Because processors and finishers of OCTG that provide heat treatment have consistently been found to engage in sufficient production-related activities under the ITC's traditional six factor analysis, such that these OCTG finishing operations constitute domestic production, since at least 2014, and absent any record information that calls into question the evidence in support, we find it is appropriate to include such production in the domestic industry and the industry support calculation.  This is consistent with Commerce's practice in prior proceedings, where finishers or processors engaged in sufficient production-related activities were found to constitute domestic production and included in the industry support calculation.[52]  As explained

---

[50] *See* Petitioners' Response at 8; *see also, e.g.*, Petition at Volume I (Exhibit I-18 (containing *2020 China Review* at 5-7)).
[51] *See* Initiation Checklist at Attachment II (page 14).
[52] *See, e.g.*, *Frozen Warmwater Shrimp from Ecuador and Indonesia:  Initiation of Less-Than-Fair-Value Investigations*, 88 FR 81043, 81045 (November 21, 2023).

above, the domestic like product is defined as co-extensive with the scope (*i.e.*, including unfinished green tube) and the domestic industry is defined as U.S. OCTG producers, including processors and finishers of green tube.  Therefore, for determining industry support, it is appropriate to compare a numerator that includes the supporters' production of the domestic like product (including green tube finishing and processing operations as detailed above), to a denominator that likewise reflects production of the domestic like product, including green tube finishing and processing operations as detailed above.[53]  Based on a reexamination of the record, Commerce continues to find it appropriate to include green tube heat-treatment processing performed on imported pipe as "U.S. production."

The record indicates that the starting point for the denominator of the industry support calculation is based on the 2020 domestic shipment data from an industry source which the petitioners described as "the recognized authority on the U.S. pipe and tube market."[54] Commerce requested supplemental information regarding this source and the starting point for the denominator in its October 7, 2021, supplemental questionnaire, in which Commerce sought clarification regarding whether all companies identified as U.S. producers in the Petition were accounted for in the domestic shipment data.[55]  The petitioners responded that, to their knowledge, this data source accounted for all U.S. shipments of the domestic like product and that these data are the best available information regarding the volume of domestic OCTG

---

[53] In accordance with section 732(c)(4)(A) of the Act, Commerce considers the following calculations for determining industry support:  (1) whether the domestic producers or workers who support the petition account for at least 25 percent of the total production of the domestic like product; and (2) whether the domestic producers or workers who support the petition account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or opposition to the petition.  Section 732(c)(4)(D) of the Act requires Commerce to poll the industry or rely on other information to determine industry support, if the petition does not establish the support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product.
[54] *See* Initiation Checklist at Attachment II (pages 4-5); *see also* Petition at Volume I (page 6).
[55] *See* Commerce's Letter, "Supplemental Questions," dated October 7, 2021.

shipments in 2020.[56]  No party submitted any evidence or argument to detract from this well-established industry source as the reasonable starting point for the denominator of the industry support calculation.  Further, no interested party claimed that this source data did not reasonably reflect all U.S. producers' domestic shipments of the domestic like product (including green tube finishing operations) *in calendar year 2020*.  Tenaris USA argued that Commerce should consider a different time period other than calendar year 2020 and questioned certain of the petitioners' adjustments to approximate total U.S. production, but Tenaris USA failed to advance any argument that the industry source data for 2020 were inaccurate, or that there was a more appropriate, reasonably available source for industry-wide shipment or production data for calendar year 2020.  Consequently, the record supports Commerce's conclusion that the shipment data from this source account for all domestic shipments of the domestic like product (including the appropriate green tube finishing operations) and that, after accounting for the domestic industry's export shipments derived from reasonably available information (including industry-wide data from the ITC's *India et al. OCTG 2020 Review*), the resulting denominator used in the industry support calculation appropriately reflects the entire universe of production of the domestic like product in calendar year 2020.

