## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE

|  |  |
|---|---|
| TENARIS BAY CITY, INC.; MAVERICK TUBE CORPORATION; IPSCO TUBULARS INC.; TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION; AND SIDERCA S.A.I.C., | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) |
| and | ) ) |
| UNITED STATES STEEL CORPORATION; BORUSAN MANNESMANN PIPE U.S. INC.; PTC LIBERTY TUBULARS LLC; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC; AND WELDED TUBE, | ) ) ) ) ) ) ) ) ) ) ) |
| Defendant-Intervenors. | ) ) |

Court No. 22-00343

# NON-CONFIDENTIAL
**Business Proprietary Information has been deleted from Pages 15-17, 22**

**COMMENTS OF PLAINTIFFS TENARIS BAY CITY, INC., MAVERICK TUBE CORPORATION, IPSCO TUBULARS INC., TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION, AND SIDERCA S.A.I.C. ON COMMERCE'S FINAL REMAND DETERMINATION**

Gregory J. Spak
Frank J. Schweitzer
Kristina Zissis
Matthew W. Solomon
**White & Case LLP**

701 Thirteenth Street, N.W.
Washington, D.C. 20005
202-626-3600

*Counsel to Tenaris Bay City, Inc.; Maverick Tube Corporation; IPSCO Tubulars Inc.; Tenaris Global Services (U.S.A.) Corporation; and Siderca S.A.I.C.*

Dated:  July 26, 2024

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     BACKGROUND ..................................................................................................2

     A.     Prior to Initiation Tenaris Raised Concerns of Potential Distortions in the Industry Support Calculation Because the Data and Information Relied upon by Commerce Was Not a Reasonable Proxy for Actual Production Levels ...........................................................................................................2

     B.     Prior to Initiation Tenaris Argued That a Petition Supported by Both OCTG Producers and Processors Had Implications for Assessing Whether the Petition Was "Filed by or on Behalf of the Industry" and Called into Question the Accuracy of Domestic Industry Support Calculations That Were Based on the Comingling of Pipe Formation Data and Pipe Finishing Data ...........................................................................................................3

     C.     Current Procedural Posture .....................................................................4

III.   THE COURT'S REMAND ORDER AND INSTRUCTIONS ...........................7

IV.   COMMERCE'S FINAL REMAND DETERMINATION FAILS TO COMPLY WITH THE COURT'S REMAND INSTRUCTIONS TO DEMONSTRATE THAT "THE DATA RELIED UPON ACCURATELY REFLECTED INDUSTRY SUPPORT" AND THAT THE CALCULATION DOES NOT REFLECT DOUBLE-COUNTING ...................................................................8

     A.     Commerce Did Not Address the "Double-Counting" Problem, and the Record Does Not Include the Information Necessary for Commerce to Consider the Issues Arising from a Petition Supported by a Combination of Producers and Processors ...................................................................9

     B.     The Record Evidence Does Not Support Commerce's Conclusion That the Denominator of the Industry Support Calculation Includes Total U.S. Production of the Domestic Like Product ...........................................13

         1.     Commerce Failed to Confirm the Completeness of the Shipment Data it Relied on from the Industry Source ...............................13

         2.     Commerce Recognizes That the ITC Has Considered That the Domestic OCTG Industry Includes Both Producers (Pipe Formers) And Processors (Heat Treaters), and that Production and Shipment Data for Producers and Processors are Separately Reported ....................19

     C.     Plaintiffs Exhausted Their Administrative Remedies ...........................23

V.    CONCLUSION .................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Apex Frozen Foods Private Ltd. v. United States*,
  37 Int'l Trade Rep. (BNA) 1779 (Ct. Int'l Trade 2015) ...........................................25

*McCarthy v. Madigan*,
  503 U.S. 140 (1992) ....................................................................................... 24-25

*Tenaris Bay City, Inc. et al. v. United States*,
  Court No. 22-00343, Slip Op. 24-31 (March 14, 2024) .................................. passim

*Trust Chem Co. Ltd. v. United States*,
  791 F. Supp. 2d 1257 (Ct. Int'l Trade 2011) .........................................................24

## STATUTES AND REGULATIONS

19 U.S.C. § 1673a(c)(4) ...................................................................................................2

19 U.S.C. § 1673a(c)(4)(A)(ii) .......................................................................................7

19 C.F.R. § 351.203(e)(1) ...............................................................................................2

## ADMINISTRATIVE DETERMINATIONS

*Certain Oil Country Tubular Goods from India, Korea, the Philippines, Taiwan, Thailand,
Turkey, Ukraine, and Vietnam*,
  Inv. Nos. 701-TA-499-500 and 731-TA-1215-1217 and 1219-1223
  (Final), USITC Pub. No. 4489 (Sept. 2014) .................................................... 7, 11, 20-21

*Oil Country Tubular Goods from India, Korea, Turkey, Ukraine, and Vietnam*,
  Inv. Nos. 701-TA-499-500 and 731-TA-1215-1216, 1221-1223 (Review),
  USITC Pub. No. 5090 (July 2020) .......................................................................... 7, 20-21

NON-CONFIDENTIAL VERSION

In accordance with this Court's decision and remand order in *Tenaris Bay City, Inc. et al. v. United States*, Court No. 22-00343, Slip Op. 24-31 (March 14, 2024) ("Remand Order") (ECF Nos. 61, 68), Plaintiffs Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation, and Siderca S.A.I.C. hereby submit comments on the *Final Results of Redetermination Pursuant to Court Remand* (June 26, 2024) ("Final Remand Determination") (ECF Nos. 74, 75) issued by the Department of Commerce ("Commerce").

