## UNITED STATES COURT OF INTERNATIONAL TRADE
### Before the Honorable Claire R. Kelly, Judge

| | |
|---|---|
| TENARIS BAY CITY, INC., MAVERICK TUBE CORPORATION, IPSCO TUBULARS INC., TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION, and SIDERCA S.A.I.C., | ) ) ) ) ) |
| *Plaintiffs*, | ) ) |
| *v.* | ) ) |
| UNITED STATES, | ) |
| *Defendant*, | ) ) |
| *and* | ) ) |
| BORUSAN MANNESMANN PIPE U.S. INC., PTC LIBERTY TUBULARS LLC, UNITED STATES STEEL CORPORATION, UNITED STEEL, PAPER AND FORESTRY, RUBBER MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, and WELDED TUBE USA INC., | ) ) ) ) ) ) ) ) ) |
| *Defendant-Intervenors.* | ) |

**PUBLIC VERSION**

Court No. 22-00343

Business Proprietary
Information Removed from
Pages v, 3–6, 11, 23, 28–32

### DEFENDANT-INTERVENORS' REPLY TO
### PLAINTIFFS' COMMENTS ON THE REMAND REDETERMINATION

Roger B. Schagrin
Luke A. Meisner
Christopher T. Cloutier
Saad Y. Chalchal*

**SCHAGRIN ASSOCIATES**

*Counsel to Borusan Mannesmann Pipe U.S., Inc., PTC Liberty Tubulars LLC, the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded Tube USA, Inc.*

Date: August 26, 2024

Thomas M. Beline
Myles S. Getlan
Sarah E. Shulman
James E. Ransdell

**CASSIDY LEVY KENT (USA) LLP**

*Counsel to United States Steel Corporation*

---

* Admitted only in New York and New Jersey. Practice limited to matters before federal courts and agencies.

1

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. iii

BACKGROUND AND PROCEDURAL HISTORY ......................................................... 2

I.    The Petition's Calculation of Industry Support ................................................. 2

II.    Commerce's Initiation of the Investigation ...................................................... 5

III.   This Court's *Remand Order* ........................................................................... 7

IV.  Commerce's *Remand Redetermination* .......................................................... 8

ARGUMENT .................................................................................................................... 9

I.    Standard of Review .......................................................................................... 9

II.    Commerce's *Remand Redetermination* Complies With the Remand Order, Is Supported By Substantial Evidence, and Is Otherwise In Accordance With Law ............................................................................................................... 10

III.  Plaintiffs' Arguments Do Not Impugn the Accuracy of the Industry Support Calculations and Fail to Demonstrate That Commerce's Explanation On Remand Was Unsupported or Otherwise Unlawful ........................................ 16

    A.    Commerce Acted Within Its Discretion By Not Reopening the Record and Rejecting Plaintiffs' Untimely Filed New Factual Information ......................... 17

    B.    Commerce Sufficiently Addressed the Theoretical Double Counting Concern ................................................................................................... 21

        1.    Addressing the Domestic Like Product Was Necessary for a Fulsome Reconsideration .............................................................. 21

        2.    Commerce Reasonably Explained that Including Green Tube Processing/Finishing in Both the Numerator and Denominator Was Required By Statute and Yielded a Balanced Industry Support Equation .................................................................................... 22

        3.    Plaintiffs Failed to Develop Record Evidence to Support Their Theories About the Inclusion of Minor Processing and Available Evidence Supports Commerce's Conclusion that Minor Processing Was Not Counted as Production ............................................................ 25

    C.    Commerce Reasonably Concluded That the Denominator of the Industry Support Calculations Accurately Reflects Total Production of the Domestic Like Product ............................................................................ 28

CONCLUSION ................................................................................................................ 32

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Camp v. Pitts*,
411 U.S. 138 (1973)...................................................................................................20

*Changshan Peer Bearing Co. v. United States*,
953 F. Supp. 2d 1354 (Ct. Int'l Trade 2014) ...........................................................18

*Coalition of Am. Flange Producers v. United States*,
448 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ...........................................................17

*Consolo v. Federal Maritime Comm'n*,
383 U.S. 607 (1966)....................................................................................13, 17, 30

*Daewoo Elec. Co. v. United States*,
6 F.3d 1511 (Fed. Cir. 1993).....................................................................................25

*Essar Steel Ltd. v. United States*,
678 F.3d 1268 (Fed. Cir. 2012).................................................................................18

*Kyocera Solar, Inc. v. United States*,
253 F. Supp. 3d 1294 (Ct. Int'l Trade 2017) .............................................................9

*Matsushita Elec. Indus. Co. v. United States*,
750 F.2d 927 (Fed. Cir. 1984).............................................................................13, 25

*Nan Ya Plastics Corp. v. United States*,
810 F.3d 1333 (Fed. Cir. 2016).................................................................................25

*Negev Phosphates, Ltd. v. United States*,
699 F. Supp. 938 (Ct. Int'l Trade 1988) ...................................................................13

*New Hampshire v. Maine*,
532 U.S. 742 (2001).............................................................................................16–17

*NSK Ltd. v. United States*,
190 F.3d 1321 (Fed. Cir. 2003).................................................................................26

*Pegram v. Herdrich*,
530 U.S. 211 (2000).............................................................................................16–17

*Pro-Team Coil Nail Enterprise, Inc. v. United States*,
587 F. Supp. 3d 1364 (Ct. Int'l Trade 2022) ...........................................................18

*PT Pindo Deli Pulp and Paper Mills v. United States,*
    825 F. Supp. 2d 1310 (Ct. Int'l Trade 2012) ...................................................................19, 29

*Qingdao Maycarrier Imp. & Exp. Co. v. United States,*
    949 F. Supp. 2d 1335 (Ct. Int'l Trade 2013) ...............................................................................17

*Shandong Rongxin Imp. & Exp. Co. v. United States,*
    203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017) ........................................................................25–26

*Tenaris Bay City, Inc. v. United States,*
    693 F. Supp. 3d 1314 (Ct. Int'l Trade 2024) ................................................................... *passim*

*Timken v. United States,*
    240 F. Supp. 2d 1228 (Ct. Int'l Trade 2002) .............................................................................26

*U.S. Steel Grp. v. United States,*
    96 F.3d 1352 (Fed. Cir. 1996).....................................................................................................13

*Usinor Sacilor v. United States,*
    893 F. Supp. 1112 (Ct. Int'l Trade 1995) ..................................................................................13

*Xinjiamei Furniture (Zhangzhou) Co. v. United States,*
    968 F. Supp. 2d 1255 (Ct. Int'l Trade 2014) ...............................................................................9

*Zenith Elecs. Corp. v. United States,*
    872 F. Supp. 992 (Ct. Int'l Trade 1994) .............................................................................26–27

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i).........................................................................................................9

19 U.S.C. § 1516a(b)(2)................................................................................................................19

19 U.S.C. § 1673a(b)(1)...........................................................................................................20–21

19 U.S.C. § 1673a(c)(4)................................................................................................................19

19 U.S.C. § 1673a(c)(4)(A)...........................................................................................................22

19 U.S.C. § 1673a(c)(4)(B)...........................................................................................................3

19 U.S.C. § 1673a(c)(4)(E)...........................................................................................................21

**Regulations**

19 C.F.R. § 351.203(e)(3)...............................................................................................................3

19 C.F.R. § 351.302(d)(1)(i) ..............................................................................................20

**Federal Register Notices**

*Certain Corrosion-Resistant Steel Products from Italy, India, the People's Republic of
China, the Republic of Korea, and Taiwan*,
    80 Fed. Reg. 37,228 (Dep't Commerce June 30, 2015) ..........................................28

*Multilayered Wood Flooring from the People's Republic of China*,
    76 Fed. Reg. 64,318 (Dep't Commerce Oct. 18, 2011) ...........................................28