Tenaris USA's concerns about "double counting" are misplaced.  The methodological approach taken here (*i.e.*, the inclusion of green tube finishing operations in the numerator and the denominator of the calculation) fairly accounts for total U.S. production by the supporters of the Petition and total U.S. production by the entire OCTG industry.  Tenaris characterizes this approach as "double counting," but, as detailed below, it is unclear how this allegation impugns the industry support calculation or skews the calculation in such a way that would overstate the

---

[56] *See* First General Issues Supplement at 4-5.

supporters' share of total U.S. production, as the calculation is made on an apples-to-apples basis. As an initial matter, there is no evidence to suggest that, to the extent the companies also engage in processing, any of the U.S. producers who provided actual production data on the record literally counted each ton of pipe they produced twice – once upon the pipe formation and again upon heat treatment, threading, *etc.* Just because a company produces OCTG and has processing capabilities does not mean that it double counted its OCTG production for purposes of providing its own actual production for inclusion in the Petition, nor does it follow that the data from these companies must be inherently flawed. Likewise, just because a U.S. producer has processing capabilities does not mean that it reported the heat treatment processing it performed on another U.S. company's already reported, domestically-produced green tube, thereby duplicating the reported quantity of the green tube and the finished OCTG product. Nevertheless, there is no overstating of the numerator of the calculation, as the green tube processed by the supporters would already be reflected in the denominator that reflects total U.S. production (including green tube finishing operations) by all U.S. producers. In other words, the supporters' green tube finishing operations in the numerator would be effectively canceled out in the denominator. As detailed above, the record indicates that denominator includes the finishing or processing operations of *all* U.S. producers who processed green tube and/or produced OCTG. A denominator that includes green tube finishing or processing operations represents the most conservative basis for measuring industry support in this instance, as inclusion of green tube finishing or processing operations, in addition to OCTG production, results in a larger denominator, which yields a more conservative calculation of industry support (*i.e.*, the larger

the denominator, the smaller the share that supporters of a petition have).[57]  The record indicates that the numerator reasonably reflects the supporters' production of the domestic like product (including green tube finishing operations, where applicable); there is no record evidence to the contrary.  If the numerator does not include the supporters' green tube finishing operations, then the resulting calculations on the record would reflect an understated, albeit more conservative assessment of industry support.  Comparing a numerator that reflects the supporters' production of OCTG (without accounting for any green tube processing operations) to a denominator that reflects the universe of U.S. production of the domestic like product (including green tube finishing operations) understates the supporters' share of both total U.S. production of the domestic like product and total U.S. production of the domestic like product produced by those producers and workers who have expressed support for, or opposition to, the Petition.

Finally, we address the record and various claims regarding petitioning companies Borusan U.S. and PTC Liberty.  In its *Remand Order*, the Court explained that Tenaris USA points to record evidence that PTC Liberty was not identified as a producer in the ITC's sunset review that was relied upon by both the petitioners and Commerce to calculate industry support.[58]  The Court then concluded that, "{b}ased upon the sunset review, it would appear that PTC Liberty finished, but did not produce pipe, in which case it is unclear whether the pipe PTC Liberty finished had already been counted in the industry support calculations."[59]  Commerce has

---

[57] We provide the following mathematical examples of this approach, where A = supporters' OCTG production, B = supporters' green tube processing, C = all other U.S. producers' OCTG production, and D = all other U.S. producers' green tube processing:  $(A + B) / (A + B + C + D)$.  The supporters' green tube processing in the numerator and denominator effectively cancels each other out, resulting in the following equation:  $(A) / (A + C + D)$.  If green tube processing is not included in either the numerator or the denominator, the equation is as follows:  $(A) / (A + C)$.  As evident in a comparison of the mathematical equations, the inclusion of green tube processing yields a result where the supporters account for a *smaller* overall share of total U.S. production than they would if green tube processing were not included in the calculation.  The calculation Commerce relied on for its initiation decision thus fairly accounts for the supporters' share of total U.S. production.

[58] *See Remand Order* at 24.