## I.    INTRODUCTION

Commerce's Final Remand Determination does not comply with the Court's remand order and instructions directing Commerce to ensure "that the data relied upon accurately reflected industry support, including whether finishing operations were counted twice." Commerce failed to do so in two different respects. First, Commerce appears to misunderstand the "double-counting" issue, and, in any event, it did not resolve the distortive effect identified by the Court. Second, the record evidence does not support Commerce's conclusion that the denominator of the industry support calculation includes total U.S. production of the domestic like product, including imported green pipe that has been processed by a U.S. processor. In this regard, Commerce failed to demonstrate based on record evidence that the shipment data from the industry source that was provided by Petitioners, and upon which Commerce relied and used as the starting point for its industry support calculations, is complete and includes domestic shipments of imported green pipe that have been processed by a U.S. processor. Accordingly, Commerce failed here too to show "that the data relied upon accurately reflected industry support." Commerce's Final Remand Determination is not supported by substantial evidence on the record and is otherwise contrary to law.

NON-CONFIDENTIAL VERSION

## II.    BACKGROUND

Petitioners submitted four different calculations (first in the petition, and then with three subsequent revisions) in their successive attempts to satisfy the statutorily-required level of domestic industry support for the petition.  *See* Remand Order at 3-9.  Petitioners represented less than 50 percent of total production of the domestic like product.  Commerce Initiation Checklist at Attachment II at 6 (Oct. 26, 2021) (C.R.26/P.R.40).[1]  However, the successive calculations contained factual mistakes, flawed assumptions, methodological errors, and relied upon information that was not indicative of the actual production data as required by the statute and regulations.  Simply put, none of the industry support calculations provided an accurate basis for Commerce to determine whether the petition satisfied the statutory threshold required to be "filed by or on behalf of the industry."  19 U.S.C. § 1673a(c)(4).

### A.    Prior to Initiation Tenaris Raised Concerns of Potential Distortions in the Industry Support Calculation Because the Data and Information Relied upon by Commerce Was Not a Reasonable Proxy for Actual Production Levels

Tenaris USA submitted four sets of comments totaling more than 200 pages of argument and documentation, and its counsel met separately with Commerce, challenging the data underlying Petitioners' successive industry support calculations, including the fact that the estimated U.S. production figure comprising the denominator of the ratio was not "indicative of production levels" as required by Commerce's regulations.  19 C.F.R. § 351.203(e)(1); Tenaris' October 8, 2021 Comments (Oct. 8, 2021) (C.R.9/ P.R.15); Tenaris' October 15, 2021 Comments (C.R.12-18/P.R.22-28); Tenaris' October 20, 2021 Comments (C.R.22/P.R.31); October 21, 2021 Ex Parte Meeting Memo (P.R.34); Tenaris' October 22, 2021 Comments (C.R.25/P.R.35).

---

[1] Citations to the administrative record from the underlying review are noted with "C.R." and "P.R." for "confidential record" and "public record" respectively.  References to the current remand record are noted with "R.C.R." and "R.P.R." for "remand confidential record" and "remand public record," respectively.

**NON-CONFIDENTIAL VERSION**

Common to each of Tenaris' arguments was the concern that Petitioners' estimated total U.S. production of the domestic like product – an estimate based on a combination of 2020 production and shipment data that was further adjusted by 2018 and 2019 shipment and production data – was not a reasonable proxy for production as required by the statute and could not provide a basis for Commerce to determine whether the Petition was filed "by or on behalf of the industry." Tenaris' October 15, 2021 Comments at 5-9; Tenaris' October 20, 2021 Comments at 6-8; Tenaris' October 22, 2021 Comments at 3-5. As discussed below, these core problems have not been corrected.

The estimated production data – starting with 2020 shipment data that were adjusted based on the use of outdated and anomalous shipment and production data dating back to 2018 – were distorted and not indicative of actual domestic OCTG production levels such that the data combined with the other information on which Commerce relied was not an accurate or sufficient basis for Commerce to determine whether the petition was filed by or on behalf of the industry and satisfied the statutory 50 percent requirement. Tenaris therefore repeatedly requested that Commerce poll the industry and request actual production data. *See, e.g.*, Tenaris' October 8, 2021 Comments at 2, 8; Tenaris' October 15, 2021 Comments at 5, 7, 10-11, 23; Tenaris' October 20, 2021 Comments at 2-9; Tenaris' October 22, 2021 Comments at 2-3, 5-6. Commerce refused.

**B.    Prior to Initiation Tenaris Argued That a Petition Supported by Both OCTG Producers and Processors Had Implications for Assessing Whether the Petition Was "Filed by or on behalf of the Industry" and Called into Question the Accuracy of Domestic Industry Support Calculations That Were Based on the Comingling of Pipe Formation Data and Pipe Finishing Data**

Tenaris also raised arguments before Commerce related to the fact that the U.S. domestic industry, and the Petitioners, are comprised of both producers (pipe formers) and processors (of formed pipe), and that this composition had potential implications for the industry support calculation. For example, in Tenaris USA's October 15, 2021 comments, Tenaris requested that

**NON-CONFIDENTIAL VERSION**

Commerce "confirm whether the data submitted by Petitioners include only their own OCTG production, or include both OCTG production and finishing operations," and submitted evidence that two petitioners – Borusan and PTC – have OCTG finishing operations in the United States. Tenaris' October 15, 2021 Comments at 9-10.  In its October 20, 2021 submission, Tenaris USA underscored the potential distortive effect of the comingling of production and processing data for Commerce's industry support calculation:

> Petitioners do not address how the issue of finishing pertains to Commerce's determination of industry support, and do not cite to any Commerce precedent to explain their unclear position.  The relationship of pipe formation and pipe finishing has implications for any assessment of a domestic OCTG industry given that the percentage of green pipe and plain end imports of OCTG into the United States will vary year to year and may constitute the majority of imports in any given year.

Tenaris' October 20, 2021 Comments at 8.  Due to these concerns, Tenaris USA specifically requested that Commerce poll the industry and "require that the OCTG data be broken out by pipe production and finishing."  Tenaris' October 20, 2021 Comments at 9.  Commerce opted not to do so.  The record demonstrates that Commerce was put on notice of this core issue – that "Petitioner's strategy to cobble together the requisite support based on data for a group that also included processors and finishers of OCTG had implications for the accuracy of the industry support calculations.'"  *See, e.g.*, Remand Order at 5; *see also* Tenaris' October 20, 2021 Comments at 8-9.  The potential for improperly counting – whether double-counting or undercounting – is one of several distortions to the numerator and denominator of the industry support calculation that stems from a petition supported by producers and processors and the comingling of the producers' and processors' production data.