[

    ].....................................................................28–29

*Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation*,
    86 Fed. Reg. 60,205 (Dep't Commerce Nov. 1, 2021) ...............................................5

*Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation*,
    87 Fed. Reg. 70,785 (Dep't Commerce Nov. 21, 2022)..............................................6

*Wire Decking from the People's Republic of China*,
    75 Fed. Reg. 32,902 (Dep't Commerce June 10, 2010) ..........................................28

**Other Authorities**

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act,
    H.R. Rep. No. 103-316, vol. 1 (1994)..........................................................................21

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**Before the Honorable Claire R. Kelly, Judge**

| | |
|---|---|
| TENARIS BAY CITY, INC., MAVERICK TUBE CORPORATION, IPSCO TUBULARS INC., TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION, and SIDERCA S.A.I.C., | ) ) ) ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| *v.* | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| *Defendant*, | ) |
| | ) |
| *and* | ) |
| | ) |
| BORUSAN MANNESMANN PIPE U.S. INC., PTC LIBERTY TUBULARS LLC, UNITED STATES STEEL CORPORATION, UNITED STEEL, PAPER AND FORESTRY, RUBBER MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, and WELDED TUBE USA INC., | ) ) ) ) ) ) ) ) |
| | ) |
| *Defendant-Intervenors.* | ) |

**PUBLIC VERSION**

Court No. 22-00343

Business Proprietary Information Removed from Pages v, 3–6, 11, 23, 28–32

**DEFENDANT-INTERVENORS' REPLY TO**
**PLAINTIFFS' COMMENTS ON THE REMAND REDETERMINATION**

Defendant-Intervenors Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC,

United States Steel Corporation, United Steel, Paper and Forestry, Rubber Manufacturing,

Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded

Tube USA Inc. (collectively, "Petitioners") respectfully submit this reply to comments filed by

Plaintiffs Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris

Global Services (U.S.A.) Corporation, and Siderca S.A.I.C. (collectively "Plaintiffs" or

"Tenaris" when excluding only Siderca S.A.I.C.) regarding the remand redetermination issued by

PUBLIC VERSION

the U.S. Department of Commerce ("Commerce") pursuant to the Court's remand in *Tenaris Bay City, Inc. v. United States*, 693 F. Supp. 3d 1314 (Ct. Int'l Trade 2024) ("*Remand Order*").

At issue is Commerce's initiation of the antidumping duty investigation on imports of oil country tubular goods ("OCTG") from Argentina after having determined that the petition was filed by or on behalf of the domestic industry. On remand, in accordance with this Court's instructions, Commerce reexamined all filings submitted to the record during the 20-day pre-initiation period and further explained its conclusion that Petitioners provided reasonably available industry support data that accurately reflected domestic OCTG production in calendar year 2020. *See generally* Final Results of Remand Redetermination Pursuant to Court Remand, dated June 26, 2024, ECF No. 74-1 and 75-1 ("*Remand Redetermination*").

Petitioners support the *Remand Redetermination* and agree with Commerce's explanation that the industry support calculations did not improperly count production by domestic OCTG producers and processors. In their comments,[1] Plaintiffs continue to contest the sufficiency of the industry support data on the record. However, as demonstrated below, the *Remand Redetermination* complies with the remand order, is supported by substantial evidence, and is otherwise in accordance with law. Therefore, the Court should sustain the *Remand Redetermination* and enter judgment for Defendant.

## BACKGROUND AND PROCEDURAL HISTORY

### I.    The Petition's Calculation of Industry Support

On October 6, 2021, a group of four domestic OCTG producers and a union representing U.S. workers at OCTG facilities throughout the United States filed petitions for the imposition of

---

[1]    Plaintiffs' remand comments (ECF Nos. 78 and 79) are hereinafter referred to as "Pls.' Cmts."

antidumping and countervailing duties on imports of OCTG from various countries, including

Argentina. *See* Petition: Volume I, P.R. 2–5 and C.R. 2–5 (Oct. 6, 2021).[2] Petitioners included

information demonstrating that the petition was filed by or on behalf of the domestic industry.

Because information on *total* domestic OCTG production was not reasonably available,

Petitioners followed Commerce's practice in a long line of cases in which domestic shipment

information is accepted as a proxy for unavailable data on domestic production in the industry

support calculations. *Id.* at 5–6. Accordingly, Petitioners submitted data on domestic shipments

of OCTG in 2020 from [                                        ], an industry source considered to be

the recognized authority on the U.S. market for pipes and tubes (including OCTG). *Id.* at 6 and

Exhibit I-2. These domestic shipment data served as a reliable starting point to estimate total

domestic OCTG production with reasonable accuracy, excluding any domestic producers that

neither supported nor opposed the petition, for the denominator in the industry support

calculations.

      Petitioners took a very conservative approach in their calculation of industry support. For

example, the numerator did not include domestic production at non-petitioning mills with

workers represented by the petitioning union, under the assumption that management at those

mills would oppose the petition. *Id.* at 7; *see also* 19 C.F.R. § 351.203(e)(3). Petitioners also

noted that Tenaris' domestic production should be disregarded in the event it opposed the

petition because it imports the subject merchandise and is related to foreign producers of the

subject merchandise, which are conflicts of interest under 19 U.S.C. § 1673a(c)(4)(B). *See*

---

[2] Citations to the public record documents are designated as "P.R." (public investigation record) or "Remand P.R." (public remand record). Citations to confidential record documents containing business proprietary information are designated as "C.R." (confidential investigation record) or "Remand C.R." (confidential remand record).

Petition: Volume I at 8–9. On this basis, Petitioners asserted that supporters of the petition accounted for over 50 percent of total domestic OCTG production by that portion of the industry expressing an opinion. *Id.* at 7 and Exhibit I-3.

Petitioners subsequently addressed comments submitted by Tenaris and amended the petition to revise their industry support calculations in response to questionnaires issued by Commerce. *See* Response to General Issues Questionnaire at 5–8 and Exhibit 8, P.R. 19 and C.R. 10 (Oct. 12, 2021) ("Petitioners' First Questionnaire Response"); Response to Tenaris Submission Concerning Petitioners' Standing at 4 and Attachment 6, P.R. 29 and C.R. 19 (Oct. 18, 2021) ("Petitioners' Standing Rebuttal"); Response to Second General Issues Questionnaire at 4–5 and Exhibit 5, P.R. 32 and C.R. 23 (Oct. 21, 2021) ("Petitioners' Second Questionnaire Response"). In their questionnaire response dated October 12, 2021, Petitioners answered a question from Commerce regarding the completeness of the industry source on domestic OCTG shipments in 2020 with [                                        ], stating that [

                                        ]. *See* Petitioners' First Questionnaire Response at 4–5 and Exhibit 6. Petitioners also demonstrated that shipments are an acceptable proxy for production in this case because the difference between shipments and production in the three most recent calendar years was [      ] with [                                        ]. *Id.* at 3–4. Additionally, in response to Tenaris' initial concerns regarding the inclusion of finishing operations, Petitioners explained that such concerns were misplaced because the industry as a whole and the U.S. International Trade Commission ("ITC") have long recognized that green

tube processors engage in sufficient production-related activities to be considered part of the domestic OCTG industry. *See* Petitioners' Standing Rebuttal at 6–8.

The petition, as amended, relied on an industry support calculation with a numerator based on domestic OCTG production by those supporting the petition (*i.e.*, Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United States Steel Corporation, Welded Tube USA Inc., Wheatland Tube Company, and [                    ]) and a denominator based on an estimate of total domestic OCTG production using domestic shipment data published in [                              ] and [

                                                        ]. *See*

Petitioners' Second Questionnaire Response at Exhibit 6. The result of this calculation methodology showed that the petition satisfied the statutory 50 percent industry support requirement. *Id.* In fact, after making these revisions, the level of support was [

                              ] the industry support calculations in the originally filed

petition.