[59] *Id*.

reexamined the record evidence regarding PTC Liberty and finds, consistent with our finding in the Initiation Checklist, that this company (formerly Boomerang Tube) was identified as a U.S. producer of OCTG in the ITC's *India et al. OCTG 2020 Review*.[60]  Moreover, in the First General Issues Supplement, the petitioners clarified that PTC Liberty was identified in the ITC's list as Boomerang Tube, which is further supported by the fact that the two plants (*i.e.*, Liberty, TX and Houston, TX) listed in the ITC's *India et al. OCTG 2020 Review* for Boomerang represent the very same Liberty, TX and Houston, TX plants identified in Tenaris USA's website printout for PTC Liberty, as discussed below.[61]  Accordingly, the record supports Commerce's prior finding, that PTC Liberty was formerly Boomerang Tube, and was identified as a U.S. producer of OCTG in the ITC's *India et al. OCTG 2020 Review*.

We also reexamined record information submitted by Tenaris USA concerning PTC Liberty – specifically, the screenshot of the company's website.[62]  On the website's "Who We Are" page, PTC Liberty states that it "produces highly engineered {OCTG} … and offer{s} Electric Resistance Welded (ERW) and Seamless tube, full finishing capabilities, and both API and Semi-Premium threading."[63]  Under "Our Facilities," PTC Liberty describes its Liberty, TX plant as a 500,000 square foot facility that houses two ERW mills with 480,000 tons of annual capacity for ERW pipe as well as heat treatment capability of 300,000 tons per year.  PTC Liberty elaborates that its Houston, TX plant is a 350,000 square foot facility that "provide{s} seamless pipe and processing of green tube."[64]  The record demonstrates that PTC Liberty is first and foremost a *producer* of OCTG; a producer that also has capabilities to process (or finish)

---

[60] *See* Initiation Checklist at Attachment II (page 14); *see also* First General Issues Supplement at 1 and Exhibit 1 (containing *India et al. OCTG 2020 Review* at I-37).
[61] *See* First General Issues Supplement at 1 and Exhibit 1 (containing *India et al. OCTG 2020 Review* at I-37); *see also* Tenaris USA Letter II at Exhibit 6.
[62] *See* Tenaris USA Letter II at Exhibit 6.
[63] *Id.*
[64] *Id*.

OCTG.  The relevance of Tenaris USA's claim with respect to the significance of PTC Liberty's processing capabilities is unclear, as information on the record indicates that U.S. pipe mills are typically equipped with the facilities necessary to perform heat-treatment, end upsetting, threading, and coupling.[65]

Next we reexamined the information Tenaris USA submitted on the record for Borusan U.S. – specifically, a screenshot of Borusan U.S.'s website.[66]  On the webpage printout, Borusan U.S. states that its Baytown, TX facility has a 300,000 ton annual production capacity and produces OCTG casing.[67]  On the same webpage, Borusan U.S. elaborates that green tube from its Gemlik facility in the Republic of Türkiye (Türkiye) is heat-treated, inspected, and threaded at its Baytown facility.[68]  In addition, Borusan U.S. indicates that it contracts with the "leading tubing processors" in Houston, TX to ensure the highest quality final product for its tubing imported from its Gemlik, Türkiye facility.[69]  This information demonstrates that Borusan U.S.'s Baytown, Texas facility further processes *imported* green tube from its Gemlik, Türkiye facility, and not domestically produced green tube from another U.S. producer.[70]  Thus, the record evidence for Borusan U.S.'s Baytown, Texas facility suggests that this facility primarily *manufactures* OCTG casing and *also* engages in processing (*i.e.*, heat-treatment, inspection, and threading) of tubing from Borusan U.S.'s facility in Türkiye.  Borusan U.S.'s production appropriately reflects its U.S. mill operations as well as the heat treatment processing of its green tube imports from its Türkiye facility.