## C.    Current Procedural Posture

Plaintiffs appealed the Final Determination to the Court on December 16, 2022, and filed the Complaint on January 13, 2023.  *See* Summons (Dec. 16, 2022) (ECF No. 1); Complaint (Jan.

NON-CONFIDENTIAL VERSION

13, 2023) (ECF No. 16).  The Court issued its opinion and remand order on March 14, 2024.  *See* Remand Order.  Commerce issued its Draft Remand Determination on May 28, 2024, and invited comments from the parties.  Draft Results of Redetermination Pursuant to Court Remand, *Tenaris Bay City, Inc. et al. v. United States*, Court No. 22-00343, Slip Op. 24-31 (CIT March 14, 2024) (May 28, 2024) (R.P.R.1).  Plaintiffs and Defendant-Intervenors submitted comments on the draft remand determination on June 4, 2024.  Defendant-Intervenors Comments on Draft Remand Redetermination (June 4, 2024) (R.P.R.2); Tenaris Comments on Draft Remand Determination (June 4, 2024) (R.C.R.1/R.P.R.3).

On June 7, 2024, Commerce rejected Plaintiffs' submission, claiming that it contained "untimely new factual information {'NFI'} not previously contained on the record of the proceeding," and instructing Plaintiffs to resubmit the comments with the supposed NFI redacted. Letter from Yang Jin Chun to White & Case LLP, re: *Slip Op. 24-31, Oil Country Tubular Goods from Argentina: Rejection of Tenaris's Comments on Draft Results of Redetermination* (June 7, 2024) (R.P.R.4-5).  Specifically, Commerce objected to Plaintiffs' reference to portions of the Commission's 2014, 2020, and 2022 OCTG determinations.

In its June 4, 2024 comments, Plaintiffs referred to the U.S. International Trade Commission's ("ITC") 2014 OCTG investigation and 2020 OCTG sunset review determinations, each of which was specifically relied upon by Commerce for purposes of its determination regarding the definition of the "domestic industry" and  the "domestic like product."  Plaintiffs observed that certain truths regarding the domestic industry and the domestic like product axiomatically follow from the ITC's definitions and the cited ITC reports upon which Commerce had expressly relied.

**NON-CONFIDENTIAL VERSION**

As discussed below, in Section IV, the following points flow directly from, and are inextricably linked to, Commerce's determination regarding its definitions of the domestic industry and the domestic like product: (1) certain U.S. companies produce green pipe (form the pipe) and also further process/finish (heat treat, thread, etc.) that pipe in the United States, and certain U.S. companies only further process (*e.g.*, heat treat, thread) pipe that has already been formed; (2) processors in the United States that perform heat treatment do so for both domestically-produced (formed) green pipe and imported green pipe; (3) for further processing to be considered part of the U.S. industry production, the pipe must be heat treated, such that, for example, the threading of pipe that has already been heat treated would not alone be considered domestic production; (4) OCTG production data are reported to the ITC separately by the domestic producers (mills that form, and sometime further process, the pipe) and the domestic processors (that heat treat pipe that is already formed); and (5) imported green pipe that is heat treated in the United States is not included in the data reported by U.S. mills, but rather is reported separately as processors' data. *See* Tenaris Comments on Draft Remand Determination at 24-25.

Plaintiffs' citations to the Commission's 2014 and 2020 OCTG determinations with respect to the definition of domestic industry and domestic like product merely echoed Commerce's reliance on those same determinations in the underlying investigation and on remand. *See, e.g.*, Initiation Checklist at Attachment II at 3; Final Remand Determination at 9. Commerce relied heavily on the Commission's 2014 and 2020 reports, and Plaintiffs' references to the reports as exemplifying the Commission's accepted practice regarding the treatment of producers and processors should not have been rejected. Regardless, those basic facts regarding the domestic industry (comprising both U.S. OCTG producers and processors) and the domestic like product (that are produced by integrated U.S. producers, and by U.S. processors that heat treat (finish) both

NON-CONFIDENTIAL VERSION

domestically produced and imported green pipe) are clear and uncontroversial. *See, e.g.*, Final Remand Determination at 8 (citing *Certain Oil Country Tubular Goods from India, Korea, the Philippines, Taiwan, Thailand, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1217 and 1219-1223 (Final), USITC Pub. No. 4489 (Sept. 2014) ("ITC 2014 OCTG Investigation"); *Oil Country Tubular Goods from India, Korea, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499-500 and 731-TA-1215-1216, 1221-1223 (Review), USITC Pub. No. 5090 (July 2020) ("ITC 2020 OCTG Review")); *see also* Tenaris Comments on Draft Remand Determination at 24-25.

Plaintiffs resubmitted the comments on June 10, 2024 with the specified portions redacted as directed by Commerce. Tenaris Resubmission of Comments on Draft Remand Determination (June 10, 2024) (R.C.R.2/R.P.R.6).

## III.    THE COURT'S REMAND ORDER AND INSTRUCTIONS

The Court recounted arguments advanced by Plaintiffs in the underlying investigation relating to the accuracy of both the numerator and denominator of the industry support calculation, and found that Commerce failed to properly take into account certain arguments so as to ensure that the data relied upon were accurate and that the industry support calculation was accurate. *See, e.g.*, Remand Order at 4 ("On October 8, 2021, Plaintiffs submitted comments to Commerce alleging (1) Petitioners misrepresented which production plants were represented by USW, causing production figures to be improperly deducted from the industry support calculation; (2) the industry support calculation was unreliable because it was based on anomalous 2020 production data; and (3) the Petitioner's reliance on shipment data, instead of production data, was not in accordance with 19 U.S.C. § 1673a(c)(4)(A)(ii)"); *id.* at 5 ("On October 20, 2021 … Plaintiffs also argued 'Petitioners bear the burden of demonstrating industry support for the petition,' and that 'Petitioner's strategy to cobble together the requisite support based on data for

NON-CONFIDENTIAL VERSION

a group that also included processors and finishers of OCTG had implications for the accuracy of the industry support calculations'"). The Court directed Commerce as follows: "Commerce must either reconsider or further explain its use of data from the 2020 market period, and specifically to ensure that finishing operations data were not double counted." Remand Order at 10. The Court remanded for further explanation or reconsideration "Commerce's determination that the ***data relied upon accurately reflected industry support, including whether finishing operations were counted twice***." Remand Order at 27 (emphasis added). Commerce's Final Remand Determination entirely fails to comply with the Court's remand instructions.