## II.    Commerce's Initiation of the Investigation

On October 26, 2021, Commerce initiated the investigation within its 20-day statutory deadline. *See Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation*, 86 Fed. Reg. 60,205 (Dep't Commerce Nov. 1, 2021) (initiation). Commerce determined that the domestic like product was coextensive with the scope, which includes finished and unfinished OCTG (including green tube), and that both OCTG production *and* green tube processing constitute domestic production that should be included in the industry support calculations. *See* Initiation Checklist Attachment II at 2–3 and 14, P.R. 40 and C.R. 26 (Oct. 26, 2021). In calculating industry support, Commerce found that polling the industry was unnecessary because

Petitioners provided reasonably available domestic shipment data and other documentation that Commerce could rely on to approximate domestic OCTG production in 2020. *Id.* at 4–8 and 13–19. Commerce accepted the petition's revised calculations that showed supporters of the petition accounted for [      ] percent of domestic production, with a numerator representing the actual OCTG production by those supporting the petition (*i.e.*, [              ]) and a denominator representing an estimate of total domestic OCTG production by the industry as a whole [

              ] (*i.e.*, [                    ]). *Id.* at 4–8 and n.53. Commerce also devised an alternative calculation methodology with [       ] estimate of total domestic OCTG production in the denominator (*i.e.*, [                    ]), which showed that supporters of the petition nevertheless accounted for [      ] percent of domestic production. *Id.*

Under either method, the petition satisfied the statutory 50 percent industry support requirement. Commerce noted that Tenaris did not submit any evidence or argument to impugn [                              ] domestic shipment data that were used as the basis for the denominator in the industry support calculations. *Id.* at 15. Commerce also explained that the calculations were conservative because the denominator assumed that all non-petitioning domestic producers opposed the petition, despite the fact that the petitioning union represented workers at non-petitioner facilities and only Tenaris formally opposed but did not submit its own production data in any of its four pre-initiation filings. *Id.* at n.53 and 21. Put differently, even when assuming and overstating the maximum possible level of opposition, the petition satisfied the statutory 50 percent industry support requirement. Accordingly, Commerce initiated the investigation that later resulted in an affirmative determination of sales made at less-than-fair value and the imposition of antidumping duties on OCTG imports from Argentina. *See Oil*

*Country Tubular Goods from Argentina, Mexico, and the Russian Federation*, 87 Fed. Reg.

70,785 (Dep't Commerce Nov. 21, 2022) (antidumping order). Plaintiffs subsequently filed this

action to contest Commerce's industry support finding and concomitant decision to initiate the

investigation.

### III.    This Court's *Remand Order*

On appeal, the Court rejected most of Plaintiffs' challenges to Commerce's finding that

the supporters of the petition accounted for more than 50 percent of domestic OCTG production

in 2020 by that portion of the industry expressing support for or opposition to the petition.

Specifically, the Court held that Commerce reasonably found there were no exceptional

circumstances that warranted an extension of the pre-initiation period by an additional 20 days.

*See Remand Order*, 693 F. Supp. 3d at 1324–25. The Court also held that Commerce acted

within its discretion under the statute when it decided not to poll the industry and instead rely on

other information regarding the OCTG market in 2020 to determine industry support for the

petition. *Id.* at 1320–24. Having sustained Commerce's overall approach, however, the Court

concluded that the agency failed to address Plaintiffs' concern regarding potential "double

counting" (*i.e.*, counting twice OCTG that is manufactured by a domestic producer and then

finished by a domestic processor) and "record evidence indicating that certain domestic

companies both produce and finish OCTG, leading to the inference that some domestic pipe may

have been double counted in the industry support calculations." *Id.* at 1326–28. The Court

explained that "Commerce may have reasons to reject this inference; however, it must

acknowledge consideration of such evidence and explain why it nonetheless rejects the

inference." *Id.* at 1327. Accordingly, the Court remanded "Commerce's determination that the

data relied upon accurately reflected industry support, including whether finishing operations

were counted twice, … for further explanation or reconsideration." *Id.* at 1328.

## IV.    Commerce's *Remand Redetermination*

After reexamining all filings submitted to the record during the 20-day pre-initiation

period, Commerce released its draft redetermination which further explained its conclusion that

Petitioners provided reasonably available industry support data that accurately reflected domestic

OCTG production in calendar year 2020. *See* Draft Results of Redetermination Pursuant to Court

Remand, Remand P.R. 1 (May 28, 2024). Petitioners submitted comments in support of the draft

redetermination, and Plaintiffs submitted comments opposing the draft redetermination. *See*

Petitioners' Comments on Draft Remand Redetermination, Remand P.R. 2 (June 4, 2024);

Plaintiffs' Comments on Draft Results of Redetermination Pursuant to Court Remand, Remand

P.R. 3 and Remand C.R. 1 (June 4, 2024).

Commerce did not reopen the record on remand and no party asked Commerce to do so.

Consistent with its regulations, Commerce rejected Plaintiffs' comments on the draft

redetermination that included untimely new factual information (*i.e.*, references to pages in prior

ITC determinations that were not previously submitted to the record of the proceeding). *See*

Rejection of Tenaris's Comments on Draft Results of Redetermination, Remand P.R. 4 (June 7,

2024). Commerce gave Plaintiffs two options—either resubmit the comments with specific

citations showing that the factual information already exists on the record or redact all references

to the non-record information. *Id.* Implicitly acknowledging that the information did not exist on

the administrative record, Plaintiffs complied by refiling a redacted version of their comments.

*See* Plaintiffs' Resubmission of Comments on Draft Results of Redetermination Pursuant to

Court Remand, Remand P.R. 6 and Remand C.R. 2 (June 10, 2024).

After considering the comments submitted by Petitioners and Plaintiffs, Commerce
issued its remand redetermination and maintained its position that the decision to initiate the
investigation was supported by substantial evidence and in accordance with law because: (1) the
domestic industry is comprised of both domestic OCTG producers *and* processors/finishers of
green tube that provide heat treatment; (2) the record did not mandate inferring that the inclusion
of finishing operations double counted production in the industry support calculations, (3)
support was not overstated as finishing operations were included in both the numerator and the
denominator; and (4) the record evidence specific to petitioners Borusan Mannesmann Pipe U.S.
Inc. ("Borusan") and PTC Liberty Tubulars LLC ("PTC Liberty") showed that they each operate
facilities that primarily produce OCTG and that are equipped to finish the OCTG that they
produce. *See Remand Redetermination* at 4–17. Commerce also addressed additional arguments
made by Plaintiffs, which Commerce found to be unpersuasive. *Id.* at 18–25.

## ARGUMENT

## I.     Standard of Review

The standard of review requires that the Court sustain any determination, finding, or
conclusion by Commerce unless it is "unsupported by substantial evidence on the record, or
otherwise not in accordance with law" 19 U.S.C. § 1516a(b)(1)(B)(i). This standard applies
equally to remand redeterminations. *See Kyocera Solar, Inc. v. United States*, 253 F. Supp. 3d
1294, 1305 (Ct. Int'l Trade 2017) (applying the same standard of review for a less-than-fair-
value investigation to a remand redetermination). Remand redeterminations are also reviewed for
compliance with the Court's remand order. *See Xinjiamei Furniture (Zhangzhou) Co. v. United
States*, 968 F. Supp. 2d 1255, 1259 (Ct. Int'l Trade 2014).