---

[65] *See* Petition at Volume I (Exhibit I-11 (citing *ITC et al. OCTG 2020 Review* at I-30)).
[66] *See* Tenaris USA Letter II at Exhibit 5.
[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] *Id.*

Our reexamination of the record supports our conclusion that: (1) PTC Liberty (formerly Boomerang Tube) is a U.S. producer, and was previously recognized by the ITC in past proceedings as such; (2) PTC Liberty is first and foremost a U.S. *producer* of OCTG that also has processing capabilities;[71] and (3) Borusan U.S. is first and foremost a U.S. *producer* of OCTG casing that also *processes* green tube imported from its facility in Türkiye.  Because Tenaris USA only provided information for PTC Liberty and Borusan U.S., the record is limited to information pertaining to those two companies, and as such, our analysis addresses only the information on the record.  Consistent with the *Remand Order*, we have reconsidered the evidence on the record and further explained our analysis of the issue with respect to inclusion of green tube processing and finishing in the industry support calculation.

## IV.     INTERESTED PARTIES' COMMENTS ON THE DRAFT REDETERMINATION

On May 28, 2024, Commerce released the Draft Remand and invited interested parties to comment on the Draft Remand.  On June 4, 2024, the petitioners and Tenaris each submitted comments regarding the Draft Remand.  On June 7, 2024, Commerce rejected Tenaris' June 4, 2024, comments after determining that the submission contained untimely new factual information not previously contained on the record of the proceeding.  On June 10, 2024, Tenaris resubmitted its comments redacting references containing new factual information in accordance with Commerce's request.  Our discussion of interested party comments is below.

---

[71] Based on record information, U.S. pipe mills are typically equipped with the facilities necessary to perform heat-treatment, end upsetting, threading, and coupling.  *See* Petition at Volume I (Exhibit I-11 (citing *ITC et al. OCTG 2020 Review* at I-30)).

**Comment:   Inclusion of Green Tube Processing and "Double Counting"**

*Tenaris' Comments*:

*The following is a verbatim summary of arguments submitted by Tenaris.  For further details, see Tenaris' Comments at 2-27.*

> Commerce Fails to Demonstrate That Domestically-Produced Green Pipe That is Further Processed (Heat Treated) by a U.S. Processor is Not Double-Counted and, Therefore, Commerce's Draft Remand Determination Fails to Comply with the Court's Instructions to Demonstrate That "The Data Relied Upon Accurately Reflected Industry Support"

> Commerce Fails to Demonstrate That the Shipment Data That Serve as the Basis for the Denominator in the Industry Support Calculation Include Shipments of Both U.S. Mills and U.S. Processors of Imported Green Pipe, and Therefore, the Draft Remand Determination Fails to Comply with the Court's Instructions to Demonstrate that "the Data Relied Upon Accurately Reflected Industry Support"

*Petitioners' Comments*:

*The following is a verbatim summary of arguments submitted by the petitioners.  For further details, see Petitioners' Comments at 2-6.*

> The Draft Remand Redetermination is a thorough and well-supported response to the Court's order. Commerce should make no changes in the final remand redetermination. There has never been any factual basis underlying the claims of Tenaris Bay City, Inc. ("Tenaris") on appeal regarding purported double counting of green tube produced in the United States by one company and then processed into OCTG by another U.S. company.

> Commerce appropriately explains how its determination that the domestic like product consists of OCTG as defined by the scope – including both unfinished green tube and finished OCTG – is consistent with the determinations of the {ITC} in its separate analyses of the domestic like product in cases involving OCTG since at least 2014.

> Commerce further explains that its inclusion of finishing operations in the numerator and the denominator of the calculation does not constitute "double counting," as any OCTG processed by supporters of the petition would already be reflected in the denominator that reflects all U.S. production (including processing operations).

> Commerce also responds to Tenaris' claims that domestic producer PTC Liberty was not

listed as a domestic producer in a 2020 ITC publication by explaining that the company is an OCTG producer with capabilities to finish/process OCTG and operates the assets of the former Boomerang Tube, which the ITC did identify as a domestic producer of OCTG in its publication. Commerce also explains that, in addition to producing OCTG casing in the United States, U.S. producer Borusan Mannesmann also finishes green tube imported from an affiliate in Türkiye. Because the company's processing operations involve imported green tube, there is no double counting of domestically produced green tube subsequently finished by Borusan Mannesmann in the United States.