IV.   **COMMERCE'S FINAL REMAND DETERMINATION FAILS TO COMPLY WITH THE COURT'S REMAND INSTRUCTIONS TO DEMONSTRATE THAT "THE DATA RELIED UPON ACCURATELY REFLECTED INDUSTRY SUPPORT" AND THAT THE CALCULATION DOES NOT REFLECT DOUBLE-COUNTING**

Commerce's Final Remand Determination fails to comply with the Court's instructions and remand order in two separate ways. First, Commerce did not address the "double-counting" distortion identified by the Court. Nor does the record include the information necessary for Commerce to consider the issues arising from a Petition supported by a combination of producers and processors. Second, Commerce did not demonstrate the data "accurately reflected industry support" because the record evidence does not support Commerce's conclusion that the denominator of the industry support calculation includes total U.S. production of the domestic like product, including imported green pipe that has been processed by a U.S. processor. In this regard, Commerce failed to confirm the completeness of the shipment data from the industry source provided by Petitioners and relied upon by Commerce as the starting point of the industry support calculations. Indeed, as Commerce recognizes, the ITC has considered that the domestic OCTG industry includes both producers (pipe formers) and processors (heat treaters), and that production and shipment data for producers and processors are separately reported.

NON-CONFIDENTIAL VERSION

A. **Commerce Did Not Address the "Double-Counting" Problem, and the Record Does Not Include the Information Necessary for Commerce to Consider the Issues Arising from a Petition Supported by a Combination of Producers and Processors**

Despite Commerce's recitation of the Court's instructions on remand, Commerce *again* either misunderstands the double-counting issue or refuses to address it. Instead, Commerce discusses the relationship between the scope of the investigation and the domestic like product, and states that it "reexamined the administrative record to determine whether companies engaged in OCTG green tube finishing operations (*i.e.*, heat treatment) should be part of the domestic industry." Final Remand Determination at 9. Commerce then again concludes that "OCTG, including unfinished green tube, as defined in the scope, constitutes a single domestic like product and that the domestic industry consists of all U.S. producers of OCTG, including finishers and processors of green tube that provide heat treatment." Final Remand Determination at 10. This discussion is superfluous because there is no disagreement about the scope of the investigation or the domestic like product, and the Court did *not* remand on the issue of scope of the product under investigation or the definition of the domestic industry.

Commerce explained its understanding of the "double-counting" issue as follows:

Just because a company produces OCTG and has processing capabilities does not mean that it double counted its OCTG production for purposes of providing its own actual production for inclusion in the Petition, nor does it follow that the data from these companies must be inherently flawed. Likewise, just because a U.S. producer has processing capabilities does not mean that it reported the heat treatment processing it performed on another U.S. company's already reported, domestically-produced green tube, thereby duplicating the reported quantity of the green tube and the finished OCTG product. Nevertheless, there is no overstating of the numerator of the calculation, as the green tube processed by the supporters would already be reflected in the denominator that reflects total U.S. production (including green tube finishing operations) by all U.S. producers. In other words, the supporters' green tube finishing operations in the numerator would be effectively canceled out in the denominator.

NON-CONFIDENTIAL VERSION

Final Remand Determination at 13.  The potential "double-counting" distortion that was remanded by the Court is not in the relationship *between* the numerator and denominator of the industry support ratio.  Rather, the distortion is *within* each of the numerator and denominator in circumstances where the production (formation of green pipe) and the processing (heat treatment) of that domestically-produced green pipe are each counted as U.S. production.  Where one ton of domestically-produced green pipe produced by one U.S. company is processed (heat treated) by a different U.S. company and each are separately counted as U.S. production, the result is "double-counting" of the same pipe.   This is the simple reality that Commerce either does not understand or is avoiding.  Commerce's statement that the inclusion of the same pipe in the numerator and denominator would be "canceled out" would be correct *only if the ratio were 1:1*– that is, were the numerator and denominator the same, which they clearly are not.  For example, removing one ton of OCTG from both the numerator and denominator of a "9/10" ratio transforms the ratio to "8/9," and a different percentage (*i.e.*, 90% to 88.8%).  On the facts of this case, in debating whether the ratio reaches the statutory requirement of 50%, one ton in the numerator has much more significance than the same ton in the denominator.  The ton in the numerator in no way "cancel{s} out" the same ton in the denominator.

An additional potential distortion to the industry support calculation that arises from the composition of the Petitioners (as comprising producers and processors) and the comingling of data (production and processing) is the need to ensure that the industry support calculation should reflect only processing that constitutes OCTG production (*i.e.*, at least heat treatment).   For example, without heat treatment, minor processing that does not result in OCTG production (*e.g.*, threading) should not be included.  In the Final Remand Determination, Commerce fails to confirm that the production by processors included its industry support calculation reflects only processing

that constitutes OCTG production (*i.e.*, heat treatment) rather than minor processing that does not result in OCTG production (*e.g.*, threading). Impermissible double-counting would also occur where one U.S. processor heat treats a quantity of pipe and a different U.S. company threads that same pipe.

Commerce's silence on these obvious problems is not surprising because the record in the investigation does not contain the information necessary to separate production resulting from processing that includes heat treatment versus processing that includes only threading. *See* Tenaris' October 20, 2021 Comments at 9 (Tenaris requested that "Commerce should poll the industry" and that Commerce should "require the OCTG data be broken out by pipe production and finishing"). By failing to ensure the processors' production in the industry support calculation only includes production of heat treated OCTG, Commerce has not demonstrated that the industry support calculation is accurate, as required by the Court.