**II.    Commerce's *Remand Redetermination* Complies With the Remand Order, Is Supported By Substantial Evidence, and Is Otherwise In Accordance With Law**

As discussed above, the Court generally approved of Commerce's methodological approach to the industry support analysis but could not conclude that Commerce's decision to initiate the investigation was supported by substantial evidence because of a procedural misstep—namely, that Commerce inadequately addressed whether the calculation accurately reflected industry support in light of "record evidence indicating that certain domestic companies both produce and finish OCTG, leading to the inference that some domestic pipe may have been double counted in the industry support calculations." *Remand Order*, 693 F. Supp. 3d at 1326. The Court therefore remanded the matter for Commerce to address one issue: whether support for the petition satisfied the statutory minimum for initiation in light of specific record evidence that *could* be interpreted to support an inference that double counting affected Commerce's industry support calculations.

In accordance with the Court's instructions, Commerce reexamined all filings submitted to the record during the 20-day pre-initiation period and further explained its conclusion that Petitioners provided reasonably available industry support data that accurately reflected domestic OCTG production in calendar year 2020 and did not improperly count production by domestic producers and processors. Commerce began its analysis by noting that Tenaris had not raised any concerns with "double counting" that distorted the level of support in the numerator of the calculations in any of its four pre-initiation filings to the agency. *Id.* at 5. Rather, Tenaris argued in its pre-initiation filings that processing operations in their entirety should be excluded from the industry support calculations. *Id.* at 5–7. Nonetheless, Commerce further explained its industry support finding in light of the Court's concerns with potential double counting of finishing operations and the overall accuracy of the underlying data.

As a threshold matter, Commerce continued to find that the record supports defining the domestic like product to include all OCTG, whether finished or unfinished (including green tube), and that the domestic industry is comprised of both domestic OCTG producers *and* processors/finishers of green tube that provide heat treatment. *Id.* at 7–10. Plaintiffs characterize this portion of Commerce's discussion as "superfluous" because "there is no disagreement about …the domestic like product{.}" Pls.' Cmts. 9. However, Commerce correctly observed that the definition of the domestic like product determined the universe of producers that make up the domestic industry and, in this way, is integral to Commerce's analysis of whether supporters of a petition satisfy the statutory 50 percent industry support requirement. *See Remand Redetermination* at 7–8 and 19. Commerce reaffirmed its original finding that the record supports defining the domestic like product as OCTG (including unfinished green tube and finished OCTG) and that the domestic industry consists of OCTG producers *and* processors/finishers of green tube that provide heat treatment. *Id.* at 8–11. As explained, defining the domestic industry to include finishing operations is consistent with Commerce's decisions in other cases and prior ITC determinations involving OCTG that date back to at least 2014. *Id.* at 10.

While Petitioners had access to data on their own OCTG production in 2020 and provided these data for use in the numerator of the industry support calculations, Commerce recognized that data on *total* domestic OCTG production in 2020 for use in the denominator were not reasonably available to Petitioners. Instead, Petitioners demonstrated to Commerce's satisfaction that [                    ], a "well-established industry source," offered data on domestic shipments of OCTG in calendar year 2020 that served as a reliable and accurate proxy for domestic production. *Id.* at 11–12 (citing Petitioners' First Questionnaire Response at

4–5). Commerce therefore continued to rely on the industry publication's data on domestic shipments as the starting point for the denominator in the industry support calculations. *Id.* Commerce then made certain adjustments (*e.g.*, adding export shipments based on 2018–2019 industry data from the ITC's then-most-recent sunset review), ultimately yielding a denominator that "appropriately reflects the entire universe of production of the domestic like product in calendar year 2020." *Id.*

Commerce explained that the inclusion of data for finishing operations ensures that the industry support calculations account for total production of the domestic like product and that concerns regarding alleged double counting in the numerator were misplaced for several reasons. First, nothing on the record suggested that domestic producers engaged in both production and processing counted each pipe they produced twice or that domestic processors counted their heat treatment as production when the green tube was manufactured by another domestic producer. *Id.* at 13. Second, the inclusion of green tube finishing operations does not overstate support in the numerator because such production is included in both the numerator *and* the denominator. *Id.* at 13–14 and n.57. This means that the "inclusion of green tube finishing or processing operations, in addition to OCTG production, results in a larger denominator, which yields a more conservative calculation of industry support{.}" *Id.* at 13. Third, and finally, the record evidence showed that petitioners PTC Liberty and Borusan operate facilities in Texas that primarily produce OCTG and that are equipped to finish the OCTG that they produce. *Id.* at 14–16.

In its opinion, the Court reasoned that Commerce needed to address certain record evidence that *could* lead to an inference that OCTG may have been double counted in the industry support calculations. *See Remand Order*, 693 F. Supp. 3d at 1326–28. The Court referenced two specific pieces of record evidence. First, the Court stated that printouts of select

12

pages from Borusan's and PTC Liberty's websites indicated that each company produces and

finishes OCTG. *Id.* at 1326. Second, the Court highlighted that PTC Liberty was not identified as

a domestic OCTG producer in the ITC's then-most-recent recent sunset review and this may

suggest that PTC Liberty only finishes OCTG. *Id.* at 1326–27. According to the Court, this

record evidence "leads to the reasonable inference … that there may be pipe that was counted for

the purposes of industry support when it was produced and again when it was finished." *Id.* at

1327.

However, the Court was careful not to compel Commerce to adopt such an inference.

This is because it is within Commerce's discretion as the fact-finder to assign greater or lesser

weight to the evidence. *See U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir.

1996); *Usinor Sacilor v. United States*, 893 F. Supp. 1112, 1123 (Ct. Int'l Trade 1995) (citing

*Negev Phosphates, Ltd. v. United States*, 699 F. Supp. 938, 953 (Ct. Int'l Trade 1988)).

Commerce is also entitled to draw reasonable inferences from the record. *See Matsushita Elec.*

*Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Under the standard of review,

"the possibility of drawing two inconsistent conclusions from the evidence does not prevent an

administrative agency's finding from being supported by substantial evidence." *Consolo v.*

*Federal Maritime Comm'n*, 383 U.S. 607, 620 (1966). Here, while the Court observed that it

might be reasonable to infer from the record that the industry support calculations could double

count production when domestic processors finished pipe manufactured by a domestic producer,

the Court also acknowledged that "Commerce may have reasons to reject this inference."

*Remand Order*, 693 F. Supp. 3d at 1327. After reexamining the record evidence on remand,

Commerce rejected the theoretical double counting inference. *See Remand Redetermination* at

14–16. Instead, Commerce found that the record reasonably supported the inference that Borusan

and PTC Liberty are OCTG producers and discerned nothing in the record to compel the conclusion that they double counted their production simply because their facilities are also equipped to finish the OCTG they produce.

Commerce explained that the ITC's then-most-recent sunset review supports the understanding that PTC Liberty is a domestic OCTG producer. *Id.* at 14–15 (citing Petitioners' First Questionnaire Response at 1 and Exhibit 1, which contains an excerpt from *Oil Country Tubular Goods from India, Korea, Turkey, Ukraine, and Vietnam*, Inv. Nos. 701-TA-499–500 and 731-TA-1215–1216, 1221–1223 (Review), USITC Pub. 5090 (July 2020) ("USITC Pub. 5090")). Table I-7 on page I-37 of the ITC publication lists the locations of each domestic OCTG producer's production facilities. As Commerce found, PTC Liberty operates assets previously owned by Boomerang Tube. *Id.* at 15. The Liberty, Texas and Houston, Texas production facilities attributed to Boomerang Tube in the ITC's sunset review match the production facilities listed in the "Our Facilities" section of PTC Liberty's company website. *See* Tenaris' Comments on Petitioners' Standing at Exhibit 6, P.R. 23 and C.R. 13 (Oct. 15, 2021) ("Tenaris' Oct. 15 Comments").