**Commerce's Position:**

We disagree with Tenaris' contention that our Draft Remand is not responsive to the Court's remand instruction, inconsistent with statutory requirements, and unsupported by substantial evidence on the record. The Court ordered Commerce to further explain or reconsider its determination that the data relied upon accurately reflected industry support, including whether finishing operations were counted twice.[72] In accordance with the Court's order, we reconsidered the information on the record and further explained the "double counting" issue as well as other arguments raised by Tenaris regarding the inclusion of processing/finishing operations.[73] We also presented mathematical examples to conceptualize the methodology and demonstrate that, even with the inclusion of green tube finishing operations, the industry support calculation was reasonable and appropriate. Contrary to Tenaris' claims that Commerce's discussion of the scope, the domestic like product, and the definition of the domestic industry are misplaced, these concepts are integral to Commerce's analysis of a petition and whether the petition meets the requirements set forth under the statute and regulations. As a result, Commerce continues to include a discussion of the relationship between these concepts in its analysis for the Court. In its remand comments, Tenaris argues that Commerce only addressed

---

[72] *See Remand Order* at 27.
[73] *See* Tenaris USA's Letter II at 9-10; *see also* Tenaris USA's Letter III at 8; and Tenaris USA's Letter IV at 5.

record information pertaining to Borusan U.S. and PTC Liberty in the Draft Remand.[74]

Commerce is limited to the record before it,[75] and because Tenaris USA only addressed

petitioning companies Borusan U.S. and PTC Liberty in its pre-initiation comments, our analysis

in the Draft Remand is likewise limited to the information on the record.

    In its pre-initiation submissions, Tenaris USA argued that "mere finishing operations"

should not be included in the industry support calculation.[76]  Commerce appropriately addressed

Tenaris USA's generalized "processing" arguments in its analysis of the record information at

the time of its initiation decision.[77]  In its remand comments, Tenaris again attempts to move the

needle and fine tune its arguments with respect to processing.  Specifically, in its remand

comments, Tenaris now concedes that processing *should* be included in the industry support

calculation, but argues that only heat treatment processing, not threading operations, should be

included.[78]  For support, Tenaris points to information that was not on the record before

Commerce at the time of initiation or currently before Commerce.[79]

    In its remand comments, Tenaris also contends that Commerce failed to corroborate

whether the shipment data are complete and include mill and processor shipments (including

imported green tube that is heat treated in the United States).[80]  As support, Tenaris [

---

[74] *See* Tenaris' Comments at 3 and 9-10.
[75] *See Shandong Jinxiang Zhengyang Import & Export Co., Ltd. v. United States*, 429 F.Supp.3d 1373, fn. 14 ("Except in very limited circumstances, this court's review of Commerce's determination is limited to the record before it.").
[76] *See* Tenaris USA's Letter II at 9-10; *see also* Tenaris USA's Letter III at 8; and Tenaris USA's Letter IV at 5.
[77] *See* Initiation Checklist at Attachment II (pages 9-10 and 14).
[78] *See* Tenaris' Comments at 3.
[79] *Id.* at 24-25.
[80] *Id.* at 17.

].[81]  Tenaris states that the [

].[82]  We

reexamined the record with respect to this exhibit and found that [

].[83]  The petitioners [

].[84]  Tenaris attempts to muddy the water again and cast doubt on

data that up until this point had remained uncontested on the record.