As discussed below in Section IV.B.2, for further processing to be considered part of the U.S. industry production, the pipe must be heat treated, such that, for example, ***the threading of pipe that has already been heat treated would not alone be considered domestic production***. The ITC has found: "processors that provide heat treatment engage in sufficient production-related activities in the United States to be treated as domestic producers." *See* ITC 2014 OCTG Investigation at 13. In contrast, the ITC also has stated that the "Commission in recent OCTG investigations has not deemed independent threaders to be part of the domestic industry producing casing and tubing." ITC 2014 OCTG Investigation at I-24 n.35. Therefore, OCTG production for purposes of the industry calculation should include only imported OCTG that has been heat treated, and then it should not be counted again if it is threaded by a different company. Commerce fails to address this issue on remand. In the Final Remand Determination, Commerce points to evidence

NON-CONFIDENTIAL VERSION

that PTC has "both API and Semi-Premium threading" and significant processing capacity.  Final Remand Determination at 15.  As discussed above, to the extent PTC further processes imported pipe and only threads it, this should not be included in the industry support calculation. Commerce's discussion of PTC's threading capacity, which is not relevant for OCTG production, raises the concern that Commerce is not properly distinguishing between OCTG production and mere threading that does not qualify as production.

Commerce discusses the record evidence regarding Borusan and PTC's processing capabilities, finding that "PTC Liberty is first and foremost a U.S. *producer* of OCTG that also has processing capabilities," and "Borusan U.S. is first and foremost a U.S. *producer* of OCTG casing that also *processes* green tube imported from its facility in Türkiye."  Final Remand Determination at 17.  As an initial matter, Commerce incorrectly focuses its limited discussion on these two processors.   The issue remanded by the Court is applicable to all U.S. producers/processors.  However, in any event, it remains impossible for Commerce to undertake the required analysis for PTC, Borusan, or any other processors based on the record in the underlying investigation.  As Tenaris noted to Commerce, the record does not disaggregate the producers' (pipe formation) and processors' (heat treatment pipe finishing, and possibly only threading) data such that it is possible to determine the source of the green pipe – and whether processors are heat treating/finishing domestically-produced green pipe or imported green pipe to ensure there is no double-counting.  *See* Tenaris' October 20, 2021 Comments at 9 (Tenaris requested that Commerce should "require the OCTG data be broken out by pipe production and finishing").

**NON-CONFIDENTIAL VERSION**

Even in its discussion of PTC and Borusan, Commerce misses the point.  If a petitioner processes a small portion of OCTG relative to its production, the possibility of double-counting, or the improper inclusion of only "threading" processing, remains.

In short, the Final Remand Determination does not address, let alone resolve, one of the issues specifically mentioned by the Court.  Commerce needs to demonstrate, with record evidence, that a length of green pipe counted as production when it is rolled is not counted again when it is processed (*i.e.*, heat treated) or not counted at all (when it is merely threaded) by a different company.  To do that, Commerce needs to have data on the source of the processors' green pipe.  It would appear that Commerce does not have the information necessary to address the Court's concern.

B.    **The Record Evidence Does Not Support Commerce's Conclusion That the Denominator of the Industry Support Calculation Includes Total U.S. Production of the Domestic Like Product**

1.    **Commerce Failed to Confirm the Completeness of the Shipment Data it Relied on from the Industry Source**

Commerce confirms in the Final Remand Determination that the denominator of the industry support calculation must "***reflect{} production of the domestic like product, including green tube finishing and processing operations***."  Final Remand Determination at 11 (emphasis added).  Consequently, as expressly recognized by Commerce, in order for the industry support calculation to be "accurate," the data used for the denominator must reflect production of both U.S. OCTG producers (*i.e.*, OCTG produced by U.S. mills) **and** U.S. OCTG processors (*i.e.*, imported green pipe, that has been heat treated in the United States by U.S. processors).  As discussed above in Section II.A., Commerce used 2020 shipment data, which were provided in Volume I, Exhibit I-2 of the Petitions, as a proxy for missing production data.  However, the record

evidence on which Commerce relied does not establish that the industry source used to derive the denominator reflects all domestic shipments of OCTG from both U.S. mills **and** U.S. processors.

Commerce concedes in its Final Remand Determination that it relied on Petitioners' claim in its October 12, 2021 response to Commerce's October 7, 2021 supplemental questionnaire that, "to their knowledge" the industry source they provided in the petition that Commerce used as "the starting point" for the denominator "accounted for all U.S. shipments of the domestic like product." Final Remand Determination at 11. Commerce concluded that the industry source information in Volume I, Exhibit I-2 of the Petitions included all U.S. shipments of OCTG despite the lack of any evidence confirming the shipment data were complete and included mill and processor shipments (including imported green pipe that is heat treated in the United States). The reliance on a mere assertion rather than requiring corroborating evidence regarding the nature of the data is an error that must be corrected in order to ensure Commerce's industry support calculation is accurate, as required by the Court.

In the Final Remand Determination, Commerce describes the source from Volume I, Exhibit I-2 of the Petitions used for the denominator:

> The record indicates that ***the starting point for the denominator of the industry support calculation is based on the 2020 domestic shipment data from an industry source which the petitioners described as "the recognized authority on the U.S. pipe and tube market."***

Final Remand Determination at 11 (emphasis added) (citing Initiation Checklist at Attachment II at 4-5 and Petition, Vol. I at 6). The Initiation Checklist in turn cites to the "Petitions at Volume I at 6 and Exhibit I-2). *See* Initiation Checklist at 5 & n.32. Commerce concludes that:

> the record supports Commerce's conclusion that the shipment data from this source account for all domestic shipments of the domestic like product (including the appropriate green tube finishing operations) and that … the resulting denominator used in the industry support calculation appropriately reflects the entire universe of production of the domestic like product in calendar year 2020.

**NON-CONFIDENTIAL VERSION**

Final Remand Determination at 12.   [          ], the record evidence demonstrates that

[                                    ], and Commerce's willingness to simply accept Petitioners'

assertion is not consistent with the substantial evidence standard.