Additionally, Commerce found that PTC Liberty's and Borusan's company websites showed that they primarily produce OCTG at their U.S. facilities. *See Remand Redetermination* at 15–16. PTC Liberty's website states that it "produces highly engineered" OCTG and operates two production facilities focused on OCTG production. *Id.* (citing Tenaris' Oct. 15 Comments at Exhibit 6). While PTC Liberty's production facilities are equipped to process and finish OCTG, nothing in these materials indicates that PTC Liberty heat treated green tube that was manufactured by a different domestic producer and then double counted that processing as production in calendar year 2020. If anything, the fact that the Houston facility is used "to

process overflow production from {PTC Liberty's} Liberty, Texas plant" indicates that PTC Liberty produces and finishes its own OCTG. *Id.* As Commerce explained, that "a company produces OCTG and has processing capabilities does not mean that it double counted its OCTG production for purposes of providing its own actual production for inclusion in the Petition, nor does it follow that the data from these companies must be inherently flawed." *Id.* at 13.

A similar analysis applies to the evidence pertaining to Borusan, whose website states that it "produces OCTG casing in a variety of sizes, weights and grades" at its Baytown, Texas facility with an annual production capacity of 300,000 tons. *Id.* at 16 (citing Tenaris' Oct. 15 Comments at Exhibit 5). Borusan's website also states that it processes and finishes OCTG at the same facility; however, the green tube is imported from Borusan's Gemlik facility in Türkiye and is not sourced from another domestic producer. *Id.* The fact that Borusan heat treats *imported* green tube eliminates the potential for double counting because, as recognized by the Court in its decision, the only scenario in which OCTG production could theoretically be counted twice is if a domestic processor heat treats green tube sourced from another domestic producer. *Id.* at 13. As instructed by the Court, Commerce reexamined the evidence on the record regarding petitioners PTC Liberty and Borusan (*i.e.*, the only information cited by Tenaris to support its double counting claim) and drew the reasonable inference that PTC Liberty and Borusan did not double count their production and processing of OCTG. Therefore, Commerce concluded that the numerator accurately reflected industry support for the petition.

\*    \*    \*

For all of these reasons, Commerce sufficiently addressed the Court's concerns and reasonably explained that the data relied upon for the numerator and denominator of the calculation accurately reflected industry support. As Commerce explained, no record evidence

demonstrates that the inclusion of producers and processors resulted in so-called "double counting" of OCTG production or otherwise inappropriately skewed the industry support calculations. The Court should sustain the *Remand Redetermination* because it complies with the remand order, is supported by substantial evidence, and is otherwise in accordance with law.

## III. Plaintiffs' Arguments Do Not Impugn the Accuracy of the Industry Support Calculations and Fail to Demonstrate That Commerce's Explanation On Remand Was Unsupported or Otherwise Unlawful

The theoretical double counting concern that was raised in Plaintiffs' opening brief and occasioned remand implicates the level of industry support in the numerator of the industry support calculations. *See* Pls.' Rule 56.2 Mot. J. Agency R. 27, ECF No. 40 (theorizing that "Petitioners' calculations of *their own production* and/or shipments might include data that pertain to mere finishing operations of Petitioners…." (emphasis supplied)); *Remand Order*, 693 F. Supp. 3d at 1326–27 (discussing evidence that might be construed as indicative of issues in production data of certain petition supporters). However, Plaintiffs challenge both the numerator *and* the denominator in their remand comments. Plaintiffs have taken the Court's remand instruction as an opportunity to raise new arguments, including arguments that conflict with their earlier position. *See Remand Redetermination* at 20.

Up until this point, Plaintiffs have fixated on the perceived need to *exclude* certain finishing operations from both the numerator and the denominator of the industry support calculations. *See* Pls.' Rule 56.2 Mot. J. Agency R. 27 (criticizing the "accept{ance of} data that treats processed pipe as 'production'" and "consider{ation of} minor finishing of imported pipe to be 'domestic production'"). In an obvious about face, Plaintiffs now take the position that certain finishing operations (*i.e.*, heat treatment) have not been adequately *included*. The rule of "{j}udicial estoppel generally prevents a party from prevailing in one phase of a case on an

argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)).

Regardless, Plaintiffs' arguments fail to satisfy the high bar of demonstrating that Commerce's industry support finding is unsupported by substantial evidence. Plaintiffs rely on their own interpretation of the record evidence in an attempt to impugn the accuracy of the industry support data. However, it is Commerce's role as fact-finder to "make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence." *Coalition of Am. Flange Producers v. United States*, 448 F. Supp. 3d 1340, 1354 (Ct. Int'l Trade 2020) (quotations and citation omitted). The Court may not disturb Commerce's choice between two reasonable interpretations of the evidence, as the substantial evidence standard allows for "the possibility of reaching two inconsistent conclusions from the evidence." *Consolo*, 383 U.S. at 620 (1966). "An alternative interpretation of the evidence, by itself, is insufficient to undermine Commerce's conclusion." *Qingdao Maycarrier Imp. & Exp. Co. v. United States*, 949 F. Supp. 2d 1335, 1343 (Ct. Int'l Trade 2013).

As further discussed below, Plaintiffs' belated arguments fall far short of demonstrating that Commerce's explanation on remand was inadequate or otherwise unlawful.

A.    **Commerce Acted Within Its Discretion By Not Reopening the Record and Rejecting Plaintiffs' Untimely Filed New Factual Information**

In their comments, Plaintiffs repeatedly express their disapproval of how Commerce conducted the remand proceeding. Specifically, Plaintiffs claim that Commerce failed to comply with the remand order and suggest that Commerce was *required* to reopen the record on remand because "the record of the investigation does not contain the information necessary to separate production resulting from processing that includes heat treatment versus processing that includes

only threading." Pls.' Cmts. 11. This claim is without merit. The Court did not hold that there was an informational gap that could only be remedied by collecting new information. In fact, in sustaining Commerce's decision not to poll the industry, the Court held that Commerce's reliance on the record evidence of domestic shipments and production to determine industry support was in accordance with law. *Remand Order*, 693 F. Supp. 3d at 1322–23.

The Court stated the following: "Commerce's determination that the data relied upon accurately reflected industry support, including whether finishing operations were counted twice, is remanded for further explanation or reconsideration." *Id.* at 1328. Nothing in the *Remand Order* required Commerce to reopen the record on remand. The Court seldom includes such an instruction. That is because Commerce has significant discretion in deciding whether to reopen the record in a remand proceeding. *See Changshan Peer Bearing Co. v. United States*, 953 F. Supp. 2d 1354, 1362 (Ct. Int'l Trade 2014) (citing *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012)). Here, there was no need to reopen the record because the record compiled during the pre-initiation period was sufficient to address the Court's concerns with potential double counting and the overall accuracy of the industry support data, in compliance with the *Remand Order*.

An instruction to reopen the record on remand is the exception rather than the rule. The Court has explained that it will not require Commerce to reopen the record "simply based on a plaintiff's argument that better information is available" because "{i}t is incumbent upon parties to provide relevant information in accordance with the agency's procedures and deadlines." *Pro-Team Coil Nail Enterprise, Inc. v. United States*, 587 F. Supp. 3d 1364, 1374 (Ct. Int'l Trade 2022). Petitioners satisfied their burden of submitting reasonably available data to demonstrate that the statutory industry support requirements have been met. Plaintiffs had every opportunity

during the pre-initiation period to submit any data that they believed more accurately measured industry support for the petition. Plaintiffs repeatedly failed to do so. As the Court explained, "Plaintiffs did not offer their own production data to undermine Commerce's reliance on shipment data, nor did they challenge the authoritative basis from which the selected shipment data was derived." *Remand Order*, 693 F. Supp. 3d at 1323.