As Commerce previously explained, no party – including Tenaris USA – contested the

validity of the industry data source in the pre-initiation period, despite having ample opportunity

to do so.  Nevertheless, Commerce has considered the merits of Tenaris' new claim and is

unpersuaded by the "facts" Tenaris points to as support.  A party's ability to point to an

alternative finding on the record – even a reasonable one – does not provide a basis for the Court

to set aside Commerce's determination.[85]  As the Court has held, "{t}he fact that industry data is

not perfect is not sufficient to suggest that Petitioners do not have industry standing" and, thus,

Tenaris "must do more than point out that industry data was not perfect in order to show that

---

[81] *Id.* at 18.
[82] *Id.*
[83] *See* Petition at Volume I (Exhibit I-2).
[84] *Id.* at Volume I (Exhibit I-2); *see also* Second General Issues Supplement at Exhibit 5.
[85] *See Pokarna Engineered Stone Ltd v. United States*, 56 F.4th 1345, 1351-52 (Fed. Cir. 2023).

{the petitioners} lack industry standing."[86]  Moreover, the Court has held that "the industry standing calculations are not meant to be exact and proxies are routinely used to estimate the amount of U.S. production of a particular product."[87]  Furthermore, merely disagreeing with the evidentiary weight Commerce assigns to pieces of evidence on the record is insufficient to overturn Commerce's determination.[88]  As such, Tenaris USA's unsubstantiated allegations of a *potential* flaw with inclusion of processing in its pre-initiation comments and Tenaris' allegations of "double counting" in its remand comments are insufficient to show that the petition was not filed by or on behalf of the domestic industry producing OCTG.  As in *QVD Food*, Tenaris "is in an awkward position to argue that Commerce abused its discretion by not relying on evidence that {Tenaris USA and Tenaris} failed to introduce into the {pre-initiation} record."[89]  Given the relatively low threshold for establishing industry support and the reliable record evidence showing that the petitioners accounted for at least 25 percent of total U.S. production of the domestic like product and more than 50 percent of total U.S. production of the domestic like product by those producers or workers expressing support for, or opposition to, the Petition, the burden was on Tenaris USA to submit adequate, rebuttal factual information in the pre-initiation period showing that the industry source used by the petitioners as the starting point for their estimate of 2020 industry-wide production data was incorrect.[90]

---

[86] *See PT Pindo Deli Pulp v. United States*, 825 F.Supp.2d 1310, 1327-28 (CIT 2012) (citing section 732(b)(1) of the Act, requiring the petition to contain information "reasonably available" to the petitioner to support its allegations).
[87] *Id.*
[88] *See Jacobi Carbons AB et.al. v. United States*, 422 F.Supp.3d 1318, 1325-26 (CIT 2019).
[89] *See QVD Foods Co., Ltd. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (*QVD Foods*).
[90] Tenaris USA's burden to show lack of industry support was arguably higher in a case such as this one, where evidence in the Petition demonstrated that even if all other domestic producers (including Tenaris USA) were to oppose the Petition, the supporters still had the requisite level of industry support for Commerce to initiate the investigation.

As a point of clarification, Commerce did rely on data from the ITC's *India et al. OCTG 2020 Review* as industry-wide information available on the record to calculate the ratio of the U.S. industry's reported production to domestic shipments, for purposes of adjusting the domestic shipment data to approximate production for the U.S. OCTG industry.[91]  We did *not* rely on this ITC data as "other information" pursuant to section 732(c)(4)(D)(i) of the Act,[92] as Tenaris incorrectly asserts.[93]  Rather, as stated in the Initiation Checklist, we relied on [

] as other information, pursuant to section 732(c)(4)(D)(i) of the Act.[94]

With respect to Tenaris' argument that there are clear principles regarding the U.S. OCTG industry, the domestic like product, and the reporting, collecting, and presentation of production and shipment data, we agree.  The existence of these clear principles in fact supports Commerce's conclusion that the industry support calculation accurately reflects U.S. OCTG production in calendar year 2020.  As Tenaris explains, under these industry principles, processors that perform heat treatment on green tube are considered part of the domestic industry producing OCTG, but that threading alone is not considered domestic production.[95]  U.S. companies, including the four petitioning companies, have participated in multiple investigations and reviews at the ITC, where they were required to report data according to these principles.  There is no evidence on the record that indicates that the companies departed from these data reporting principles when providing data used in the Petition's industry support calculation.