     First, a [

].  *See* Petition, Vol. I at Exhibit I-2.  The [

].  The [

].  Petition, Vol. I at Exhibit I-2.  This [

].  Petition, Vol.

I at Exhibit I-2.  The [

]  Petition, Vol. I at Exhibit I-2 (emphasis added).

This  [

]  Therefore, [

NON-CONFIDENTIAL VERSION

]. In such case, Commerce relied on 2020 shipment data that [

].

As discussed below, Commerce relied upon the ITC's OCTG industry practice for purposes of its initiation determination and does so again on remand, and the ITC collects shipment and production data (from mills) and from processors (tolling and non-tolling operations of domestically-produced and imported green pipe) and presents the data separately in OCTG cases. Final Remand Determination at 9-10 (discussing the ITC's OCTG practice from 2014 and 2020 in connections with its analysis of producers and processors). This [

]. In addition, Commerce confirms on remand that it is relying solely on Petitioners' assertions regarding what the data include. Commerce fails to point to any record evidence that actually demonstrates that the *denominator* of the industry support calculation includes complete shipments of U.S. mills and U.S. processors (including imported green pipe that is heat treated in the United States). In the Final Remand Determination, Commerce states that it "requested supplemental information regarding this source {…} in its October 7, 2021, supplemental questionnaire, in which Commerce sought clarification regarding whether all companies identified as U.S. producers in the Petition were accounted for in the domestic shipment data." Final Remand Determination at 11. The specific question Commerce asked of Petitioners on October 7, 2021, only one day after the petition was filed, was:

With regard to the source of data for shipments by the U.S. industry ([
]), do all of the producers listed on pages 3-5 of the Petitions [
]? If not, please identify the producers

**NON-CONFIDENTIAL VERSION**

[                              ] and provide an estimate of the 2020 shipments of each producer.  Provide supporting documentation for any estimates used.

Commerce General Issues Questionnaire at Question 4 (Oct. 7, 2021) (C.R.7/P.R.12).

Petitioners merely asserted that, "as far as Petitioner is aware," the source in Volume I, Exhibit I-2 of the Petitions accounted for all U.S. shipments and [

                                                    ]:

> As far as Petitioner is aware, the [          ] shipment data account for all U.S. shipments of the domestic like product.  [
>
>                                                    ].
>
> …
>
> Given that [
>
>
>                              ], it is reasonable for Petitioner to rely on this data as the best available information regarding the volume of domestic OCTG shipments in the U.S. market in 2020.
>
> Further information on the data [
>
>                              ] at [     ]

Petitioners General Issues Questionnaire Response at 4-5 (Oct. 12, 2021) (C.R.10/P.R.19).

Therefore, Petitioners [

                              ].  There was no further follow up by Petitioners or Commerce.  The record reflects that (1) Petitioners never responded to Commerce's specific question with actual evidence, but only offered their assertion, (2) Commerce failed to follow up with a request that Petitioners provide actual evidence instead of their best guess, and (3) Commerce [                                        ].

In the Final Remand Determination, Commerce defends the absence of record evidence supporting the accuracy of the denominator of the industry support calculation with the assertion that "petitioners responded that, to their knowledge, this data source accounted for all U.S.

**NON-CONFIDENTIAL VERSION**

shipments of the domestic like product and that these data are the best available information regarding the volume of domestic OCTG shipments in 2020." Final Remand Determination at 11-12. Commerce relies solely on Petitioners' mere assertions about their awareness of the accuracy and completeness of data that is uncorroborated by any record evidence, let alone substantial evidence. This falls far short of the Court's remand instructions to provide a further explanation or reconsider whether "the data relied upon accurately reflected industry support." Remand Order at 27.

Further, Commerce also claims that it was appropriate to conclude the "shipment data from this source" included mills and processors shipments because "{n}o party submitted any evidence or argument to detract from this well-established industry source as the reasonable starting point for the denominator of the industry support calculation," and "no interested party claimed that this source data did not reasonably reflect all U.S. producers' domestic shipments of the domestic like product (including green tube finishing operations) *in calendar year 2020*." Final Remand Determination at 12 (emphasis original). Commerce's assertions and failure to point to any corroborating record evidence suggest that Commerce still does not know if the data are accurate.

Moreover, Commerce is simply wrong that "no interested party" challenged its use of the 2020 shipment data. As Tenaris details above in Section II, it made four submissions, and its counsel separately met with Commerce, in order to challenge the use of the combination of 2020 production and shipment data to estimate total U.S. production of the domestic like product, and requested that Commerce poll the industry in order to obtain actual production data. *See* October 21, 2021 Ex Parte Meeting Memo; *see also* Tenaris' October 15, 2021 Comments at 5-9; Tenaris' October 20, 2021 Comments at 6-8; Tenaris' October 22, 2021 Comments at 3-5. Another interested party, TMK, the foreign producer and exporter in the *OCTG from Russia* AD and CVD

investigations, also submitted comments regarding the industry support calculation. *See* Initiation

Checklist at Attachment II at 8 n.58.  As Commerce notes in its Initiation Checklist, TMK likewise

challenged the use of 2020 data, and stated that, "if Commerce determines that 2020 production

data are sufficiently representative of the U.S. OCTG industry, then Commerce should disregard

the petitioners' industry support calculation and poll the industry for 'proper' 2020 production

data."  Initiation Checklist at Attachment II at 12.  Both Tenaris and TMK objected to the use of

the combination of the 2020 production and shipment data at all, as well as the use of shipment

data instead of actual production data.  Finally, and central to this issue, Tenaris also raised

arguments related to the fact that the Petitioners, and the domestic industry, were comprised of

OCTG producers and processors, and the comingling of producer and processor data had

implications for the accuracy of the domestic industry support calculations. *See* Tenaris' October

15, 2021 Comments at 9-10; Tenaris' October 20, 2021 Comments at 8-9; October 21, 2021 Ex

Parte Meeting Memo; Tenaris' October 22, 2021 Comments at 5.

In order to comply with the Court's remand instructions regarding the accuracy of the data

relied upon for purposes of reflecting industry support, Commerce must actually confirm that the

source data in Volume I, Exhibit I-2 of the Petitions include complete mill and processors' data

(including heat treatment of imported green pipe).

> **2.  Commerce Recognizes That the ITC Has Considered That the Domestic OCTG Industry Includes Both Producers (Pipe Formers) And Processors (Heat Treaters), and that Production and Shipment Data for Producers and Processors are Separately Reported**

In connection with its determination to initiate the investigation and, now again, for

purposes of its Final Remand Determination, Commerce continues to rely extensively on the ITC's

past practice as support for its determinations regarding (1) the U.S. OCTG industry (the domestic

industry) and (2) the domestic like product.  Commerce stated:

NON-CONFIDENTIAL VERSION

> Here, we reexamined the administrative record to determine whether companies engaged in OCTG green tube finishing operations (*i.e.*, heat treatment) should be part of the domestic industry. As this evidence shows, in the 2014 OCTG Final, the ITC applied its traditional six factor analysis regarding a firm's U.S. production-related activities and concluded that processors of green tube that provide heat treatment engage in sufficient production-related activities to be considered domestic producers of OCTG. The record also reflects that in subsequent proceedings on OCTG, the ITC consistently included processors of green tube that provide heat treatment as part of the domestic industry.

Final Remand Determination at 9-10 (citing ITC 2014 OCTG Investigation); *see also* Final Remand Determination at 8 n.43 (citing ITC 2020 OCTG Review). Commerce also referred to the 2020 ITC sunset review as support for including Borusan and PTC – both with finishing operations – as part of the domestic industry. Final Remand Determination at 15 n.60 (citing ITC 2020 OCTG Review at I-37); *see also id.* at 8 ("While Commerce is not bound by the criteria used by the ITC to determine the domestic like product in answering this question, we reviewed the ITC's traditional six factors for the domestic like product presented by the petitioners in the Petition"). Commerce also cites to the petition – and OCTG ITC determinations contained therein – for the proposition that "the petitioners did not offer a definition of the domestic like product distinct from the scope of the investigation." Final Remand Determination at 8 & n.43 (citing Petition, Vol. I; ITC 2020 OCTG Review at 7; ITC 2014 OCTG Investigation at 12).

Commerce explained that "{w}hile both Commerce and the ITC must apply the same statutory definition regarding the domestic like product (*i.e.*, section 771(10) of the Act), they do so for different purposes and pursuant to a separate and distinct authority." Final Remand Determination at 8. Commerce further concluded that "{b}ased on our analysis of the information presented by the petitioners, as well as past ITC determinations on OCTG, we concluded that the domestic like product consists of OCTG (including green tube), as defined in the scope of the Petition." Final Remand Determination at 8-9.

NON-CONFIDENTIAL VERSION

Commerce also specifically relied on data from the U.S. OCTG industry from the ITC's 2020 OCTG sunset review to calculate industry support as part of its analysis of whether the petition was "filed by or on behalf of the industry" and whether the Petitions satisfied the 50 percent statutory threshold requirement. *See* Initiation Checklist at Attachment II at 5. In the Initiation Checklist, Commerce referenced the ITC data, stating that, in order to "approximate non-petitioning companies' production from the available shipment data, the petitioners first calculated the historical ratio (2018-2019) of non-petitioning companies' production to shipments derived from data reported in the ITC's *India et al* OCTG 2020 Review and applied the resulting ratio to the estimated non-petitioning companies' shipments in 2020." Initiation Checklist at Attachment II at 5.

The ITC's practice, and Commerce's reliance on that practice, regarding the U.S. OCTG industry, the domestic like product, and the reporting, collection, and presentation of production and shipment data related to the domestic OCTG industry make several points plainly evident.

**First**, certain U.S. companies produce green pipe (form the pipe) and also further process/finish (heat treat, thread, etc.) that pipe in the United States, and certain U.S. companies only further process (heat treat, thread, etc.) pipe that has already been formed.

**_Second_**, *processors in the United States that perform heat treatment do so for both domestically-produced (formed) green pipe and imported green pipe*. *See, e.g.*, ITC 2014 OCTG Investigation at I-24 ("After the forming phase, the pipe body is heat-treated, and its ends upset, threaded and coupled, as needed. U.S. pipe mills typically are equipped with the facilities necessary to perform these processes … Processors and threaders mainly serve imports, since OCTG are often imported with plain ends, and are heat treated, upset, and threaded in the United States"); ITC 2020 OCTG Review at I-30 ("After the forming phase, the pipe body is heat-treated,

21

NON-CONFIDENTIAL VERSION

and its ends upset, threaded and coupled, as needed. U.S. pipe mills typically are equipped with the facilities necessary to perform these processes … Processors and threaders mainly serve imports, since OCTG are often imported with plain ends, and are heat treated, upset, and threaded in the United States").

**Third**, for further processing to be considered part of the U.S. industry production, the pipe must be heat treated, such that, for example, ***the threading of pipe that has already been heat treated would not alone be considered domestic production***.

**Fourth**, *OCTG production data are reported to the ITC separately by the domestic producers (mills that form, and sometime further process, the pipe) and the domestic processors (that heat treat pipe that is already formed).*

**Fifth**, *imported green pipe that is heat treated in the United States is not included in the data reported by U.S. mills, but rather is reported separately as processors data.*

The ITC reports provides important context for evaluating Commerce's ultimate conclusion that:

> the shipment data from this source account for all domestic shipments of the domestic like product (including the appropriate green tube finishing operations) and that, after accounting for the domestic industry's export shipments derived from reasonably available information (including industry-wide data from the ITC's *India et al. OCTG 2020 Review*), the resulting denominator used in the industry support calculation appropriately reflects the entire universe of production of the domestic like product in calendar year 2020.

Final Remand Determination at 12. [



                                                              ]. The [

                                                    ] Petitioners and Commerce relied upon the use of 2020 shipment data as a "reasonable proxy" – which Tenaris consistently opposed – for

total domestic OCTG production data in order to account for missing 2020 production data from the non-petitioning domestic companies and to estimate total U.S. OCTG production data (*i.e.*, total production of the domestic like product) for 2020.

### C.   Plaintiffs Exhausted Their Administrative Remedies

Commerce argues that "Tenaris USA's {double-counting} claim failed to satisfy the requisite exhaustion of administrative remedies."  Final Remand Determination at 5.  Commerce is incorrect and its position is baseless.  As explained in Section III above, the Court's Remand Order recounted arguments advanced by Plaintiffs in the underlying investigation relating to the accuracy of both the numerator and denominator of the industry support calculation, and found that Commerce failed to properly take into account certain arguments so as to ensure that the data relied upon were accurate and that the industry support calculation was accurate.  *See, e.g.*, Remand Order at 4.  The Court remanded for further explanation or reconsideration "Commerce's determination that the ***data relied upon accurately reflected industry support, including whether finishing operations were counted twice***."  Remand Order at 10, 27 (emphasis added).

The record reflects that Tenaris USA repeatedly argued that the comingling of production and processing data had implications for the accuracy of the industry support calculation and therefore requested that Commerce solicit disaggregated data.  *See* Section II above.  Commerce itself emphasized the fact that the U.S. domestic industry and the Petitioners are comprised of both producers (pipe formers) and processors (of formed pipe).  Final Remand Determination at 11 (referring to the industry support calculation "denominator that likewise reflects production of the domestic like product, *including green tube finishing and processing operations*" (emphasis added)).  Therefore, Commerce was clearly also on notice about the fact that the composition of Petitioners and the domestic industry had potential implications for the industry support calculation.  In fact, the record shows that Tenaris specifically notified Commerce that "{t}he

relationship of pipe formation and pipe finishing has implications for any assessment of a domestic OCTG industry given that the percentage of green pipe and plain end imports of OCTG into the United States will vary year to year and may constitute the majority of imports in any given year." Tenaris' October 20, 2021 Comments at 8.

The Court has explained that "{t}he determinative question is whether Commerce was put on notice of the issue, not whether Plaintiff's exact wording below is used in the subsequent litigation." *Trust Chem Co. Ltd. v. United States*, 791 F. Supp. 2d 1257, 1268 & n.27 (Ct. Int'l Trade 2011). Commerce was put on notice by Tenaris of the core issue of "Petitioner's strategy to cobble together the requisite support based on data for a group that also included processors and finishers of OCTG had implications for the accuracy of industry support calculations.'" *See, e.g.*, Remand Order at 5; *see also* Tenaris' October 20, 2021 Comments at 8-9. Indeed, Defendant-Intervenors conceded that the double-counting issue was plainly evident and was before Commerce: "Nor did Commerce need to further consider Tenaris transparent delaying tactic in arguing that Commerce should investigate whether Petitioners double-counted producers with finishing operations, as the allegation had no factual basis." Defendant-Intervenors' Response in Opposition to Rule 56.2 Motion at 23 (Sept. 22, 2023) (ECF Nos. 48, 49).

Finally, the Supreme Court has recognized, "federal courts are vested with a 'virtually unflagging obligation' to exercise the jurisdiction given them" and they "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992) (citations omitted). That admonition is critical here. Ensuring that the statutory requirements for initiating an antidumping investigation are satisfied is fundamental to the agency's statutory mandate and its authority to conduct the investigation, without which there is no legal basis for a final determination or the imposition of

NON-CONFIDENTIAL VERSION

an antidumping duty order.  The consequences of an unlawful initiation, or an initiation that is not supported by substantial evidence, can be irrevocable harm and enormous commercial costs and financial liabilities.

Commerce was provided with clear notice of the potential for distortions to the accuracy of Petitioners' the industry support calculation (*i.e.*, the accuracy of the figures in the numerator and denominator) that stems from a petition supported by producers and processors and the comingling of the producers' and processors' production data.  In this case, Commerce had every opportunity to develop the evidentiary record and to "correct its own mistakes."  *See Apex Frozen Foods Private Ltd. v. United States*, 37 Int'l Trade Rep. (BNA) 1779 (Ct. Int'l Trade 2015) (citing *McCarthy v. Madigan*, 503 U.S. at 145) (stating that the exhaustion rules "give Commerce a chance to 'correct its own mistakes' before being hauled into federal court").  Tenaris USA identified that the comingling of production and processing data had implications for the accuracy of the industry support calculation and asked Commerce to address distortions resulting from the fact that the Petitioners and the domestic industry comprised both producers and processors (*i.e.*, by soliciting disaggregated production and processing data).  Tenaris' October 20, 2021 Comments at 9.

## V.    CONCLUSION

Based on the foregoing, the Court should find that Commerce's Final Remand Determination is not supported by substantial evidence on the record, is not in accordance with law, and does not comply with the Court's remand order and instructions.  In the absence of an initiation that was supported by substantial evidence and consistent with law, there was no legal basis for Commerce's conduct of the investigation, its issuance of a final determination, or the imposition of an antidumping duty order.

NON-CONFIDENTIAL VERSION

Respectfully submitted,


/s/ Gregory J. Spak
Gregory J. Spak
Frank J. Schweitzer
Kristina Zissis
Matthew W. Solomon

**White & Case LLP**
701 Thirteenth Street, N.W.
Washington, D.C.  20005
202-626-3500

*Counsel to Plaintiffs Tenaris Bay City, Inc.,*
*Maverick Tube Corporation, IPSCO Tubulars Inc.,*
*Tenaris Global Services (U.S.A.) Corporation, and*
*Siderca S.A.I.C.*

Dated: July 26, 2024

NON-CONFIDENTIAL VERSION

CERTIFICATE OF COMPLIANCE

I, Gregory J. Spak, certify that the attached brief complies with the word limitation requirement, as stated in the Standard Chambers Procedures.  The word count for the Comments of Plaintiffs Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation, and Siderca S.A.I.C. on Commerce's Final Remand Determination, as computed by the White & Case word processing system (Microsoft Word 2016), is 7,997 words.


/s/ Gregory J. Spak
Gregory J. Spak