Plaintiffs would rather have more precise domestic OCTG production data on the record that differentiate between heat treatment and other types of finishing operations, assuming such data even existed and were reasonably available when the petition was filed. But Plaintiffs' mere preferences are immaterial to the statutory standard of review. Substantial evidence on the record supports Commerce's conclusion that the industry support data on the record accurately reflect production of the like product by the domestic industry, which is comprised of OCTG producers and processors/finishers of green tube that provide heat treatment. There is no direct evidence on the record that undermines Commerce's conclusion. As Commerce explained, "{t}he fact that the industry data is not perfect is not sufficient to suggest that Petitioners do not have industry standing" and "the industry standing calculations are not meant to be exact and proxies are routinely used to estimate the amount of U.S. production of a particular product." *Remand Redetermination* at 22 (quoting *PT Pindo Deli Pulp and Paper Mills v. United States*, 825 F. Supp. 2d 1310, 1327–28 (Ct. Int'l Trade 2012)). The statute at 19 U.S.C. § 1673a(c)(4) does not require the level of precision that Plaintiffs ask the Court to compel. Plaintiffs also claim that Commerce erred by focusing its analysis on evidence related to PTC Liberty and Borusan; however, Commerce did so because the record (including Tenaris' pre-initiation submissions) is limited to information pertaining to those two companies. *See Remand Redetermination* at 17 and 19–20; *see also* Tenaris' Oct. 15 Comments at Exhibit 5 and Exhibit 6.

Plaintiffs similarly complain that the references to prior ITC reports in their initial comments on the draft remand redetermination should not have been rejected. *See* Pls.' Cmts. 6. They suggest that Commerce's rejection was arbitrary because Commerce also relied on portions of the same ITC reports to support its explanation on remand. *Id.* However, Plaintiffs fail to mention that Commerce relied on pages from these ITC reports that Petitioners timely placed on the record in the pre-initiation period. Conversely, Plaintiffs' comments on the draft remand redetermination contained untimely new factual information because they referenced pages from the ITC reports that were not on the record. *See* Rejection of Tenaris's Comments on Draft Results of Redetermination at 1–2. In addition, Plaintiffs' comments on the draft remand redetermination included references to a 2022 ITC report, a document that Commerce does not rely on at all – and could not have relied on, as it was published more than one year after the initiation of the investigation. *Id.* Commerce's rejection of the information was thus in accordance with its regulations. *See* 19 C.F.R. § 351.302(d)(1)(i). Despite the fact that the rejected information is not on the record, Plaintiffs continue to include references in their comments before the Court. *See* Pls.' Cmts. 11, 21. Even though the information in no way undermines Commerce's analysis, the Court should disregard Plaintiffs' references to non-record information because judicial review is limited to the administrative record before Commerce. *See* 19 U.S.C. § 1516a(b)(2); *see also Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("{T}he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

Moreover, Commerce's decision not to reopen the record and its rejection of Plaintiffs' untimely new factual information are consistent with the discretion afforded to the agency by the governing statute and legislative history. The petition is required to contain reasonably available

data to demonstrate industry standing. *See* 19 U.S.C. § 1673a(b)(1). The statute provides that those who would qualify as interested parties may submit comments or information on the issue of industry support *before* Commerce decides whether to initiate an investigation. *See id.* § 1673a(c)(4)(E). In addition, the statute prohibits Commerce from revisiting the issue of industry support after initiation. *See id.* The Statement of Administrative Action accompanying the Uruguay Round Agreements Act further explains that "the question of industry support will be resolved conclusively at the outset of a proceeding, thereby eliminating the burden on petitioners under current law of potentially rearguing this issue after initiation." H.R. Rep. No. 103-316, vol. 1, at 862, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4192. Although Commerce's industry support finding may be subject to judicial review, the statutory text and the legislative history clearly expect parties to submit all data relevant to the issue of industry support in the pre-initiation phase and that Commerce will analyze industry support based on the record compiled at that time. As Commerce explained, "the pre-initiation record is not mercurial or fluid once a decision is made to initiate an investigation" because, if that were the case, "after every initiation there would be an endless loop of litigious claims that new data and information have become available, such that Commerce must reexamine its decision to initiate." *Remand Redetermination* at 24. Thus, Commerce reasonably exercised its discretion in deciding not to reopen the record on remand and in rejecting Plaintiffs' untimely new factual information.

### B.    Commerce Sufficiently Addressed the Theoretical Double Counting Concern

#### 1.    *Addressing the Domestic Like Product Was Necessary for a Fulsome Reconsideration*

Plaintiffs incorrectly assert that Commerce misunderstood the double counting concern described by the Court in its *Remand Order* because Commerce included a "superfluous" discussion regarding the domestic like product—an aspect of Commerce's determination that is

not being challenged. *See* Pls.' Cmts. 8–9. The Court, however, ordered Commerce to reconsider or further explain its determination that the data it relied upon accurately reflected industry support. As Commerce explained, this analysis necessarily begins with the definition of the domestic like product. *See Remand Redetermination* at 7–11 and 19. This is because the statute frames industry support in terms of the proportion of production of the domestic like product that is attributable to supporters of the petition. *See* 19 U.S.C. § 1673a(c)(4)(A). Thus, Commerce must define the domestic like product before it can identify the members of the domestic industry. In its reevaluation of industry support in the *Remand Redetermination*, Commerce began by revisiting the evidence on the record regarding the domestic like product and concluded that the domestic like product consists of finished and unfinished OCTG (including green tube). From this, Commerce determined that the domestic industry is composed of all domestic OCTG producers and OCTG processors that engage in sufficient production-related activities (*i.e.*, processors/finishers that provide heat treatment). These preliminary steps informed Commerce's understanding that the industry support calculations are accurate if they appropriately account for production by OCTG producers and processors/finishers of green tube that provide heat treatment, *i.e.*, the industry as a whole. Contrary to Plaintiffs' assertion, Commerce's domestic like product discussion shows that it understood the Court's instructions and undertook a fulsome reconsideration in response.

          2.    *Commerce Reasonably Explained that Including Green Tube Processing/Finishing in Both the Numerator and Denominator Was Required By Statute and Yielded a Balanced Industry Support Equation*

Plaintiffs next take issue with Commerce's use of mathematical equations to explain that the inclusion of finishing operations does not overstate the numerator in the industry support calculations. *See* Pls.' Cmts. 9–10. Because the domestic industry includes domestic OCTG

processors/finishers of green tube that provide heat treatment, Commerce was required to include

heat treatment processing/finishing operations in the industry support calculation. Plaintiffs

concede as much elsewhere in their brief. *Id.* at 13. Commerce thus included production of the

domestic like product by supporters of the petition in the numerator and included production of

the domestic like product by *all* domestic OCTG producers and processors that heat treat green

tube. *See Remand Redetermination* at 13–14. Commerce reasoned that the inclusion of green

tube processing in the numerator and the denominator appropriately balanced both sides of the

equation. To illustrate, Commerce provided the following equation as an example:

$$\frac{A + B}{A + B + C + D}$$

*Id.* at 14 n.57 (A = supporters' production, B = supporters' processing/finishing, C = all others'

production, D = all others' processing/finishing). Plaintiffs object because, in their view,

"Commerce's statement that the inclusion of the same pipe in the numerator and the denominator

would be 'canceled out' would be correct *only if the ratio were 1:1*." Pls.' Cmts. 10 (emphasis in

original). They proffer a hypothetical example that removes one ton of production in both the

numerator and the denominator to show that doing so would result in a different percentage of

industry support. *Id.* But Plaintiffs' results-oriented arithmetic is untied to actual data in the

record and incorrectly implies that the inclusion of processing/finishing was optional.

Plaintiffs misunderstand Commerce's logic. The numerator represents production by

*supporters* of the petition and the denominator represents production by *all producers* of the

domestic like product that either support or oppose the petition [

                              ]. *See Remand Redetermination* at 13 ("{T}he record indicates that

{the} denominator includes the finishing or processing operations of *all* U.S. producers who

processed green tube and/or produced OCTG."). Unless the entire domestic industry expresses

either support or neutrality regarding a petition, the numerator will necessarily be a subset of the production reflected in the denominator. Here, Petitioners do not purport to account for *every* ton of green tube that has been heat treated and processed into finished OCTG. Thus, contrary to Plaintiffs' misleading mathematical example,[3] Commerce was not referring to "the same pipe" in the numerator and denominator, *see* Pls.' Cmts. 10, but rather "supporters' green tube processing" in the numerator and "supporters' green tube processing" *plus* "all other U.S. producers' green tube processing" in the denominator. *See Remand Redetermination* at 14 n.57.

As Commerce explained, "inclusion of green tube finishing or processing operations {for the entire domestic industry}, in addition to OCTG production, results in a larger denominator" and "the larger the denominator, the smaller the share that supporters of a petition have," resulting in overall lower industry support. *Id.* at 13–14. To the extent that green tube processing/finishing by petition supporters increased the numerator, that amount is, as Commerce put it, "canceled out" or counterbalanced by the inclusion of the same green tube processing/finishing in the denominator. *Id.* at 14 n.57 ("B" in the numerator is balanced by "B" in the denominator). In other words, "the inclusion of green tube processing yields a result where the supporters account for a *smaller* overall share of total U.S. production than they would if

---

[3] Plaintiffs' mathematical example relies on the unsupported assumption that only petition supporters had processing-based OCTG production. A far more reasonable and evidence-based assumption is that non-petitioner processors accounted for some additional production of the domestic like product, given that "{p}rocessors…mainly serve imports." Petition: Volume I at 16 (USITC Pub. 5090 at I-30). Mathematically expressed, adding two tons of OCTG to the numerator to account for supporting OCTG processors and three tons of OCTG to the denominator to account for both petitioning *and* non-petitioning OCTG processors would transform a "9/10" (90%) ratio to a lower "11/13" (84.6%) ratio. Regardless, Commerce was required by statute to include domestic like product production—which includes heat treatment OCTG processing—in the industry support calculations. Excluding such production was never a lawful option.

green tube processing were not included in the calculation." *Id.* at 14 n.57.[4] Thus, Commerce's mathematical logic is sound and further supports its conclusion that the inclusion of finishing operations, as required by statute, balances the industry support calculations as the universe of products in the numerator and the denominator match.

        3.     *Plaintiffs Failed to Develop Record Evidence to Support Their Theories About the Inclusion of Minor Processing and Available Evidence Supports Commerce's Conclusion that Minor Processing Was Not Counted as Production*

       Plaintiffs argue that the data Commerce relied upon are too imprecise and contend that, in response to a "potential distortion" theorized by Plaintiffs, Commerce was obligated to take additional steps "to confirm that the production by processors included {in} its industry support calculation reflects only processing that constitutes OCTG production (*i.e.*, heat treatment) rather than minor processing that does not result in OCTG production (*e.g.*, threading)." Pls.' Cmts. 10–11. Plaintiffs ask this Court to demand more than the substantial evidence standard requires. The substantial evidence standard asks "whether the evidence *and reasonable inferences from the record*" support the agency's conclusion. *Daewoo Elec. Co. v. United States*, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (quoting *Matsushita*, 750 F.2d at 933) (emphasis added). Commerce defined the domestic industry to include domestic producers as well as domestic processors that

---

[4] Plaintiffs did not argue before Commerce in the remand proceeding that petition supporters accounted for more OCTG processing/finishing than other members of the domestic industry and identify no record evidence of any such disparity. *See* Plaintiffs' Resubmission of Comments on Draft Results of Redetermination Pursuant to Court Remand at 12–16. Plaintiffs also have not made the argument in their comments to the Court, which are a near verbatim copy of their comments on Commerce's draft redetermination. *See* Pls.' Cmts. 9–13. Plaintiffs have thus both failed to exhaust their administrative remedies and also waived the argument. *See Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1350 (Fed. Cir. 2016). Regardless, as established *supra*, Commerce was required to include all domestic like product production, including heat treatment processing/finishing, in assessing industry support. Therefore, the petition supporters' relative share of production of a particular product, whether high or low, has no bearing on the accuracy of the industry support calculations.

provide heat treatment in addition to any other processing. *See Remand Redetermination* at 7–11. The record evidence indicated that domestic OCTG producers, including PTC Liberty and Borusan, were capable of performing the full range of production and processing themselves, as "U.S. pipe mills are typically equipped with the facilities necessary to perform heat-treatment, end upsetting, threading, and coupling." *Id.* at 15–16 and n.71.

Plaintiffs identified *zero* evidence on the record to demonstrate that Commerce's industry support calculations count minor processing as domestic like product production. *See Remand Redetermination* at 20. Plaintiffs' mere speculation regarding the potential inclusion of minor processing does not constitute evidence of any actual distortion in the industry support calculations. *See id.* at 22; *see also NSK Ltd. v. United States*, 190 F.3d 1321, 1328 (Fed. Cir. 2003); *Timken v. United States*, 240 F. Supp. 2d 1228, 1236 (Ct. Int'l Trade 2002). The record evidence in fact points in the opposite direction and thus supports Commerce's conclusion. Commerce cited record evidence, specifically the ITC's then-most-recent OCTG publication, for the proposition that domestic mills could perform their own heat treatment, in addition to more minor processing. *Remand Redetermination* at 16 n.65 and 17 n.71. The same page in the ITC publication established that "{p}rocessors and threaders mainly serve *imports*" (emphasis added), suggesting that the chance of domestic double-counting were minimal. *See* Petition: Volume I at 16 (citing USITC Pub. 5090 at I-30). The only two producers specifically addressed by Plaintiffs fit this pattern, as both PTC Liberty (on its own OCTG) and Borusan (OCTG imported from Türkiye) perform heat treatment, not only minor processes. *See Remand Redetermination* at 15–16 (discussing Tenaris' Oct. 15 Comments at Exhibit 5 and Exhibit 6). The Court should reject Plaintiffs' belated demand for data that disaggregate production and processing to prove a wholly speculative negative – *i.e.*, that the industry support data do not

include minor processing – in an improper attempt to assign Commerce the burden of proof to rebut the Petitioners' standing. *Cf. Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1341 (Ct. Int'l Trade 2017) (citing *Zenith Elecs. Corp. v. United States*, 872 F. Supp. 992, 996 (Ct. Int'l Trade 1994)) (explaining that the evidentiary burden falls on the party challenging standing).

Additionally, as noted by Commerce, Plaintiffs acknowledged that "there are clear principles regarding the U.S. OCTG industry, the domestic like product, and the reporting, collecting, and presentation of production and shipment data." *Remand Redetermination* at 23; *see also* Plaintiffs' Resubmission of Comments on Draft Results of Redetermination Pursuant to Court Remand at 24–25. Before the Court, Plaintiffs similarly assert that it is "plainly evident" from the long history of proceedings involving OCTG that processing counts as production if the pipe is heat treated and that domestic processors report their production based on the volume of pipe that they have heat treated. *See* Pls.' Cmts. 21–23. Commerce explained that "{t}he existence of these clear principles in fact supports Commerce's conclusion" because it is known throughout the industry that heat treatment processing is considered production, but not threading alone, and the petitioning companies engaged in the production of OCTG "have participated in multiple investigations and reviews at the ITC, where they were required to report data according to these principles." *Remand Redetermination* at 23. Commerce had no reason to suspect that the industry support data in this case – including the data specific to PTC Liberty and Borusan – suddenly deviated from the way domestic producers and processors have reported OCTG production over the years in many proceedings. This, too, supports Commerce's evidence-based inference that any processing other than heat treatment was not counted as

production and the potential inclusion of minor processing as domestic production is an

unsubstantiated theory.

### C.    Commerce Reasonably Concluded That the Denominator of the Industry Support Calculations Accurately Reflects Total Production of the Domestic Like Product

Plaintiffs contend that the denominator of the industry support calculations does not

accurately reflect total production of the domestic like product because, in their view, the record

"does not establish that the industry source used to derive the denominator reflects all domestic

shipments of OCTG from both U.S. mills *and* U.S. processors." Pls.' Cmts. 13–14. The industry

source in question is [                              ] included in the petition. *See* Petition:

Volume I at Exhibit I-2. As an initial matter, Commerce generally finds that official government

statistics and data from industry publications are reliable and credible sources of information.

*See, e.g.*, *Multilayered Wood Flooring from the People's Republic of China*, 76 Fed. Reg. 64,318

(Dep't Commerce Oct. 18, 2011), and accompanying Issues and Decision Memorandum at 61

(explaining reliance on official statistics from Philippines Forest Management Bureau to value

plywood factor of production); *Wire Decking from the People's Republic of China*, 75 Fed. Reg.

32,902 (Dep't Commerce June 10, 2010), and accompanying Issues and Decision Memorandum

at 15–16 (explaining reliance on prices from American Metals Market as benchmark for wire

rod). In the past, Commerce has relied on industry sources similar to [

] for purposes of measuring industry support. *See Certain Corrosion-Resistant Steel*

*Products from Italy, India, the People's Republic of China, the Republic of Korea, and Taiwan*,

80 Fed. Reg. 37,228, 37,230 (Dep't Commerce June 30, 2015) (stating that domestic shipment

data from the American Iron and Steel Institute were used to estimate domestic production).

Here, Petitioners explained that [                              ] is "{t}he recognized authority

on the U.S. pipe and tube market." Petition: Volume I at 6. Commerce has relied on data from this industry source to [                                                                    ]. *See* [



                                                                    ]. Thus, Commerce

acted in accordance with its practice and reasonably found [                                    ] to

be a reliable and credible source for data on domestic shipments of OCTG in 2020.

      This Court has held that "perfection" is not the standard applicable to industry support

analyses. *See PT Pindo*, 825 F. Supp. 2d at 1327–28. Plaintiffs' remaining arguments fail to

demonstrate that Commerce's reliance on [                                    ] to derive the

denominator in the industry support calculations was unsupported by substantial evidence.

Plaintiffs erroneously state that there is no corroborating record evidence that the industry source

accounted for all domestic OCTG shipments (including mills and processors). *See* Pls.' Cmts.

13–15, 17–18. In fact, [                                              ], which state that [

                                              ] support

Commerce's characterization of that source as "well-established" and [                    ]. *See*

*Remand Redetermination* at 12 and n.56 (citing Petitioners' First Questionnaire Response at 4–

5); Initiation Checklist Attachment II at 14 and nn.31–32 (citing same and other sources). More

specifically, Commerce cited evidence that the industry source [



                                              ]

Petitioners' First Questionnaire Response at Exhibit 6 (cited by Initiation Checklist Attachment

II at 14 n.41). The industry source [


]. The industry source also [



]. *Id.*

These uncontested facts on the record strongly indicate that the industry source's data accurately

reflect all domestic shipments of OCTG in 2020 and corroborate Commerce's conclusion.

Finally, Plaintiffs' remand comments claim that [




]. *See* Pls.' Cmts. 15–16. There is

no support for Plaintiffs' expedient reading of [          ], and even if it were reasonable,

Commerce's contrary conclusion would not thereby be rendered unreasonable. *See Consolo*, 383

U.S. at 620. The full text of [          ] is as follows:

    [

                                                    ]

Petition: Volume I at Exhibit I-2. Plaintiffs maintain that this [



] Pls.' Cmts. 15. However, as Commerce explained, [



]. *See Remand Redetermination* at 20–21; *see also* Petition: Volume I at Exhibit

I-2. Plaintiffs otherwise note that [

]. *See* Pls.'

Cmts. 15. Even assuming, *arguendo*, that [

], it nevertheless

supports Commerce's conclusion.

Commerce generally "reexamined the record with respect to this exhibit." *Remand*

*Redetermination* at 15. [

] Petition: Volume I at Exhibit I-2. The [

]. *Id.* The [

] *Id.* (emphasis supplied). Plaintiffs misconstrue [

]. *Id.* Plaintiffs' reading of [

]. First, facilities with the ability to produce and process OCTG

may be referred to as mills. *See, e.g.*, Petition: Volume I at Exhibit I-11 (USITC Pub. 5090 at I-

30) ("After the forming phase, the pipe body is heat-treated, and its ends upset, threaded and

coupled, as needed. U.S. pipe mills typically are equipped with the facilities necessary to

perform these processes."). Second, if [

]. Indeed, insofar as evidence on the record shows

that OCTG, regardless of the source, is primarily sold through distributors, *see* Petition: Volume

I at 21 (citing USTIC Pub. 5090), [

]. Thus, the only reasonable reading

of [                                        ] supports Commerce's conclusion that the

industry source accounted for domestic shipments by domestic mills *and* domestic processors.[5]

<u>**CONCLUSION**</u>

For the foregoing reasons, Commerce's *Remand Redetermination* complies with the

remand order, is supported by substantial evidence, and is otherwise in accordance with law.

Accordingly, Petitioners respectfully request that the Court sustain the *Remand Redetermination*.


Respectfully submitted,


| | |
|---|---|
| /s/ Roger B. Schagrin | /s/ Thomas M. Beline |
| Roger B. Schagrin | Thomas M. Beline |
| Luke A. Meisner | Myles S. Getlan |
| Christopher T. Cloutier | Sarah E. Shulman |
| Saad Y. Chalchal[*] | James E. Ransdell |

SCHAGRIN ASSOCIATES
*Counsel to Borusan Mannesmann Pipe U.S., Inc., PTC Liberty Tubulars LLC, the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded Tube USA, Inc.*

CASSIDY LEVY KENT (USA) LLP
*Counsel to United States Steel Corporation*

Date: August 26, 2024

---

[5] Other record evidence supports Commerce's conclusion. Tenaris submitted data published by the American Iron and Steel Institute ("AISI") indicating that the domestic industry had total shipments of 957,000 short tons of OCTG in 2020. *See* Tenaris' Oct. 15 Comments at Exhibit 4. The fact that the domestic shipment data published by AISI are [
                                                                                       ] indicates that the AISI data are limited to shipments by mills and the [                        ] data reflect shipments by domestic mills and domestic processors that heat treat green tube into finished OCTG.

[*] Admitted only in New York and New Jersey. Practice limited to matters before federal courts and agencies.

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief contains 9,474 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in this Court's Chamber's Procedures. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

Dated: August 26, 2024                    /s/ Roger B. Schagrin
                                                           Roger B. Schagrin

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**Before the Honorable Claire R. Kelly, Judge**

| | |
|---|---|
| TENARIS BAY CITY, INC., MAVERICK TUBE CORPORATION, IPSCO TUBULARS INC., TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION, and SIDERCA S.A.I.C., )<br><br>*Plaintiffs,* )<br><br>*v.* )<br><br>UNITED STATES, )<br><br>*Defendant,* )<br><br>*and* )<br><br>BORUSAN MANNESMANN PIPE U.S. INC., PTC LIBERTY TUBULARS LLC, UNITED STATES STEEL CORPORATION, UNITED STEEL, PAPER AND FORESTRY, RUBBER MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, and WELDED TUBE USA INC., )<br><br>*Defendant-Intervenors.* ) | Court No. 22-00343 |

## <u>ORDER</u>

Upon consideration of the U.S. Department of Commerce's Final Results of Redetermination Pursuant to Court Remand, ECF Nos. 74-1 and 75-1, the comments opposing the remand redetermination, the responses thereto filed in support of the remand redetermination, the administrative record, all other papers and proceedings herein, and upon due deliberation, it is hereby

**ORDERED** that the remand redetermination is sustained; and it is further

**ORDERED** that judgment is entered in favor of the United States.

**SO ORDERED**.

_____
Honorable Claire R. Kelly, Judge
U.S. Court of International Trade

Dated: _____, 2024
      New York, New York