---

[91] *See* Initiation Checklist at Attachment II (page 5).
[92] Section 732(c)(4)(D)(i) of the Act requires that Commerce poll the industry or rely on other information to determine industry support if the petition does not establish the support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product.
[93] *See* Tenaris' Comments at 23-24.
[94] *See* Initiation Checklist at Attachment II (page 6).
[95] *See* Tenaris' Comments at 24-25.

Thus, Tenaris' claims regarding potential flaws in the underlying data in the industry support calculation is unsubstantiated and without merit.

Finally, we note that as support for its arguments in its initial comments on the Draft Remand, which Commerce rejected from the record as they contained new factual information, Tenaris also provided information from the ITC's report published in *November 2022* – the year *after* Commerce evaluated the merits of the Petition and initiated the investigation.[96]  In reaching its initiation decision in October 2021, Commerce examined the information available on the record and concluded that the petitioners had provided information reasonably available to them to establish that the Petition was filed by or on behalf of the domestic industry producing OCTG. Data availability will always change as time goes by.  What constitutes "reasonably available information" on the pre-initiation record is not mercurial or fluid once a decision is made to initiate an investigation – otherwise, after every initiation there would be an endless loop of litigious claims that new data and information have become available, such that Commerce must reexamine its decision to initiate.  The statute and regulations support this determination – Commerce must evaluate the record before it within the short pre-initiation period to determine whether a petitioner has provided information reasonably available to it to support its allegations, including satisfying the requirement that the petition must contain, to the extent reasonably available to the petitioner, information relating to the degree of industry support for the petition. As detailed above, Commerce evaluated the record, including the merits of Tenaris USA's pre-initiation comments, and determined that the petition requirements were met.  Just because Commerce evaluated and weighed the evidence differently than Tenaris does not render

---

[96] *See* Commerce's Letter, "Rejection of Tenaris' Comments on Draft Results of Redetermination," dated June 7, 2024.

Commerce's initiation decision improper.[97]  As demonstrated above, throughout the course of this litigation and in its remand comments, Tenaris continues to refine its arguments, raising new concerns *post hoc* with a level of specificity that was not articulated in its pre-initiation comments.  Tenaris' assertions regarding green tube heat treatment processing, OCTG threading operations, concerns with the industry source used as the denominator, and other information from ITC reports were not on the record before Commerce in the pre-initiation period and are currently not on the record before Commerce.  Nevertheless, as outlined above, Commerce has considered the merits of Tenaris' newly articulated arguments and continues to find that the information on the record supports the conclusion that the petitioners provided information reasonably available to them and demonstrated that the Petition was filed by and has the support of the domestic industry.

Thus, Commerce's decision to initiate the LTFV investigation on OCTG from Argentina was reasonable considering the law and the facts on the record.

## V.    FINAL RESULTS OF REDETERMINATION

Pursuant to the Court's *Remand Order*, and based on the analysis above, Commerce has further explained and reconsidered the "double counting" question.  Accordingly, Commerce

---

[97] *See, e.g.*, *Mitsubishi Heavy Indus. Ltd. V. United States*, 275 F.3d 1056, 1062 (CIT 2001) ("{T}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence" and *Cleo*, 501 F.3d at 1296 (citing *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001) ("Even if it is possible to draw two inconsistent conclusions from evidence on the record, such a possibility does not prevent Commerce's determination from being supported by substantial evidence."); *Haixing Jingmei Chem. Prod. Sales Co. v. United States*, 335 F.Supp.3d 1330, 1346 (CIT 2018) ("mere disagreement with Commerce's weighing of the evidence" insufficient basis for legal challenge)).

continues to find that initiating the investigation was in accordance with law and based on

substantial evidence.

6/26/2024

X ~~Ryan Majerus~~

Signed by: RYAN MAJERUS

Ryan Majerus
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance